## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-----------------------------------------------------------------X

| | | |
|---|---|---|
| **JANE DOE,** | : | **Civ. No. _____** |
| | : | |
| **Plaintiff,** | : | |
| | : | **COMPLAINT** |
| -against- | : | |
| | : | |
| **WESLEYAN UNIVERSITY,** | : | **JURY TRIAL** |
| | : | **DEMANDED** |
| | : | |
| **Defendant.** | : | |

-----------------------------------------------------------------X

Plaintiff Jane Doe[1] (hereinafter referred to as "Plaintiff" or "Jane"), by her attorneys Warshaw Burstein, LLP, and Needles, Zardes & Cooper, P.C., as and for her Complaint, respectfully alleges as follows:

### NATURE OF THIS ACTION

1.      Jane is a former student at Wesleyan University ("Wesleyan") who was falsely accused of cheating during two summer courses taught by Professor Andrea Roberts ("Roberts").

2.      Jane was an "A" student in Roberts's classes prior to these false allegations.

3.      Despite technological evidence indicating that it was impossible for Jane to have cheated as Roberts alleged, Wesleyan found Jane responsible for repeatedly accessing online course materials during Roberts's exams.

4.      During the course of the investigation, hearing, and sanctioning process, Wesleyan withheld exculpatory evidence in its sole possession, custody, and control.

5.      Wesleyan also refused to meaningfully consider additional exculpatory evidence provided by Jane's expert.

---

[1] Plaintiff has filed, contemporaneously with this Complaint, a Motion to proceed pseudonymously.

6.    In order to prove her innocence, Jane offered her cell phone to Wesleyan without knowing what they could possibly find on it. But Wesleyan declined to review it.

7.    Wesleyan, with the pre-conceived goal of preserving the Moodle system and with callous disregard for her known disability, rubber-stamped Roberts's false allegations of cheating despite witnesses, technological evidence, and expert testimony in Jane's favor and in the face of evidentiary irregularities that were never resolved.

8.    Rather than providing the support that it previously promised to Jane, Wesleyan forced a nineteen-year-old student with a disability to combat the full force of its administration alone and misinformed.

9.    As detailed further below, Wesleyan did not provide Jane with the objective process or fundamental fairness promised in its student handbook.

10.   Wesleyan failed to exercise reasonable care to install, implement, and administer Moodle, its university-wide online course material database.

11.   Accordingly, Jane brings this action against Wesleyan for breach of contract, negligence, promissory estoppel, negligent misrepresentation, negligent and intentional infliction of emotional distress, reckless and wanton misconduct, breach of fiduciary duty, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA").

## THE PARTIES

12.   Jane is a natural person residing in New York, New York.

13.   Wesleyan is a private liberal arts college located in Middletown, Connecticut.

14.   Jane and Wesleyan are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because Jane and Wesleyan are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

16.     Jane is a citizen of the State of New York.

17.     Wesleyan is a citizen of the State of Connecticut.

18.     Wesleyan is a Connecticut corporation with its principal place of business in Middletown, Connecticut.

19.     This Court has personal jurisdiction over Wesleyan on the grounds that Wesleyan is conducting business within the State of Connecticut.

20.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

21.     Jane suffers from developmental coordination disorder, a neurodevelopmental disorder that significantly impairs her fine motor skills.

22.     Jane's disability is not readily apparent.

23.     With hard work and the support of accommodations granted to her under the Americans with Disabilities Act ("ADA"), Jane earned excellent grades and standardized test scores throughout high school.

24.     Jane applied to Wesleyan and was accepted to the class of 2020.

25.     Jane chose to attend Wesleyan, in part, because of its reputation for justice, fairness, and community.

26.     Jane declined acceptance offers from other colleges and universities in order to attend Wesleyan.

## I.     Wesleyan's Representations to Jane

### A. The Student Handbook And Wesleyan Honor Code

27.     Upon her acceptance, Wesleyan provided Jane with copies of its school policies, including the Student Handbook (the "Handbook").

28.     The Handbook establishes, among other things, Wesleyan's responsibilities to its students; the Wesleyan Honor Code (the "Code"); what constitutes a violation of the Code; and identifies an Honor Board to conduct hearings for alleged violations of the Code.

29.     The Honor Board consists of a voting membership of four undergraduate students and an advisory membership of at least one faculty member and the dean for academic advancement (or a designee).

30.     The general rights Wesleyan promises to give its students include "The right to abstain from performing acts and the right to be protected against actions that may be harmful to the health or emotional stability of the individual or that degrade the individual or infringe upon his/her personal dignity," and "The right to be protected by standards of justice and fairness in any proceedings with the University."

31.     With respect to the Honor Board's advisory membership, the Handbook states that:

> The role of the faculty and administrative advisor(s) is to brief the board before each hearing to ensure a clear understanding of the regulation(s) in question and of the hearing procedures. The advisor(s) shall advise the chair during hearings to see that the board follows procedures correctly. The advisors may offer information and assist the chair in facilitation. They may also offer advice or clarification regarding appropriate sanctions or questions regarding policies and procedures during deliberations in closed session.

32.     With respect to Honor Board hearings, the Handbook guarantees that:

4

All judicial hearings shall be conducted in accordance with the standards of fair process.

33.     Moreover, with respect to Honor Board hearings, the Handbook affirmatively states that:

The board may require the cooperation of any member of the university community in furnishing testimony or evidence directly related to the adjudication of a case.

34.     According to the Handbook, the Honor Board's "decisions regarding responsibility shall be based on the evidential standard of 'fair preponderance.' The board is responsible for determining if it is more likely than not that the alleged violation occurred."

35.     According to the Handbook, the "The Honor Board shall receive evidence, hear witnesses, determine if a reported student(s) is responsible for violation(s) of the Honor Code, and shall recommend sanctions to the dean for academic advancement."

36.     Under the Handbook, a reported student's rights include the "[o]pportunity to review the reports that serve as the basis for the charge(s)", "[a]ssistance from an advisor", and "[c]onfidentiality regarding the outcome of their hearing (except for the reporting party's right to be informed of the board's decision) and of any subsequent appeal."

37.     With respect to hearing procedures, "[a]ll parties involved in the hearing may review available written evidence in the case file before the hearing" and "[a]ll judicial hearings shall be conducted in accordance with the standards of fair process. Specifically, the accused student should be informed of the nature of the charges against him/her, be given a fair opportunity to refute them, and be given the opportunity to appeal the board's decision."

38.     Additionally, if an appeal of an Honor Board decision is granted, the Wesleyan Appeals Board orders "a new hearing before a new board/panel."

39.     Wesleyan assures its students that "No punitive action may be taken by a faculty

member or university official with respect to an alleged violation of the Honor Code unless fair process is followed."

40.     According to the Handbook, students have a right to "[w]ritten notice of the results of hearings and appeals."

**B.  Class Dean Statements At Freshman Orientation**

41.     At Wesleyan's freshman orientation in the fall of 2016, students and families, including Jane and her parents, were introduced to "class deans" who, they were informed, would act as trusted advisors and resources in the Wesleyan "community."

**II.     Moodle**

42.     Moodle is a free and open-source learning management system.

43.     On or about September 10, 2010, *The Wesleyan Argus*, the University's student-run newspaper, printed an article titled "University Switches to Easier, Cheaper Moodle." The article noted that:

> Moodle bears no price tag except for the burden it places upon the ITS [Information Technology Services] department. In contrast, Blackboard, which will be phased out this year, cost the University just under $50,000 – about $42,000 was used for Blackboard itself and about $6,000 for an add-on that included blogs and other additional features.

44.     As one Wesleyan professor interviewed for the article stated, "[i]t's pretty similar in terms of what it does . . . For me, it was more a matter of using something like Moodle that is open source and free, or pay $50,000."

**III.     Roberts's False Accusations**

45.     Jane began her first year at Wesleyan in the fall of 2016.

46.     Upon her enrollment at Wesleyan, Jane registered her disability with Accessibility Services and was entitled to certain accommodations, including extra time for her

exams, which were to be taken separate and apart from other students.

47.     During her freshman year, Jane maintained a 3.4 GPA on a full and challenging course load, focusing on classes that would satisfy her pre-med requirements.

48.     In an effort to advance her studies, Jane took three summer courses taught by Roberts:

        a.     Introductory Chemistry I ("CHEM 141"), between May 29 and July 1, 2017.

        b.     Introductory Chemistry II ("CHEM 142"), between July 6 and August 4, 2017.

        c.     The lab course for CHEM 141 and CHEM 142.

49.     She diligently attended all of Roberts's classes and study sessions while regularly meeting with Roberts during her office hours.

50.     Jane earned a grade of "A" in CHEM 141 and found herself excelling in chemistry so much that she informally tutored other students in her class and seriously considered majoring in chemistry.

51.     Recognizing Jane's aptitude and dedication, Roberts asked Jane to serve as her teaching assistant for a chemistry course in the fall of 2017.

52.     On August 4, 2017 Jane took her final exam in CHEM 142 and returned home to enjoy a brief break with her family before returning to Wesleyan for her sophomore year.

53.     Jane was thrilled to have successfully completed her first year at college and eagerly looked forward to a promising future at Wesleyan and beyond.

54.     That all changed on the morning of Friday, August 6 when Jane was copied on an email from Roberts.

55.     Roberts also copied Dean David Phillips ("Phillips"), Jane's class dean at Wesleyan.

56.     Roberts's August 6 email attached two letters reporting Jane to the Honor Board.

57.     The first letter, dated August 4, 2017, related to CHEM 141 and falsely accused Jane of cheating by using Moodle during exams on June 14th, June 21st, June 28th, and June 29th.

58.     In the opening paragraph of her first letter, Roberts wrote: "[Jane] is entitled to 50% extra time to complete tests and to do so in a completely separate room. As we have several students with accommodations in this course, it was not possible to have a proctor in the room for the entire time that [Jane] was completing her exams."

59.     The letter continued: "On August 4th, I looked through the activity logs on the Moodle page for the CHEM 141 course. I found during the final exam on Thursday, June 29th, [Jane] logged into the Moodle page fourteen times beginning at 12:20pm with the last login occurring at 12:51pm."

60.     Roberts's first letter went on to state that Jane "logged into the Moodle site four times during the allotted time period on June 14th, eighteen times on June 21st and thirty-five times on June 28th."

61.     Roberts authored a second letter dated August 4, 2017, related to CHEM 142 that falsely accused Jane of cheating by using Moodle during exams on July 12th, July 19th, July 26th, August 2nd, and August 4th.

62.     Roberts's second letter noted that "[o]n Friday, August 4th, the final exam was administered . . . [Jane] was entitled to four and a half hours. The final exam was administered from 9:00am until noon, with [Jane] being permitted until 1:30 to complete the exam."

8

63.     Roberts shockingly alleged, "I found that [Jane] logged into the Moodle page at 9:11am and continued to do so throughout the entire exam . . . [accessing] the course website sixty-six times during the final exam."

64.     Roberts went on to accuse Jane of accessing Moodle "twice during the allotted time period on July 12th, once during that time on July 19th, twice on July 26th, and twice during the exam on August 2nd."

65.     Jane never accessed Moodle during Roberts's exams

66.     Jane never accessed course materials during Roberts's exams.

67.     Jane never even touched her cell phone during Roberts's exams.

68.     Jane did not take an exam for one of Roberts's classes on June 29th.

69.     Roberts did not administer an exam for any class that Jane was enrolled in on June 29th.

70.     Furthermore, a review of the Moodle webpages Jane allegedly accessed during exams demonstrates that a vast majority of the pages contained questions but no answers.

71.     None of the pages contained problems or answers to the exams Jane was actually taking.

72.     The CHEM 141 and CHEM 142 exams all consisted of complicated chemistry problems requiring multiple pages of handwritten solutions and answers.

73.     In light of Jane's neurodevelopmental disorder, repeatedly accessing Internet webpages on her iPhone, allegedly up to sixty-six times during one exam, would have left Jane with no time to actually complete the chemistry problems on the exam.

74.     Jane was able to complete and submit her exams in less than the time allotted.

75.     Roberts's statement that there was no one to proctor the exams was false.

9

76.     During the summer of 2017, a chemistry graduate student (the "TA") served as Roberts's teaching assistant and proctor.

77.     TA's duties included conducting study sessions and administering and monitoring exams.

78.     He frequently entered Jane's exam room unannounced, and Jane took several of the exams in question in a room with a large glass window that gave TA a clear view of Jane throughout the entire exam.

79.     Contrary to Roberts's statements, all of her exams *were* monitored.

80.     On August 4th, TA observed Mary Moe[2], a CHEM 142 student taking the exam in another classroom, with her cell phone out and reported Mary's behavior to Roberts.

81.     Meanwhile, Roberts's accusations against Jane were based entirely on Moodle activity logs, not any eyewitness account.

82.     During the summer of 2017 Roberts used and administered Moodle for CHEM 141 and CHEM 142, informing students that she:

> Maintain[s] a Moodle site that archives a variety of course-related information. Important announcements will be posted as well as copies of the current problem sets, practice exams and exams with solutions **as they become available**. The . . . site also lists links to other relevant sites. Students will have access to their recorded grades throughout the course. (Emphasis added.)

83.     In each and every instance, the answers to exams administered in CHEM 141 and CHEM 142 were only made available **after** Jane took the exam.

84.     Moodle purports to log every "movement" of every user logged in who accesses the website. "Moodle logs" purport to show the user identification, date, time, IP address, and action taken (i.e., page accessed) for every "click" on each specific webpage.

---

[2] Mary Moe" is a pseudonym. Plaintiff will identify students by pseudonyms to protect their confidentiality. Wesleyan knows the identity of all of the students so identified.

85.     Notably, the Moodle logs Roberts submitted to support the accusations against Jane do not identify which time zone is applied to the time stamps.

86.     Instead of submitting Jane's entire log history in CHEM 141 and CHEM 142, Roberts selected and highlighted only certain portions of logs.

87.     Roberts did not submit the entire log history for other students in CHEM 141 and CHEM 142 for purposes of comparison.

88.     Roberts's selective submission of evidence impeded Jane's ability to prepare for her hearing.

89.     In addition to accusing Jane of cheating on a non-existent June 29 exam, Roberts either did not highlight or entirely excluded portions of the Moodle logs that raise questions regarding the accuracy of the Moodle logs.

90.     For example, Roberts failed to highlight or reference entries that show Jane accessing a document titled "File: CHEM 141 - Administrative Information - updated May 29th" on "05/27/17, 19:13" and a document titled "File: Problem Set #4 - updated 6-23-17" on "06/21/17, 23:15," **despite the impossibility of Jane accessing these documents two (2) days before they existed**.

91.     Roberts had control over the implementation and administration of Moodle and Moodle logs for her courses.

92.     Wesleyan had control over the implementation and administration of Moodle and Moodle logs on a university-wide basis.

93.     Jane had no access to the complete set of Moodle logs available to Roberts.

94.     Jane had no access to the complete set of Moodle logs available to Wesleyan.

95.     Jane had no knowledge of the extent of the Moodle logs available to Roberts and

Wesleyan.

96.     Jane had no means of knowing there was a more complete version of the Moodle logs than those submitted by Roberts prior to her first hearing.

97.     Certain that there must be some mistake, Jane and her mother contacted Jane's class dean, Phillips.

98.     During her phone conversation with Phillips, Jane immediately and unequivocally denied cheating.

99.     Jane also told Phillips how emotionally distressed she was by the allegations.

100.     Jane's disciplinary record was spotless until Roberts's false accusations.

101.     Jane's mother asked Phillips whether the family should seek legal counsel, to which Phillips responded that Wesleyan's process was "quasi-judicial", "not a lawyer type of thing", and "not a kangaroo court."

102.     Phillips further assured Jane and her mother that Wesleyan's Information Technology Services ("ITS") would answer any "technical questions" they may have and that the Honor Board process was undertaken very "seriously and deliberately."

103.     Phillips further informed Jane and her mother that he had previously served as the Honor Board's administrative advisor for several years and volunteered to serve as Jane's advisor.

104.     Based on Phillips's statements and Wesleyan's professed commitment to justice and critical inquiry, Jane reasonably believed that Phillips would fairly guide her on the Honor Board process; that Wesleyan would conduct a competent impartial investigation and fair hearing; and that the truth mattered as much to Wesleyan as it did to her.

105.     A series of emails amongst key Wesleyan administrators, investigators, and

adjudicators directly involved in Jane's case reveal that Phillips's statements were false.

106.    The Honor Board's clerk, Lorna J. Scott ("Scott") was "in the process of wrapping up loose ends" to leave Wesleyan "in a month's time" when Jane's case landed on her desk in August 2017.

107.    Scott had no formal education in computer science.

108.    Scott only had access to Roberts's version of events when she repeatedly communicated to key investigators and administrators that Jane was "obviously" guilty and that there was "some urgency" to investigate and "resolve[]" Jane's case "as soon as possible" because Jane "could be suspended."

109.    On August 7, Scott wrote to Roberts, in part, "[i]t is so unfortunate that you have to deal with this situation! Since **these rather blatant violations will undoubtedly have an impact on [Jane]'s fall semester**, we will aim at reviewing this case as soon as we can." (Emphasis added.)

110.    Later on August 7, Scott wrote to Roberts, again noting:

I just chatted with [Jane's] class dean David Phillips, and our advisor to the [Honor] Board Louise Brown, and we all concluded that we should get some feedback from ITS about [Jane's] accessing the Moodle files. She is maintaining that she did not access the files during the exam, and suggested some other possibilities – like her phone automatically refreshing the site which was previously accessed before the exam, etc. ITS will be able to tell us in no uncertain terms whether or not her device could have somehow been logged on to Moodle without her knowing it. **This seems unlikely, but it is best for all of us that we make sure we have answers about this before the hearing.** So we are going to postpone the hearing a bit until we can have ITS review the logs. Is there any other information we can give ITS when they look into this? (Emphasis added.)

111.    Dean Louise Brown ("Brown") was an influential member of the panel that would determine Jane's fate.

112.    Brown is no longer employed at Wesleyan.

113.    Before Wesleyan's investigation of Roberts's allegations against Jane was completed, Scott stated to Brown that any suggestion that Jane did not cheat "seems unlikely."

114.    At the same time that she prematurely proclaimed Jane's guilt, Scott led Jane to believe that Wesleyan would investigate the allegations against her impartially and in good faith.

115.    On August 8, Scott sent Jane an email stating:

> I spoke a bit with Dean Phillips yesterday about your situation, and he mentioned that you'd be willing to have ITS research why it appeared that you were logged into Moodle's various answer keys and course info at the time of the exams. Would you be able to send me the address (IP address?) and number of your cell phone so ITS can compare it to what they find on Moodle? **This will help all of us clarify exactly what happened.** (Emphasis added.)

116.    Assured that Wesleyan would seek the truth with impartiality, Jane immediately provided the information Scott requested, writing in an email to Scott: "Yes, let's figure out what happened . . . I would also like to speak with ITS, especially if there is any information I can provide them. As you may know, I am beside myself and would like to figure out what happened as soon as possible."

## III.    Wesleyan Conducts a Flawed, Incomplete, and Biased "Investigation" into Roberts's Accusations

117.    Thereafter, Wesleyan turned to Rachel N. Schnepper ("Schnepper"), its Director of Academic Technology, to investigate Roberts's assertions regarding the Moodle log activity.

118.    Schnepper started working at Wesleyan, her eighth employer in fewer than 13 years, in July 2017.

119.    Schnepper received a B.A. from Vassar College in Religion, with a minor in Women's Studies, and a Ph.D. from Rutgers University's History Department, with a major in Early Modern Europe and a minor in Global/Comparative History.

14

120.     Schnepper taught history courses at various universities after she was awarded her Ph.D.

121.     Schnepper has no formal education or training in information technology.

122.     Schnepper has no formal education or training in computer forensics.

123.     Schnepper has no formal technical or computer-based certificates or certifications.

124.     Despite her lack of relevant education, training, and experience, Wesleyan determined that Schnepper was the best person to investigate serious cheating allegations in a case that Phillips, a Wesleyan dean with years of experience advising the Honor Board, described as the "most technically complicated" he had ever encountered.

125.     On August 8, 2017, Roberts emailed Schnepper, Scott, and another member of Wesleyan's ITS department stating, "I am sure that you have already done this or even know it a priori, but I decided to do a search of the IP address that [Jane] provided to Lorna [Scott]. Attached please find screen shots of various books that describe that particular IP address."

126.     Roberts's August 8, 2017 email attempted to cast suspicion on Jane before any evidence was presented.

127.     Yet, the screenshots that Roberts attached indicated that Jane's cell phone was located in Rome, Italy based upon its IP address.

128.     Schnepper confirmed that, based on Jane's IP address, Jane was in Italy.

129.     At the time Schnepper made her finding that she was in Italy, Jane was at home in New York.

130.     Jane had not been to Italy since she was ten years old.

131.     At the time Schnepper made her finding that Jane was in Italy, Schnepper and

Roberts were or should have been aware that Jane was at her home in New York.

132.     Neither Schnepper nor Roberts questioned why Roberts's research placed Jane's cell phone IP address in Italy.

133.     Instead of confirming Jane's actual location, Schnepper stated:

While [Jane] may be in Italy now, her laptop [sic] was not on August 4th. And, as Andrea [Roberts] suggested earlier, [Jane] seems to have a poor grasp of how ip addresses work. Neither her cell phone nor her laptop (or any internet accessing device) have [sic] a permanent IP address. It will change depending on how and where the internet is being accessed, so her current IP address is fairly meaningless.

134.     On August 9, 2017, Schnepper wrote an email to Roberts, Scott, and another member of Wesleyan's ITS department in which she focused on the August 4, 2017 exam and wrote "[a]t 12:41, the user accessed Moodle again from a cellphone, this time on an AT&T cellular network . . . and then again nine minutes later, back on Wesleyan internet, this time from a laptop registered to [Jane]."

135.     Schnepper continued that:

[t]he Moodle logs clearly demonstrate, however, that Moodle was being accessed from Wesleyan during the time of the exam. The only other plausible explanation, I believe, to explain this use of Moodle is that someone else is using [Jane]'s Wesleyan username and password to access Chem 142 content on Moodle. And while that is possible, I find it highly unlikely.

136.     On August 9, 2017, after Schnepper completed her "investigation", Wesleyan formally charged Jane with violating Sections B(1) and B(5) of the Honor Code during exams administered in CHEM 141 on June 14 (4 times), June 21 (18 times), June 28 (35 times), June 29 (14 times) and in CHEM 142 on July 12 (2 times), July 19 (1 time), July 26 (2 times), August 2 (2 times), and August 4 (66 times). In total, Wesleyan formally charged Jane with accessing Moodle 144 times during nine exams.

137.     Subsection B(1) of the Honor Code prohibits "[t]he attempt to give or obtain

16

assistance in a formal academic exercise without due acknowledgement. This includes, but is not limited to cheating during an exam; helping another student to cheat or to plagiarize; completing a project for someone and/or asking someone to complete a project for you."

138.    Subsection B(5) of the Honor Code prohibits "[d]eception concerning adherence to the conditions set by the instructor for a formal academic exercise."

139.    Indicating the extent of its "due diligence", Wesleyan illogically asserted that Jane:

      a.    Somehow managed to use her *laptop* four (4) times during the June 14 exam without anyone seeing her do it; and

      b.    Logged into Moodle 14 times to look at her own grades "during the final exam on June 29."

140.    While the Moodle log for June 29 does show 14 logins, Roberts did not administer an exam in CHEM 141, and Jane did not take any exams on June 29, 2017.

141.    Wesleyan's charging letters informed Jane that the relevant Honor Code "information is in the Wesleyan Student Handbook found online on the Wesleyan Website" and included a link to the Handbook.

142.    The letters further directed Jane to "visit the website referenced above to familiarize yourself with the procedures of the Honor Board."

**IV.    Wesleyan Thwarts Jane's Ability to Prepare for the Initial Hearing**

143.    Shocked at ITS's conclusion, Jane nonetheless knew that she had not cheated and gathered as much evidence and information that was in her possession to establish her innocence, believing that Wesleyan would adjudicate the accusations against her fairly.

144.    Even though fundamental fairness and Wesleyan's express representations

require that an accused student have a reasonable opportunity to defend herself, Wesleyan thwarted Jane's attempts to gather evidence at every step.

145.     Because she had not cheated, Jane **knew** that eyewitnesses would affirmatively state that they did not see her access her cell phone, and certainly not her laptop computer (which everyone would notice), during any exam.

146.     As a result, Jane sought and received statements from the few eyewitnesses who could provide their account, specifically students identified herein as Classmate # 1 and Classmate # 2.

147.     Neither of these students had any connection to Jane outside the chemistry classes.

148.     Both of these students testified that they each had a direct view of Jane during the June 21, 2017 exam.

149.     Both of these students testified that they would have been able to see Jane access her cell phone had she done so during the exam.

150.     Both of these students testified that they did not see or hear Jane access her cell phone at any time during the exam.

151.     Specifically, Classmate # 1 attested in writing that during the June 21 exam:

> [Jane] promptly sat down to continue taking her exam. Other than writing down . . . answers and the rustling of papers, not a single noise came from [Jane]'s corner. Not only did I not, under any circumstances, see [Jane] go near her bag after placing it on the ground beside her desk, I did not hear any beeps/vibrations/or rings of any sort from her phone.

152.     As to Jane's character, Classmate # 1 wrote:

> Upon hearing the allegations . . . I was in a state of utter disbelief. Primarily because they are blatantly false and I was present at the time, but I was also shocked because [Jane] is in general, but particularly in regard to academic matters, an exceptionally honest, dedicated student. Jane worked extremely hard

in the course and was exceedingly generous with her time and patience in explaining confusing concepts to other students (myself included).

153.   Even Roberts expressed shock at the thought that Jane would cheat:

I was sitting at the table outside just after [Jane] had turned in her exam when I looked at the activity logs. **And you can ask my TA because he was right there.** I - I was shocked. [Jane] was shocked getting the allegation. I was far more shocked looking at
this and thinking of all the students in the class . . . it was not something that I expected. (Emphasis added.)

154.   Despite Jane's repeated requests that Roberts's TA be called to testify, Wesleyan refused to call him to furnish any testimony.

155.   Immediately after being formally charged, Jane contacted TA.

156.   TA repeatedly entered Jane's exam room unannounced during all of the CHEM 141 and CHEM 142 exams in question.

157.   During certain exams, TA was able to see Jane through a large, clear glass window while Jane took the exams.

158.   Jane had worked closely with TA throughout the summer.

159.   TA had knowledge of Jane's character, diligence, and aptitude in CHEM 141 and CHEM 142.

160.   Jane sent TA an email on August 10, which stated "I need to speak with you as soon as possible. Do you have any availability?"

161.   Less than an hour later, TA responded to Jane and wrote "[i]f this is about CHEM142 I don't think it would be appropriate to meet. You can talk to Professor Roberts if it pertains to a grading issue or discrepancy."

162.   Jane immediately responded to TA and wrote, "My concern is about CHEM 141 and CHEM 142 and is not related to a grading issue. It is very important that I speak to you as

soon as possible."

163.    TA wrote back, "As class is over, you can address any questions you have to professor Roberts."

164.    Immediately after sending that response, TA forwarded the entire email chain to Roberts and wrote "[h]ere is the email chain from today."

165.    Less than four minutes after TA sent the email chain to her, Roberts forwarded the chain to Scott, writing "My TA . . . just stopped me in the hallway and said that he received these emails from [Jane]. I am not sure if they are relevant, but I wanted you to have them just in case."

166.    TA was a graduate student in Roberts's department.

167.    Roberts had a direct impact on TA's academic career.

168.    Upon information and belief, Roberts discouraged TA from responding to Jane.

169.    Upon information and belief, Roberts discouraged TA from participating in any hearing related to the charges brought against Jane.

170.    On August 14, 2017, Jane spoke with Scott to request that TA appear and testify at her hearing.

171.    Scott rejected Jane's request, writing in part:

> [a]s for your question about being able to ask . . . TA, some questions, that is entirely up to you and to him. **There is no policy about gathering information and witnesses, I think it is up to the discretion of you and whoever you ask.** (Emphasis added.)

172.    Wesleyan's written procedures and policies state, "The [Honor] board may require the cooperation of any member of the university community in furnishing testimony or evidence directly related to the adjudication of a case."

173.    TA was "a member of the University community" and his eyewitness testimony was "directly related" to Jane's case.

174.    Scott's statement that she could not assist Jane in obtaining TA's cooperation was false and contrary to Wesleyan's written procedures and policy, as well as her own practice.

175.    Scott's failure to facilitate TA's appearance and testimony meant that Jane was unable to present relevant evidence that would have helped her establish her innocence.

176.    Scott knew that she could assist Jane in obtaining a witness's cooperation.

177.    Scott assisted Roberts in obtaining witness cooperation prior to Jane's hearing.

178.    On August 14 at 10:03 pm, Roberts emailed Scott to request assistance in obtaining witness cooperation at the hearing, specifically asking:

I have a question for you about the hearings for [Jane]. Should someone from ITS (Rachel, Miriam and/or Matt) be present at the hearing to talk to the Honor Board about what they found or are the documents that they sent you enough? If you think it is important, would you please ask them to come?

179.    In response, Scott emailed Schnepper and another member of ITS the very next morning at 9:15 am:

I don't think we have ever solicited the help of ITS in such a persistent manner as we have for Andrea Roberts's Honor Board case! Thank you again for your input and patience. **Andrea and the Board were wondering if one of you (or Matt) would be available and willing to come to the hearing at 9:30 AM tomorrow morning to explain the findings and observations on the CHEM 141 & 142 Moodle logs, or to be there as consultants in case there are additional questions? What makes this extra- challenging is that the student . . . is insisting that she didn't cheat on her exams, so I think this is why we have been so determined to explore every possibility.** Please let us know if you would be available to be at the hearing. **We** really appreciate this! (Emphasis added.)

180.    Scott followed up on August 16 to make sure Schnepper would attend, asking "[M]aybe we could just ask if you could remain available 'on call' in case the Board or

Professor wanted to call you to follow up with a final question or clarification?"

181.    Despite Scott's representations to Jane that ITS would answer any questions she had, Scott's communication indicates that ITS's presence was required to assist only Roberts and the Board.

182.    Scott gave Roberts's email address to ITS so that they could communicate "directly" with Roberts.

183.    Jane, however, was required to communicate with ITS through Scott.

184.    Specifically, Scott required Jane to "send me any questions that you have for ITS and I will be happy to forward them to the person who was reviewing the reports and then I will pass their responses along to you."

185.    Jane's only exposure to Moodle was as a student.

186.    Jane did not know anything about how Moodle is administered.

187.    Jane did not know anything about Wesleyan's networking system.

188.    ITS installed and operated Moodle.

189.    ITS installed and operated Wesleyan's Internet network.

190.    Roberts managed Moodle for CHEM 141 and CHEM 142.

191.    ITS had the necessary access and expertise to understand the extent and nature of technical evidence that would be presented against Jane.

192.    Roberts had the necessary access and expertise to understand the extent and nature of the technical evidence that would be presented against Jane.

193.    Jane relied on ITS to answer her questions and to impartially investigate Roberts's accusations of cheating.

194.    Jane reasonably believed, based on Wesleyan's representations, that ITS would do so.

195.    Jane was concerned with problems relating to the technology and software at issue and frustrated by the delay caused by seeking information necessary to prepare for the hearing through an intermediary at a time when Wesleyan was not even in session.

196.    As directed by Scott, Jane submitted questions for ITS.

197.    In response to Jane's questions, Schnepper provided confusing answers.

198.    As a result, on August 15 Jane wrote to Scott and asked to speak with Schnepper directly.

199.    Scott forwarded Jane's email to Schnepper and wrote:

**[T]his student is not letting this go.** May [Jane] call you to clarify in person what she was asking? Are you comfortable giving her your extension #? There is nothing that prohibits a student from asking a question, but it is totally up to you. ***Wow.*** (Emphasis added.)

200.    Schnepper responded: "I am afraid I am in meetings the whole afternoon, and I do not have the time to talk to her today."

201.    When she sent her response, Schnepper was aware that the hearing scheduled for the next day turned entirely on academic technology.

202.    Schnepper was aware that the hearing had potentially life-altering consequences for Jane.

203.    Still, later that day, Schnepper wrote to Scott: "Honestly, I found [Jane's] questions to be last ditch, desperate attempts to find another reason to explain the Moodle activity. They actually provoked laughter from one of the computing guys when I was reading them to Matt."

## V.      Roberts's Last-Minute Misleading Charts

204.     On August 10, 2017 Roberts informed Scott *via* email that she was reviewing

Jane's final exam answers and "what [Moodle webpages] [Jane] opened and the order in which

she opened them and it is absolutely uncanny how well they mesh."

205.     Contrary to Roberts's statement to Scott, the order of Moodle pages accessed did

not match the order of the exam questions.

206.     Roberts created "charts" for the Honor Board purporting to show the temporal

order in which Jane allegedly accessed Moodle webpages during the exams on June 21, June

28, July 26, August 2, and August 4.

207.     Each chart consisted of three columns: "Question Attempted"; "Related Content

on Moodle"; and "Question #".

208.     For the June 21, June 28, and August 4 exam charts, Roberts listed the Moodle

webpages Jane allegedly viewed out of the chronological order in which they actually appeared

on the Moodle logs so that Jane's alleged access of the Moodle webpages would temporally

line up with the order of the exam questions.

209.     For the June 21, June 28, August 2, and August 4 exam charts, Roberts included

irrelevant references to Moodle webpages that Jane allegedly accessed outside of the time

periods designated for these exams.

210.     The charts for the July 26 and August 2 exams were identical even though the

exams covered different material.

211.     Roberts did not create charts regarding Jane's alleged access of Moodle

webpages during the June 14, July 12, or July 19 exams (or the phantom June 29 exam).

VI.   **Wesleyan Discovers and Delays Sending Jane Crucial Exculpatory Evidence Until Hours Before the Initial Hearing**

212.   On August 14, Schnepper sent Roberts copies of Wesleyan's Wi-Fi logs for August 2 and August 4.

213.   The Wi-Fi logs were created on August 10, 2017.

214.   The Wi-Fi logs were created after the charges against Jane were issued.

215.   Schnepper's email stated, "Here is a report the networking guys ran of [Jane]'s internet access on August 4th and August second."

216.   Schnepper also claimed that the report showed that "from 9 am to 12:30 (ish), [Jane] was accessing Wes Wi-Fi from Exley 150" on August 4.

217.   Schnepper's statement regarding Jane's Wi-Fi use was false.

218.   Wesleyan's Wi-Fi log showed that Jane's phone connected to Wesleyan Wi-Fi at 9:12 am and then reconnected to Wesleyan Wi-Fi at 11:57 am on August 4.

219.   Wesleyan's Wi-Fi log did not show how long Jane's phone was connected to Wesleyan Wi-Fi when it connected at 9:12 am and reconnected at 11:57 am on August 4.

220.   Wesleyan's Wi-Fi log did not show that Jane was continuously using Wesleyan Wi-Fi from "9 am to 12:30 (ish)" on August 4.

221.   Wesleyan's Wi-Fi log only definitively showed that Jane was connected to Wesleyan Wi-Fi at 9:12 am and 11:57 am on August 4.

222.   Because the Moodle logs showed access through Wesleyan Wi-Fi, evidence indicating that Jane's cell phone was not even connected to Wesleyan Wi-Fi for almost all of the August 4 exam was material and exculpatory.

223.   As Wesleyan's Director of Academic Technology, Schnepper should have been able to competently read Wesleyan's Wi-Fi log.

224.   If she were able to competently read Wesleyan's Wi-Fi log, Schnepper should have been able to see that the available evidence indicated that Jane's phone was not connected to Wi-Fi for almost all of the August 4 exam.

225.   As Wesleyan's Director of Academic Technology, Schnepper had custody and control over all the technological evidence in Jane's case.

226.   Schnepper failed to disclose this material and exculpatory evidence to Jane before Jane's initial hearing.

227.   Jane was reliant on Schnepper's expertise and position to fully understand the technical aspects of her case.

228.   Compounding its wrongful conduct, even though Wesleyan had possession of and shared the Wi-Fi log with Roberts at least as early as August 10, Scott did not email the Wi-Fi log to Jane until 2:54 pm on August 15, mere hours before Jane's 9:30 am August 16 hearing.

229.   Wesleyan has never explained why they did not send Jane the 17-page, double-sided document with technical language and abbreviations until at least five days after ITS obtained it and mere hours before a hearing that would have life-altering consequences for Jane.

230.   Schnepper's refusal to communicate with Jane and the technical language of the Wi-Fi log that Wesleyan sent Jane on the eve of her hearing led Jane to ask Scott for a brief extension so that she could clarify her understanding of Schnepper's opaque email responses and obtain assistance in understanding the Wi-Fi log.

231.   Scott refused to grant the extension on the purported ground that it would not be convenient for the Honor Board.

232.   Jane's mother also emailed Brown to seek a brief extension so that they could

have some time to understand the Wi-Fi log.

233.    Wesleyan again refused to provide a brief extension.

## VII.    Jane's Initial Hearing on August 16, 2017

234.    The Honor Board for the August 16, 2017 hearing (the "Initial Hearing") consisted of three student panelists and Brown, the Board's administrative advisor.

235.    Roberts, Schnepper, Matt Elson ("Elson"), Wesleyan's Unix system administrator, and Mohit Bachhav ("Bachhav"), Wesleyan's network administrator, also attended the Initial Hearing.

236.    A fourth student panelist called in to join the Initial Hearing.

237.    The Honor Board's student chair ("Panelist # 1) for the Initial Hearing informed the fourth student panelist that she would not be needed.

238.    Panelist # 1's directive ran contrary to Scott's representations to Jane as well as Wesleyan's representations in its Handbook that Honor Board cases are heard by four student panelists.

239.    Contrary to the Handbook, a second advisory member of the Hearing Board was absent from the Initial Hearing.

240.    Thus, the only person acting as the Honor Board's advisor at the Initial Hearing was Brown who had been exposed to Scott's biased conviction that Jane was "obviously" guilty.

241.    Both omissions were contrary to procedures which provide that the Honor Board's "voting membership . . . **shall** consist of **four** undergraduate students" and its "advisory membership . . . **shall** consist of **at least one faculty member** appointed by the Faculty Educational Committee, **and the dean of academic advancement (or designee)**,

serving ex officio." (Emphasis added.)

242.    Jane's father accompanied her to Wesleyan for the Initial Hearing but was not allowed into the hearing room.

243.    Jane's only support in the hearing room during the Initial Hearing was Phillips acting as her advisor.

244.    Roberts was fully aware of Jane's disability and legally protected need for accommodations.

245.    Yet, during the Initial Hearing, Roberts implied that Jane voluntarily sequestered herself from other students taking the same exam and chose to sit facing away from the proctor for certain exams.

246.    Roberts falsely stated that Jane had chosen and booked her own exam rooms although a student in CHEM 141 and CHEM 142 other than Jane had booked the exam rooms.

247.    Roberts's statements were false and inflammatory and demonstrated bias against students with disabilities.

248.    In fact, during the Initial Hearing, Jane provided witnesses statements from students who were in the same room with her during the June 21 exam, disproving Roberts's false, prejudicial, and bigoted assertion.

249.    Roberts's prejudice and her adversarial posture did not end there.

250.    During the Initial Hearing, Jane tried to establish that clicking on 18 different web pages within one minute would be pointless and, more importantly, impossible due to her disability.

251.    Roberts's response and the ensuing exchange is included below:

> Roberts: Just so you know, right now, while we were sitting here, I opened up my Moodle page, and if you download something, if you access a file and save

it, I just did it one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen times.

Brown: In one minute? Roberts: In a minute and a half.

Jane Doe: But were you reading those files? I think what I'm trying to make a point about is how would I be able to – why would I do that to read them?

. . .

Roberts: So, um, I would also argue that I'm twice her age, and I'm a lot slower. Jane

Doe: But I also have fine motor skill issues. That's why I have extra time. Roberts:

Okay, I – all right. We'll address that later.

252.    Roberts's prejudicial attempt to cast suspicion on Jane's use of legally granted accommodations made Jane feel ashamed about using accommodations and concerned about using them in the future.

253.    Roberts's statements also violated Wesleyan's numerous written promises to protect disabled students from such discriminatory conduct and harassment.

254.    Specifically, the Handbook states:

> [T]he University condemns all forms of discriminatory interference with the exercise of rights of an individual or of any group to which that individual belongs. Such abridgement of rights is particularly abhorrent when carried out by those who have power over the individual they are affecting – whether that power comes from an administrative, academic, or any other position on campus.

255.    Wesleyan also assures members of the University community that they will receive "[p]rotection from discrimination" on the basis of, among other categories, disability.

256.    The Handbook also prohibits "any form of discriminatory harassment performed by a member or members of the University against any individual or groups" which "may include any action or statement intended to insult, stigmatize, or degrade an individual or group on the basis of," *inter alia*, disability.

257.    After Roberts made her hostility towards students with disabilities known,

Brown asked about the July 26 exam.

258.    Roberts falsely stated that Jane "had from noon to 3:00 p.m." to complete that

exam.

259.    In response Jane stated:

> But I could not have taken the exam until 3:00 p.m. I had meetings every
> Wednesday at 2:00 p.m. And I actually didn't understand that I had until 3:00
> p.m. My understanding I had until 1:30 because it is time and a half. And then, if
> I needed to, I could stay until 2:00 p.m., which is never an option that I took up.

260.    During the Initial Hearing, Jane repeatedly offered Wesleyan's ITS staff access

to her cell phone to further demonstrate the impossibility of the allegations.

261.    However, the ITS staff refused to take or even view Jane's cell phone.

262.    Jane challenged the accuracy of the Moodle logs related to Roberts's courses,

including those related to the final exam periods.

263.    Schnepper responded as noted below and the following exchange ensued:

> Schnepper: Um, for the CHEM 142 final, I've not spent as much time looking at
> the activity for all of the other Moodle logs.
>
> Jane: Right. But wouldn't that be – wouldn't it be important to look at the other
> activity? I mean, this is a consistent issue outside of exams as well. Wouldn't that
> speak to what's happening during the exam?
>
> Schnepper: Um, I was asked to look for, specifically, this one exam. And the
> sort of research that we could also do because of the time, um, like checking the
> IP address and stuff like that, um, we don't keep those records for – Mohit, how
> long do we keep them for, like a week?
>
> Bachhav: About a week.
>
> Schnepper: A week, yeah. So, we – doing a deep dive for the earlier exams we
> couldn't do. So, I was just focusing and asking Matt and Mohit, um, to focus on
> the CHEM 142 one.

264.    Almost immediately after the Initial Hearing, Schnepper sarcastically posted on

her Twitter account, "I spent the morning at an honor board hearing and the afternoon in budget

land. My life is super glamorous."

265.    Schnepper's tweet showed that she did not take certain aspects of her role as Wesleyan's Director of Academic Technology seriously, specifically the requirement that she provide information about academic technology to the Honor Board.

266.    Phillips, who was supposed to be acting as Jane's advisor, did not provide Jane with any guidance during the Initial Hearing.

267.    After the Initial Hearing, Phillips told Jane's father that Jane's case was the "most technologically complicated [Honor Board] case" he had ever encountered.

268.    Phillips also admitted that ITS was "ill-equipped" to handle the case.

269.    Despite Jane's valid challenges to the software and technology at issue, in its decision dated August 21, 2017 (the "Initial Hearing Decision"), the Honor Board found Jane "more likely than not" cheated on five of the nine exams, specifically those administered on June 21, June 28, July 26, August 2, and August 4.

270.    The other four exams administered on June 14, June 29, July 12, and July 19 were not referenced in the decision, indicating that Jane was "not responsible."

271.    Notably, Roberts did not administer an exam on June 29, 2017.

272.    Moreover, the Honor Board wrote that "[t]he Moodle log was not submitted for another exam in question given on June 27."

273.    However, neither Roberts's initial accusatory letter nor Wesleyan's formal charging letters notified Jane about a violation related to an exam administered on June 27, 2017.

274.    Although the Moodle logs were the "primary evidence" the Honor Board relied on, the Board did not question the validity of the Moodle logs used to find Jane responsible

despite failing to find any evidence of cheating in the June 14, June 29, July 12, and July 19 Moodle logs.

275.    It is also unclear why the Honor Board found Jane responsible for cheating on the June 21 exam.

276.    The IP address used to access Moodle on June 21 did not correspond to any electronic device owned by Jane.

277.    In the Initial Hearing Decision, the Honor Board wrote "[g]iven the extent and seriousness of the violations, the sanction is dismissal from the University."

278.    Jane personally reviewed 80 cheating-related cases decided by the Honor Board, and none resulted in dismissal from Wesleyan.

## VIII.   Jane Obtains Exculpatory Evidence and is Granted an Appeal

279.    Jane immediately made efforts to appeal the Initial Hearing Decision.

280.    Given ITS's refusal to even speak with Jane much less properly investigate the allegations against her, Jane had no choice but to retain the world-renowned BDO Consulting ("BDO") to conduct an independent forensic analysis.

281.    As a regular part of its business, BDO performs forensic analysis of computers, email and webmail systems, mobile devices, and storage media.

282.    As part of its engagement, BDO forensically analyzed Jane's electronic devices, activity related to those devices, including any Wesleyan documentation (Moodle logs and Wi-Fi records), and AT&T cellular data usage logs.

283.    BDO was informed that Wesleyan Wi-Fi logs for June 21, June 27, June 28, and July 26 were deleted from its records.

284.    Garry Pate ("Pate"), BDO's Consulting Director, performed the analysis on

behalf of BDO.

285.    Pate obtained a B.A. in Criminal Justice from the University of Maryland and an M.S. in Information Technology from American Continental University.

286.    Among other groups, Pate is affiliated with the Computer Forensic Tool Testing Committee, the High Technology Crime Investigation Association, the Information Assurance Certification Review Board, the National Institute of Science and Technology, and the International Association of Computer Investigative Specialists.

287.    On September 4, 2017, Jane timely appealed the Initial Hearing Decision (the "Initial Appeal").

288.    Attached to the Initial Appeal was a declaration from Pate, dated September 4, 2017.

289.    Pate's declaration included a detailed review of the Moodle logs, Wesleyan's Wi- Fi access logs, and AT&T's cellular data usage records for August 2 and August 4, 2017.

290.    Due to Wesleyan's deletion of Wi-Fi logs for June 21, June 27, June 28, and July 26, Pate could only perform an analysis of the Moodle logs and AT&T's cellular data usage records for those dates.

291.    Pate conclusively determined that the Moodle logs were inaccurate.

292.    Specifically, with respect to the August 4 exam, where Jane was accused of accessing 66 separate Moodle webpages from her cellular telephone through Wesleyan Wi-Fi, Pate determined:

> While the Moodle logs show access to the curriculum from 9:11am to 1:09 pm, neither the Wesleyan Wi-Fi nor AT&T data usage logs showed [Jane]'s iPhone 6s accessing the network during the same time period. It would have been **impossible** for [Jane] to access the Moodle site course curriculum as depicted in the Moodle logs without either Wi-Fi or Cellular service. (Emphasis added.)

293.    With respect to the August 2 exam, Pate concluded that "AT&T cellular usage logs show minimal cellular data usage at only 11:25am (23kb). *Please note – This amount of data usage is consistent with receiving a text message or email, and not indicative of active device usage*." (Emphasis in original.)

294.    Based on the new AT&T evidence obtained by Jane, her request for an appeal of the Initial Hearing Decision was granted by Michael J. Whaley ("Whaley"), Wesleyan's Vice President for Student Affairs, in a letter dated September 7, 2017 (the "Appeal Decision").

295.    However, contrary to the express terms of the Handbook, the exact same panel of the Honor Board that conducted the Initial Hearing conducted the Appellate Hearing.

296.    In the Appeal Decision, Whaley noted:

> [a]fter careful review of your letter, your case is being remanded back to the Honor Board **so that they may review and consider the new information from BDO (as well as any other information you wish to share)**. **You should be aware that I've shared BDO's report with our own IT experts who have filed a brief response in the case file.** Therefore, please be sure to review this information prior to when the Board convenes again. (Emphasis added.)

297.    Nothing in the Handbook permits remand to the original hearing panel for reconsideration following a student appeal of an adverse decision.

298.    Instead, regarding appeals, the Handbook notes, "If the appeal is granted, the Appeals Board has the authority to recommend a **new** hearing before a **new** board/panel." (Emphasis added.)

299.    Upon reviewing her case file again in preparation for her second hearing (the "Appellate Hearing"), Jane discovered Wesleyan's "IT expert's" email.

300.    Specifically, on September 6, 2017, Schnepper wrote an email to Whaley and Scott, copying Elson and Bachhav, which stated, in part:

> I have reviewed [Mr. Pate's declaration] with Matt Elson and Mohit Bachhav, CC'd here. We have found that BDO's analysis of the Wi-Fi records is one

possible interpretation of the records. The Wi-Fi records report that a cell phone registered to [Jane] accessed Wesleyan Wi-Fi on August 4th at 9:12 am and again at 11:57 am.  What the records do not indicate is how long the cell phone was on the Wi-Fi. One interpretation of these records is that the cell phone accessed the Wi-Fi at 9:12 and then again at 11:57. Another possible interpretation is that the cell phone accessed it from 9:12 am till 11:45, stopped being used, and then was not used again till 11:57. These logs do not show duration of use.

301.    Schnepper's other "possible interpretation" did not factor in AT&T's records for Jane's cell phone that conclusively established that Jane's phone was not connected to Wesleyan Wi-Fi continuously between 9:18 am and 11:57 because minimal cellular data usage consistent with receiving a text message or email at 9:18 am interrupted the Wi-Fi connection.

302.    Thus, Schnepper's other "possible interpretation" was wrong.

303.    Pate reviewed Schnepper's September 6 email and authored another declaration sworn to on September 12, 2017 that corrected Schnepper's other "possible interpretation."

304.    Pate's September 12, 2017 declaration stated:

In her email dated September 6, 2017, Dr. Schnepper agrees that the data in Wesleyan's Wi-Fi log supports BDO's interpretation that [Jane] did not have Wi-Fi access between 9:12 am and 11:57 am [when an alleged 48 Moodle accesses occurred] and could not have accessed the course curriculum on the Moodle website without access to Wesleyan's Wi-Fi. Dr. Schnepper states that the Wi-Fi log could be interpreted to show that [Jane's] phone accessed Wesleyan Wi-Fi from 9:12 am until 11:45 am, and then again at 11:57 am.

However, the AT&T data usage records and the Moodle logs show minimal cellular data usage at only 9:18am (56kb). *Please note- That amount of data usage is consistent with receiving a text message or email, and not indicative of active device usage.*

The Wesleyan Wi-Fi log does not show a reconnection until 11:57am. The cellular data usage at 9:18am would have interrupted the continuous access to the Wesleyan Wi-Fi from 9:12 am until 11:45 am.

The Wesleyan Wi-Fi log does not support active Wi-Fi access. [Jane] could not have actively accessed the Moodle website for almost three hours between 9:12am and 11:57am without any change in Wi-Fi channel, Wi-Fi authentication, or reconnection with AT&T cellular service. (Emphasis in original.)

35

305.    In addition, as a prominent example that Moodle log time stamps can be wrong, Pate attached a November 2014 KPMG report from an investigation commissioned by the Australian government into the inaccuracy of Moodle timestamps.

306.    Pointing to KPMG's findings with respect to Moodle's time records, Pate stated, in part:

> The Moodle platform is typically supported by an Administrator. As noted in the KPMG Holding Redlich report dated November 11, 2014, the accuracy of times recorded in the Moodle logs may be imprecise. The Redlich report states "the dates and times recorded in the system are in part defined by the computer (the hardware and operating system).
> As such, we did observe that if the time zone and/or time set on the computer hosting the Moodle software was incorrect, that these incorrect dates were logged within the underlying database, and reported incorrectly using the Moodle software.

## IX.   The September 13, 2017 Appellate Hearing and Wesleyan's Disregard of Exculpatory Evidence

307.    In anticipation of the Appellate Hearing, on September 11, 2017, Jane wrote to Scott and asked, among other questions, "[h]ave I been provided with the entire universe of evidence to be presented against me at the hearing?"

308.    In response, Ms. Scott wrote "You should have everything that was presented – everything in your file."

309.    Jane further asked Scott if there "[w]ill be any new witnesses?"

310.    Scott responded "[t]here will be no new witnesses."

311.    Whaley informed Jane that the Appellate Hearing would be limited to consideration of the AT&T records and ITS's response in the case file.

312.    Whaley's and Scott's representations were false.

313.    Jane intended to call the BDO expert to testify at the Appellate Hearing.

314.    Based on Scott's and Whaley's representations, Jane decided not to call the BDO

expert to testify at the Appellate Hearing.

315.    At the outset of the Appellate Hearing, Schnepper and Bachhav discussed the results of an "experiment" attempting to mimic the controlled procedures utilized by BDO in its assessment.

316.    Specifically, Bachhav indicated that he conducted a test using the iPhone of another member of ITS (who did not appear at the Appellate Hearing).

317.    However, this "experiment" was intrinsically flawed.

318.    Not only was the test conducted using a different phone during a different date and time than the incidents alleged in Roberts's charge, the following items were absent and not addressed:

      a.    The test plan – including the test methodology, objectives, metrics, and expected results;

      b.    Make, model, service life, and configuration of the test iPhone;

      c.    Configuration of the Moodle platform;

      d.    Configuration of the Wi-Fi platform;

      e.    Configuration of the backup server;

      f.    Patches (firmware/software/malware and virus) applied since the incidents;

      g.    Moodle platform content accessed during the test;

      h.    Test iPhone cellular service provider and logs;

      i.    Moodle and Wi-Fi test logs;

      j.    Validation of the exact same number of students accessing the Wi-Fi platform during the test; and

k.      Validation that the test phone received data usage at 2 independent times during the test.

319.    Equally troubling was that new evidence (*i.e.*, Wesleyan's IT "experiment") was submitted to the Honor Board despite Scott's assurances that Jane had received all evidence that would be at issue during the Appellate Hearing.

320.    Jane was unprepared and not equipped to present a counter-experiment due to this ambush presentation.

321.    When Jane again offered her iPhone for use during the Appellate Hearing to demonstrate that her phone was incapable of downloading certain information, the Honor Board rejected her overtures.

322.    Upon the introduction of Wesleyan's IT "experiment" into the record, the student chairing the Appellate Hearing ("Panelist # 2"), expressly stated "[u]m, just because this – this seems to be new evidence, um, this – this experiment . . . because if it's new evidence, then it's a little more problematic. But . . ."

323.    Brown *immediately* cut Panelist # 2 off, abruptly stating "it sounds like it's a confirmation."

324.    The Honor Board did not circulate or show Jane the Wi-Fi report ITS created as part of the "experiment."

325.    During the Appellate Hearing, Wesleyan's IT "experts" admitted that even after receipt of the two BDO declarations, they did not review or analyze Jane's AT&T cellular data usage records.

326.    Indeed, Pate's September 4, 2017 declaration was supported by the testimony from Bachhav.

327.   In response to a question about how Wesleyan Wi-Fi interacts with AT&T cellular data, the following exchange took place:

Panelist # 2:   Can — you have access to an AT&T cell tower for network data and Wi-Fi at the same time?

Bachhav:   No.

Panelist # 2:   No. So either I'm connecting to Wi-Fi, or I'm connecting to AT&T.

Bachhav:   Yes.

328.   Despite previous representations that Jane was in possession of all evidence that would be used during the Appellate Hearing, Wesleyan submitted even more new evidence following the improper introduction of the IT "experiment."

329.   Specifically, Schnepper provided unconfirmed hearsay testimony from Elson concerning a Wesleyan backup server known as the "Apache server."

330.   Wesleyan has never explained why they did not preserve any records concerning the Apache server that supposedly confirmed the "primary evidence" used to expel a student who adamantly maintained her innocence.

331.   Moreover, Schnepper did not personally review any data or documentation concerning the Apache server.

332.   Nevertheless, Schnepper, for the very first time in the proceedings against Jane, asserted that Elson told her that the Apache logs (which Schnepper did not review and which were neither preserved nor produced) confirmed that all 144 of the access times listed on the Moodle log were accurate.

333.   However, when one Honor Board member asked Schnepper how devices connect to the Apache server, Schnepper responded, "[y]eah, so that would be a Matt [Elson]

39

question, and, um, he's not here."

334.    Schnepper further testified: "[u]m, because of the independent confirmation

from the Apache servers, um, I am not the UNIX administrator, so, um, we would need Matt

Elson to confirm that um, but the independent confirmation on the Apache server, that is

confirming the Moodle logs."

335.    But Elson was not present at the Appellate Hearing.

336.    Wesleyan made no effort to call him or have him testify at the Appellate Hearing

despite his superior and exclusive knowledge of UNIX and the Apache server.

337.    As BDO would later confirm, the Apache server was not independent but instead

mirrored the data contained in the Moodle log, and therefore confirmed nothing.

338.    Panelist # 2 allowed ITS to present Schnepper's Apache log testimony because it

was "not real evidence" but "just . . . happened to be helpful anecdotal evidence, but anecdotal

— anecdotal evidence."

339.    Nothing in the Handbook states that "anecdotal evidence" is not "evidence."

## X.    Brown Oversteps Her Role and Honor Board Members Inadvertently Record Themselves Mocking Jane and Revealing Their Failure to Understand the Evidence

340.    Brown, the Honor Board's administrative advisor, thwarted the fact-finding

process and foreclosed the Honor Board's ability to uncover the truth.

341.    According to the Handbook:

> The role of the faculty and administrative advisor(s) is to brief the board before
> each hearing to ensure a clear understanding of the regulation(s) in question and
> of the hearing procedures. The advisor(s) shall advise the chair during hearings
> to see that the board follows procedures correctly. The advisors may offer
> information and assist the chair in facilitation. They may also offer advice or
> clarification regarding appropriate sanctions or questions regarding policies
> and procedures during deliberations in closed session.

342.    Despite the foregoing, Brown exceeded her role during the process.

343.    For example, when Schnepper offered hearsay testimony about Elson's alleged statements concerning the Apache server, Jane questioned the propriety of admitting "testimony" from someone who did not attend the hearing or provide a written statement or any documentation to support that he indeed made such statements.

344.    In response to Jane's valid concerns, Brown told Jane "that question is – is not a question for this hearing."

345.    Brown stopped Jane's valid line of inquiry and prevented the Honor Board from properly testing the evidence before it.

346.    Brown also improperly threatened to shut down the Appellate Hearing.

347.    During the Appellate Hearing, Brown repeatedly told Jane that the Honor Board hearing is "not a court of law."

348.    Jane stated, "I understand this isn't a court of law, but if this was brought to a court of law, which is what I will pursue if I'm not found innocent, you know, this is a big issue."

349.    In response, Brown warned Jane "I need to – to decide whether or not we can continue if you're doing – if you're threatening a lawsuit" and immediately called a recess.

350.    Nothing in the Handbook states that an Honor Board hearing can be immediately and unilaterally terminated if a student mentions vindicating her innocence in a court of law.

351.    As the Honor Board's procedural advisor, Brown's threat to terminate the Appellate Hearing was beyond the pale and meant to intimidate Jane.

352.    Brown's threat to terminate the Appellate Hearing caused Jane to become distraught and suffer significant emotional distress.

353.    Unfortunately for Brown, the Honor Board failed to turn the hearing recorder off during the recess.

354.    The inadvertent *sub rosa* recording revealed Brown, a dean of one of the nation's premier educational institutions, laughing at and mocking Jane along with the three student panelists.

355.    The Appellate Hearing recording also reveals the student panelists were confused by the technical evidence.

356.    The following exchange was recorded:

Panelist # 2:    So, should we just finish up the interview?

Panelist # 1:    I - I just need to like . . .

Brown:    Yup, we can continue. But, you know. The thought that, can we really continue?

Panelist # 1:    I just want to ask, like in either a simple point or blurb, like ask her, so with this new evidence, what are you claiming now? That's my only question.

357.    In an attempt to explain the evidence to Panelist # 1, the recorded statements of Panelist # 2 and Panelist # 3 reveal their own confusion as they — incorrectly — summarized the evidence presented in the BDO declarations:

Panelist # 3:    [Jane]'s claiming that this is evidence that counteracts the Moodle log and the Wi-Fi logs.

Panelist # 2:    That we no longer have to present. Because the Moodle logs have been — she's trying to — she's mainly picking at the veracity of the Moodle logs, so if there's any questions about that.

358.    Jane was not contending that the AT&T records "counteract . . . the Wi-Fi logs."

359.    Instead, the AT&T records perfectly supplement the Wi-Fi logs to show that Jane's cell phone was not even connected to Wesleyan Wi-Fi during most of the August 4

exam.

360.    In fact, such a scenario does "counteract" the ***Moodle logs***.

361.    Instead of enabling the student panelists to understand the evidence, Brown, who clearly did not understand the evidence herself, conveyed to the student panelists that the evidence wasn't worth understanding:

> Panelist # 1:   I just don't get it still.
>
> Brown: Well, I think that's the problem.
>
> Panelist # 2:   But I think the problem is that are you gonna get it from her, or do we just have to sit down?
>
> Brown: That's what she's — I feel like she's repeated over and over that she's innocent. She did not do this. We have — you know, so this is part of the deliberation. Do we have any questions for clarity? You sure?

362.    Brown's behavior communicated to the young and impressionable Wesleyan students on the Honor Board that Jane's defense was not worthy of fair and impartial consideration.

363.    Panelist # 1 did not ask Jane any questions to clarify her understanding of the evidence presented after Brown dismissed BDO's independent forensic analysis comprehensively laid out in two sworn declarations as Jane "repeat[ing] over and over that she's innocent."

## XI.    Wesleyan's Ill-Prepared "Experts" and the Honor Board's Rubber Stamp

364.    Wesleyan and BDO agreed that the Moodle logs showed access to webpages through Wesleyan Wi-Fi.

365.    BDO and Wesleyan also agreed Jane's iPhone could not be connected to both Wesleyan Wi-Fi and AT&T cellular data at the same time and that a connection to one drops the connection to the other.

366.    Wesleyan granted Jane's request for the Appellate Hearing on the basis that the AT&T data usage records for Jane's iPhone constituted "new evidence."

367.    Whaley clearly stated that **the entire and sole purpose** of the Appellate Hearing was to consider what the AT&T data usage records show about how long Jane's cell phone was connected to Wesleyan Wi-Fi on August 4.

368.    BDO set forth its analysis and conclusion that the AT&T cellular data records **conclusively** established that Jane's cell phone disconnected from Wesleyan Wi-Fi almost immediately after she entered the exam room on August 4.

369.    The BDO analysis also stated that the Wesleyan Wi-Fi records **conclusively** established that Jane's cell phone did not re-connect with Wesleyan Wi-Fi until almost the end of the exam.

370.    As a result, BDO concluded that it was **impossible** for Jane to have accessed Moodle webpages as depicted in the Moodle logs.

371.    At the conclusion of the Appellate Hearing, however, ***Wesleyan's "experts" admitted that they could not respond to BDO's analysis and conclusion because they did not look at the AT&T records***:

> Brown:  I would like a — a response to [BDO's analysis and conclusion that Jane's cell phone was not connected to the Internet during most of the August 4 exam].
>
> Panelist # 2:    Yeah. Brown:  Statement.
>
> Schnepper:     Well, I've not seen the AT&T logs, so. Bachhav:     Neither did I see the AT&T logs.

372.    The Honor Board did not ask Schnepper and Bachhav, Wesleyan's IT experts

actually responsible for implementing and administering that software and infrastructure, a single question in response to this astonishing admission.

373.    By letter dated September 14, 2017 (the "Appellate Hearing Decision"), the Honor Board affirmed its own original decision, finding that Jane "more likely than not" cheated on five of the nine exams.

374.    In the Appellate Hearing Decision, the Honor Board wrote:

> After consideration of the new evidence, the Board upholds the original decision of "more likely responsible than not." While important for consideration, the new evidence does not undermine the integrity of the Moodle logs which [sic] were used as primary evidence in reaching the original findings. The sanction of "dismissal" as the sanction for violating the Honor Code still stands, despite the new information provided by BDO's report and your time zone theory.

375.    The Appellate Hearing Decision also informed Jane that "Wesleyan will maintain a record of your violation of the Honor Code. If you apply to other schools, you may be asked to disclose any information regarding disciplinary action while attending Wesleyan."

## XII.   BDO Addresses Wesleyan's IT Experiment and Phantom "Apache Logs" and Wesleyan Closes the Case

376.    On September 28, 2017, Jane timely appealed the results of the Appellate Hearing Decision (the "Second Appeal").

377.    In her Second Appeal, Jane noted much of the foregoing denial of fair process; Schnepper's material, false, and misleading statements; Brown's prejudicial influence; and the Honor Board's recorded comments revealing their confusion about the BDO analysis.

378.    As part of Jane's Second Appeal, Pate provided yet a third declaration, sworn to on September 28, 2017.

379.    Because Wesleyan failed to preserve any relevant data for the other exam dates and the testimony at the second hearing focused almost exclusively on the August 4, 2017 data,

Pate provided clarity with respect to the records from that date.

380.    Pate noted that "[t]he Wesleyan Moodle log for August 4 lists . . . 39 log-in

accesses between 9:18 am and 11:57 am . . . AT&T cellular logs show that [Jane] did not use

her AT&T cellular data to access the Moodle website content."

381.    Based on the foregoing, Pate concluded:

It would have been impossible for [Jane] to log in to Moodle 39 times between 9:18 am and 11:57 am as depicted on the Moodle logs. The Wesleyan Wi-Fi logs show a timeline of channel changes and web connections, but not connection duration. As Dr. Schnepper stated at the September 13, 2017 hearing, Wi-Fi logs do not monitor continuous access but rather connection to different access points. If [Jane] was successfully and continuously connected to the Wesleyan Wi-Fi between 9:12 am and 11:57 am, why would the Wi-Fi platform need to change channels or re-authenticate at an access point at 11:57 am? Especially if [Jane] was in a static position in a classroom.

382.    With respect to Schnepper's testimony that the so-called Apache server log

confirmed the Moodle log, Pate concluded:

Evidence has not been provided by ITS that the Apache server did anything but mirror the data contained on the Moodle platform and may have simply tracked Moodle's behavior. As such, the Apache logs do not represent an independent verification of access to the Moodle platform content.

383.    Pate further noted in his declaration that "[a]ccording to the Wesleyan ITS, all

relevant backup data from the Moodle platform, Wi-Fi platform, and Apache server has been

deleted, or is no longer available."

384.    Pate also detailed the intrinsic flaws in Wesleyan's IT "experiment."

385.    Whaley denied Jane's Second Appeal by letter dated October 6, 2017 (the

"Second Appeal Decision").

386.    The Second Appeal Decision stated that Whaley's decision was based in part on

discussing the case with the student chair.

387.    Pursuant to the Handbook, the original adjudicators should not be part of an

appeal determination.

388.    The Handbook states, "Appeals Board members will not have been involved in the adjudication of the case being appealed."

**XIII.   Wesleyan's Arbitrarily Severe and Unprecedented Sanction**

389.    Out of the over 80 cheating-related disciplinary cases that Jane reviewed from the fall of 2013 through the spring of 2016, Wesleyan did not expel one single student, including students who had prior discipline history.

390.    Even a student who admitted to plagiarizing "six of . . . eight written assignments for the course . . . virtually word-for-word from websites and another outside source" **and** to fabricating facts "on several assignments involving the review of live facts" was only suspended for one semester.

391.    Five of the nine students suspended had previously appeared before and been sanctioned by the Honor Board for other violations.

392.    A review of eight recent Honor Board decisions concerning cheating by Moodle reveals that none of the accused students, other than Jane, was expelled from Wesleyan.

393.    At least one student **admitted** to using Moodle to look up the solutions to the exam the student was taking.

394.    The punishment for that student was a zero for the exam.

395.    In the case of one student, ITS actually provided evidence that the Moodle log was inaccurate.

**XIV.   Adding Insult to Injury, Wesleyan Violates Jane's Confidentiality**

396.    The Handbook expressly promises that "[t]he University requires that judicial boards and administrative staff maintain confidentiality regarding judicial matters."

397.    Nevertheless, in blatant violation of Wesleyan's written policy, Introduction to Chemistry Professor Anthony P. Davis openly discussed Jane's hearing process and sanction during a class conducted at the beginning of the Fall 2017 semester.

398.    Because there were approximately only ten students enrolled in CHEM 141 and CHEM 142, other students were easily able to identify Jane as the student in question.

## XV.    Jane's Damages

399.    As a direct result of Wesleyan's actions, Jane's chances of pursuing her dream of becoming a doctor or a lawyer have been destroyed.

400.    As a result of Wesleyan's actions, Jane's education was severely and permanently disrupted, and her future career goals in medicine, or anywhere else, have been derailed and diminished.

401.    Jane has been forced to shift career goals as a result of Wesleyan's actions.

402.    Instead of pursuing her long-held goal of becoming a doctor or attending law school, she is now attempting to gain employment at a global investment bank.

403.    As a result of Wesleyan's actions, Jane's disciplinary record is marred by a baseless, unjust expulsion.

404.    Despite successfully completing a summer internship at a global investment bank, Wesleyan's unjust and baseless decision to expel Jane remains a part of her educational record that could be discovered by a potential employer at any time and used as a reason to deny her employment.

405.    As a result of Wesleyan's actions, Jane's academic record has been permanently marred by two grades of "F" that have reduced her grade point average from 3.4 to 2.5, severely diminishing her future academic and employment opportunities.

406.   The Handbook states that the student will be notified "of the outcome of the appeal," and "If the appeal is denied, the sanctions will be imposed and the University will consider the case closed."

407.   Jane only learned that she received these two "F" grades after she ordered her transcript from Wesleyan, as she was not informed that this would be part of her sanction.

408.   As a result of Wesleyan's actions, Jane has suffered and will continue to suffer undeserved opprobrium, reputational damage, physical harm, mental anguish, emotional harm, economic losses, and damage to her future educational and career prospects.

409.   Without appropriate redress, the unfair outcome of Wesleyan's flawed disciplinary process will continue to cause irreversible damages to Jane, with no end in sight. Jane seeks redress from this Court to undo the wrongs occasioned by Wesleyan.

### AS AND FOR A FIRST CAUSE OF ACTION
### Breach of Contract

410.   Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein.

411.   A contractual relationship existed between Wesleyan and Jane at all relevant times hereto.

412.   Jane paid all of the required tuition and fees while she was enrolled at Wesleyan.

413.   Wesleyan was required to act in accordance with its policies when investigating and adjudicating allegations of misconduct against Jane.

414.   Based on the foregoing, Wesleyan has materially breached its contractual relationship with Jane by failing to comply with its obligations, standards, policies and procedures set forth in the Handbook during the investigation and adjudication of Jane's case.

415.   As a direct and foreseeable consequence of these breaches, Jane sustained

tremendous damages, including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

416.     Jane is entitled to recover damages for Wesleyan's breach of the express and/or implied contractual obligations described above.

417.     As a result of the foregoing, Jane is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
### Negligence

418.     Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein.

419.     Moodle is an open-source, online learning platform affecting approximately 3,224 students attending Wesleyan.

420.     Wesleyan began utilizing Moodle in September 2010.

421.     Miriam Cope, a member of Wesleyan's ITS department, installed version 3.0 of Moodle at Wesleyan at some point prior to the events giving rise to this litigation.

422.     There were several known "bugs" in Moodle version 3.0.

423.     Upon information and belief, during the relevant time period of the allegations, Wesleyan had no Moodle administrator.

424.     The customs of the community of schools that implement and administer Moodle include performing regular updates to download the latest version of Moodle software to prevent "bugs" or "glitches."

425.     For example, Columbia College Chicago conducts faculty workshops to train

their faculty on how to use Moodle because "with every update, faculty members have to relearn the program."

426.    Wesleyan assumed a duty of care to properly install, implement, and administer Moodle when it decided to utilize Moodle as its university-wide learning management system.

427.    Wesleyan assumed a duty of care to protect Jane Doe from the known "bugs" associated with Moodle when it decided to install, implement, and administer Moodle as its university-wide learning management system.

428.    Wesleyan should have anticipated that its failure to properly install, implement, and administer Moodle was likely to result in harm to its students, specifically false accusations of cheating leading to expulsion.

429.    Wesleyan should have anticipated that its failure to protect students from known "bugs" associated with Moodle was likely to result in harm to its students, specifically false accusation of cheating leading to expulsion.

430.    Public policy considerations demand that Wesleyan's failure to properly install, implement, and administer Moodle should extend to Jane and the consequences suffered by Jane.

431.    The accusations made by Wesleyan and the subsequent disciplinary action taken by Wesleyan fall within the foreseeable harm of Wesleyan's failure to properly install, implement, and administer Moodle.

432.    This failure led to the baseless expulsion of a model student.

433.    Allowing Wesleyan to act in a manner contrary to its mission as an institution of higher learning would discourage students from engaging in tertiary education, a necessary facet of an advanced and ordered society.

434.    Wesleyan owed Jane a duty of reasonable care to properly install, implement, and administer Moodle as its university-wide leaning management system.

435.    Wesleyan owed Jane a duty of care to protect her from known "bugs" associated with Moodle.

436.    Wesleyan failed to properly install, implement, and administer Moodle.

437.    Wesleyan failed to protect Jane from the known "bugs" associated with Moodle.

438.    Wesleyan breached its duty of reasonable care to Jane when it failed to properly install, implement, and administer Moodle.

439.    Wesleyan breached its duty of reasonable care to Jane when it failed to protect her from the known "bugs" associated with Moodle.

440.    As a proximate cause of Wesleyan's breach of its duty of reasonable care to properly install, implement, and administer Moodle, Jane was expelled from Wesleyan.

441.    As a proximate cause of Wesleyan's breach of its duty of reasonable care to protect Jane from known "bugs" associated with Moodle, Jane was expelled from Wesleyan.

442.    As a result of her expulsion from Wesleyan, Jane has suffered economic, reputational, and emotional damages.

443.    As a result of the foregoing, Jane is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

444.    Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein.

445.    Jane was expelled from Wesleyan as a result of Wesleyan's failure to properly

investigate and adjudicate the claims made against her.

446.    Jane's expulsion has put her educational and professional career in serious

jeopardy and has completely foreclosed certain career paths.

447.    Jane's expulsion and the consequent disruption of her educational and future

professional life have caused her severe emotional distress.

448.    Wesleyan's failure to properly investigate and adjudicate the claims made

against Jane created an unreasonable risk of causing her emotional distress.

449.    Jane's distress was a foreseeable result of Wesleyan's failure to properly

investigate and adjudicate the claims made against Jane.

450.    Jane's emotional distress was so severe that it resulted in illness or bodily harm.

451.    Jane suffered a major episode of depression as a result Wesleyan's failure to

properly investigate and adjudicate the claims made against her.

452.    As a result of the stress related to Wesleyan's failure to properly investigate and

adjudicate the claims made against her, Jane gained 20 pounds during the month of September

2017.

453.    As a result of the stress related to Wesleyan's failure to properly investigate and

adjudicate the claims made against her, Jane experienced tachycardia which required medical

testing.

454.    As a result of Wesleyan's false accusations and wrongful expulsion and harm to

her academic record and its consequences for her future, Jane suffered from disrupted sleep and

diet.

455.    As a result of Wesleyan's negligent and wrongful actions, Jane suffered from

anxiety and fell into a deep depression, which manifested itself in insomnia, panic attacks,

serious episodes of self-harm, and suicidal ideation.

456.    As a result of Wesleyan's false accusations and her wrongful expulsion, Jane has required regular treatment by a therapist and a psychiatrist and the administration of increasingly potent anti-anxiety medication which were required to preserve her life and health as a direct result of Wesleyan's wrongful actions.

457.    As a result of Wesleyan's false accusations and her wrongful expulsion, Jane suffers from post-traumatic distress so that she is anxious and fearful about any situation that may occasion false accusations, including academic exercises.

458.    Wesleyan's failure to properly investigate and adjudicate the claims made against Jane and its callous treatment caused Jane's distress.

459.    As a result of the foregoing, Jane is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
### <u>Intentional Infliction of Emotional Distress</u>

460.    Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein.

461.    By its conduct as alleged above, Wesleyan knew or should have known that emotional distress was the likely result of its conduct.

462.    Wesleyan's conduct, as alleged, was extreme and outrageous.

463.    Wesleyan's conduct, as alleged, caused Jane emotional distress.

464.    The emotional distress suffered by Jane as a result of Wesleyan's conduct was severe.

465.    As a result of the foregoing, Jane is entitled to damages in an amount to be

determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and

disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Negligent Misrepresentation

466.    Jane repeats and realleges each and every allegation hereinabove as if fully set

forth herein.

467.    Wesleyan represented to Jane that she would receive an investigation and hearing

concerning Roberts's unfounded accusations "conducted in accordance with the standards of fair

process."

468.    This representation was false.

469.    Wesleyan failed to exercise reasonable care or competence in communicating

this false information to Jane.

470.    Wesleyan further represented to Jane that "[t]he University requires that judicial

boards and administrative staff maintain confidentiality regarding judicial matters."

471.    This representation was false.

472.    Wesleyan failed to exercise reasonable care or competence in communicating

this false information to Jane.

473.    Wesleyan's false representations induced Jane to enroll at Wesleyan.

474.    Jane justifiably relied on Wesleyan's false representations when she enrolled at

the University, ultimately to her detriment.

475.    Wesleyan represented to Jane that the Appellate Hearing would be limited to

consideration of certain new evidence, specifically, the AT&T records and ITS's response in

the case file.

476.    This representation was false.

477.    Wesleyan failed to exercise reasonable care or competence in communicating this false information to Jane.

478.    Wesleyan represented to Jane that she had all of the evidence that would be presented at the Appellate Hearing in her possession prior to the appellate hearing.

479.    This representation was false.

480.    Wesleyan failed to exercise reasonable care or competence in communicating this false information to Jane.

481.    Wesleyan informed Jane that there was no policy related to calling witnesses to testify.

482.    This representation was false.

483.    Wesleyan failed to exercise reasonable care or competence in communicating this false information to Jane.

484.    Jane has suffered pecuniary harm as a result of her justifiable reliance on Wesleyan's false representations.

485.    As a result of the foregoing, Jane is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**<u>Promissory Estoppel</u>**

486.    Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein.

487.    Wesleyan promised Jane that she would receive an investigation and hearing concerning Roberts's unfounded accusations "conducted in accordance with the standards of

fair process."

488.    Wesleyan further promised Jane that "[t]he University requires that judicial boards and administrative staff maintain confidentiality regarding judicial matters."

489.    Wesleyan knowingly made false representations to Jane regarding the investigation and adjudication of the false claims made against her, and further promised to maintain the confidentiality of the hearing process and sanctions.

490.    Jane relied upon these representations of Wesleyan to her detriment.

491.    As a result of Jane's reasonable and justified reliance on Wesleyan's false promises, Jane is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN SEVENTH CAUSE OF ACTION
### Reckless and Wanton Misconduct

492.    Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein.

493.    During its investigation of Roberts's allegations against Jane, Wesleyan acted capriciously, arbitrarily, and in bad faith.

494.    During the Initial Hearing, Wesleyan acted capriciously, arbitrarily, and in bad faith.

495.    During the Appellate Hearing, Wesleyan acted capriciously, arbitrarily, and in bad faith.

496.    In determining the sanction against Jane, Wesleyan acted capriciously, arbitrarily, and in bad faith.

497.    Following Jane's improper expulsion, Wesleyan acted capriciously, arbitrarily, and in bad faith.

498.    Wesleyan consistently violated its own stated policies and procedures.

499.    Wesleyan conducted a biased investigation and hearing process where Jane's guilt was already assumed.

500.    Wesleyan failed to provide Jane with exculpatory evidence that it had in its sole possession, custody, and control.

501.    Wesleyan failed to properly acknowledge expert exculpatory evidence that Jane provided.

502.    Wesleyan administrators exercised undue influence on student panelists that participated in the Initial Hearing and the Appellate Hearing.

503.    Wesleyan falsely represented to Jane that the Appellate Hearing would be limited to consideration of certain new evidence, specifically, the AT&T records and ITS's response in the case file.

504.    Wesleyan falsely informed Jane that she had all of the evidence that would be presented at the Appellate Hearing in her possession prior to the appellate hearing.

505.    Wesleyan falsely informed Jane that there was no policy related to calling witnesses to testify.

506.    Wesleyan enforced a sanction that was unforeseeable and unharmonious when compared to previous instances of punishment for similar and more serious alleged misconduct.

507.    Wesleyan conveyed the outcome of Jane's disciplinary process to the student body in such a way that it impermissibly identified Jane in violation of Wesleyan's policies and federal law.

508.    Wesleyan's actions as described above were performed with reckless indifference to Jane's rights.

509.     As a result of Wesleyan's reckless and wanton misconduct, Jane is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as punitive damages in an amount to be determined.

## AS AND FOR AN EIGTH CAUSE OF ACTION
### Breach of Fiduciary Duty

510.     Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein

511.     At all relevant times, a fiduciary relationship existed between Jane and Wesleyan.

512.     Wesleyan assumed a fiduciary duty when it installed, implemented, and administered Moodle as the university-wide online course material database.

513.     Wesleyan had superior expertise, skill, and knowledge regarding the installation, implementation, and administration of Moodle as the university-wide online course material database.

514.     Jane trusted and relied upon Wesleyan to properly install, implement, and administer Moodle.

515.     Wesleyan failed to properly install, implement, and administer Moodle.

516.     Wesleyan breached its fiduciary duty to Jane by failing to properly install, implement, and administer Moodle.

517.     Wesleyan assumed a fiduciary duty when it administered Moodle for CHEM 141 and CHEM 142.

518.     Wesleyan had superior expertise, skill, and knowledge regarding the administration of Moodle for CHEM 141 and CHEM 142.

519.     Jane trusted and relied upon Wesleyan's superior expertise, skill, and knowledge

regarding the administration of Moodle as it applied to CHEM 141 and CHEM 142.

520.    Wesleyan failed to properly administer Moodle during CHEM 141 and CHEM 142.

521.    Wesleyan breached its fiduciary duty when it failed to properly administer Moodle during CHEM 141 and CHEM 142.

522.    Wesleyan assumed a fiduciary duty when it utilized evidence related to Moodle in the disciplinary process.

523.    Jane trusted and relied upon Wesleyan's superior expertise, skill, and knowledge regarding Moodle evidence during the disciplinary process.

524.    Prior to the Initial Hearing, Wesleyan had exculpatory evidence related to Moodle in its exclusive possession, custody, and control.

525.    Wesleyan did not timely provide Jane with the exculpatory evidence related to Moodle prior to the Initial Hearing.

526.    Wesleyan breached its fiduciary duty to Jane by withholding the exculpatory evidence.

527.    Wesleyan assumed a fiduciary duty when it initiated its disciplinary process against Jane.

528.    Wesleyan had superior expertise, skill, and knowledge of its own disciplinary process.

529.    Jane relied upon and trusted Wesleyan's superior expertise, skill, and knowledge regarding its own disciplinary process.

530.    According to the Handbook, Wesleyan was required to conduct its disciplinary proceedings pursuant to the "standards of fair process."

531.    Wesleyan did not engage in a fair disciplinary process as required by the Handbook.

532.    Wesleyan breached its fiduciary duty to Jane by failing to conduct a disciplinary process that comported with the "standards of fair process."

533.    Wesleyan's aforementioned breaches of its fiduciary duties were done to advance its own interests.

534.    Wesleyan's aforementioned breaches of its fiduciary duties were the proximate cause of Jane's unwarranted expulsion.

535.    As a result of Wesleyan's breaches of its fiduciary duties, Jane is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A NINTH CAUSE OF ACTION
### Violation of the Connecticut Unfair Trade Practices Act (CUTPA)

536.    Jane repeats and realleges each and every allegation hereinabove as if fully set forth herein.

537.    Jane is a person within the meaning of Conn. Gen. Stat. §§ 42-110a (3) and 42-110g(a) entitled to bring an action under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*

538.    At all relevant times, Wesleyan was a person within the meaning of Conn. Gen. Stat. §§ 42-110a (3) acting in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. §§ 42-110a *et seq.*

539.    The foregoing actions of Wesleyan constitute unfair and deceptive acts and practices in the conduct of trade or commerce that are unethical, unscrupulous and offensive to public policy, and are a violation of Conn. Gen. Stat. § 42-110b(a).

540.     As a result of the foregoing unfair and deceptive acts and practices, Jane has suffered an ascertainable loss within the meaning of Conn. Gen. Stat. §§ 42-110g(a) and has suffered damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

541.     Moreover, Wesleyan's foregoing conduct has caused and will continue to cause irreparable injury to Jane for which she has no adequate remedy at law.

542.     The foregoing actions of Wesleyan show calculated, deceitful and unfair conduct, and reckless indifference to the rights of Jane.

543.     Accordingly, Wesleyan is liable to Plaintiff for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

544.     Jane is mailing a copy of this Complaint to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection for the State of Connecticut, as required by Conn. Gen. Stat. § 42-110g(c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant judgment in her favor on all claims for relief and award:

A.     On her First Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

B.     On her Second Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

C.     On her Third Cause of Action, a judgment in an amount to be determined at trial

together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

D.      On her Fourth Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

E.      On her Fifth Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

F.      On her Sixth Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

G.      On her Seventh Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements, as well as punitive damages in an amount to be determined;

H.      On her Eighth Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements;

I.      On her Ninth Cause of Action, a judgment in an amount to be determined at trial together with interest thereon, and the sum of Plaintiff's attorneys' fees, expenses, costs and disbursements, as well as punitive damages in an amount to be determined;

J.      All equitable and injunctive relief needed to correct Jane's student judicial record and standing at the University; and

K.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Jane herein demands a trial by jury of all triable issues in the present matter.

Dated: September 26, 2019

**ZELDES, NEEDLE & COOPER, P.C.**
*Attorneys for Plaintiff*

By: _____
David S. Rintoul, Esq.
100 Lafayette Boulevard, 7th Floor
Bridgeport, Connecticut 06604
(203) 332-5782
drintoul@znclaw.com

-and-

**WARSHAW BURSTEIN, LLP**
*Attorneys for Plaintiff*
Kimberly C. Lau (*pro hac vice* pending)
James E. Figliozzi (*pro hac vice* pending)
575 Lexington Avenue
New York, New York 10022
(212) 984-7709
klau@wbny.com
jfigliozzi@wbny.com