UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Jane Doe,<br>　　　*Plaintiff*,<br>　　　　　*v.*<br>Wesleyan University,<br>　　　*Defendant*. | Civil No. 3:19-cv-01519 (JBA)<br><br>February 19, 2021 |

**RULING GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

Plaintiff Jane Doe brings claims against Defendant Wesleyan University for breach of contract, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, negligent misrepresentation, promissory estoppel, reckless and wanton misconduct, breach of fiduciary duty, and violation of the Connecticut Unfair Trade Practices Act. (Am. Compl. [Doc. # 50].) Defendant moves to dismiss all claims in this seventy-four page, 662-paragraph Amended Complaint (Def.'s Mot. to Dismiss [Doc. # 54].) Plaintiff opposes. (Pl.'s Mem. in Opp. [Doc. # 64].)

## I.    Factual Background from Amended Complaint

Plaintiff is a former Wesleyan student who was expelled for allegedly cheating on exams in two summer courses taught by Professor Andrea Roberts. (Am. Compl. ¶¶ 1, 398.) Plaintiff enrolled at Wesleyan in the fall of 2016 as a first-year student. (*Id.* ¶ 44.) In the summer of 2017, Plaintiff took three summer chemistry courses taught by Professor Roberts. (*Id.* ¶ 47.) Plaintiff earned an A in one of the summer courses, and as a result of her academic success, Professor Roberts asked her to serve as a teaching assistant for one of her upcoming chemistry courses the following fall semester. (*Id.* ¶ 50.)

On August 6, 2017, Plaintiff received a letter from Professor Roberts accusing her of having cheated on exams she took on June 14, June 21, June 28, and June 29. (*Id.* ¶¶ 53, 56.) Professor Roberts alleged that Plaintiff had accessed Moodle, an online "learning management system" used at Wesleyan, during these exams. (*Id.* ¶¶ 42-43, 53-64.) Professor Roberts believed Plaintiff was able to access Moodle during the exams because

she, unlike most other students, took her exams partially unproctored and therefore could access electronic devices without detection more easily. (*See id.* ¶ 57.) As a result of her developmental coordination disorder, Plaintiff received fifty percent extended time to complete exams and took her exams in a low-distraction environment. (*Id.*) Professor Roberts asserted that it was "not possible to have a proctor in the room for the entire time that [Plaintiff] was completing her exams." (*Id.*)

Professor Roberts stated that she examined the Moodle activity logs which record users' activity on their class web pages. (*Id.* ¶ 58.) She observed that the activity logs showed that Plaintiff had logged into Moodle four times during the June 14 exam, eighteen times during the June 21 exam, thirty-five times during the June 28 exam, and fourteen times during the June 29 final exam. (*Id.* ¶¶ 58-59.) A few days later, Professor Roberts also accused Plaintiff of accessing Moodle during exams on July 12, July 19, July 26, August 2, and August 4. (*Id.* ¶ 60.) Professor Robert stated that the Moodle logs indicated that Plaintiff specifically accessed relevant course content during all of these exams. (*Id.* ¶¶ 62-63.)

Plaintiff vigorously denies having cheated, insisting that she never accessed Moodle or any course materials during any of Professor Roberts's exams. (*Id.* ¶¶ 64-65.) She also maintains that she had never even touched her cellphone, the device by which she allegedly accessed Moodle, during any of her exams. (*Id.* ¶ 66.)

Attempting to discredit the veracity of Professor Roberts's allegations, Plaintiff notes that she did not even have an exam for Professor Roberts on June 29, one of the dates she was alleged to have cheated. (*Id.* ¶ 67.) She also argues that the "vast majority of the pages" that she was alleged to have viewed would not have aided her in any of the exams as they were problem sets that did not contain any answers. (*Id.* ¶ 71.) Moreover, Plaintiff maintains that her developmental coordination disorder made it impossible for her to have cheated as alleged; she could not have accessed webpages up to sixty-six times during one exam as she then would have had no time left to complete the chemistry problems on the exam. (*Id.* ¶ 72.)

Although Professor Roberts characterized Plaintiff's exams as largely unproctored, Plaintiff alleges that the teaching assistant ("TA") regularly made unannounced visits to her testing room that would have enabled him to detect any unauthorized cellphone usage. (*Id.*

2

¶¶ 75-78.) This TA had reported at least one other student for using her cellphone while taking a chemistry exam. (*Id.* ¶ 79.)

In response to Professor Roberts's allegations, Wesleyan initiated an investigation into Plaintiff's alleged misconduct. As a part of this investigation, Wesleyan consulted with various staff members whose duties were related to academic technology. (*Id.* ¶ 116.) Professor Roberts discussed with Rachel Schnepper, Wesleyan's Director of Academic Technology, the various IP addresses Plaintiff used to allegedly access Moodle. Plaintiff maintains that an IP address on the Moodle logs places her in Italy. (*Id.* ¶ 127.)  Plaintiff says she was home in New York at the time and had not been to Italy for over a decade. (*Id.* ¶¶ 128-129.)

On August 9, 2017, Wesleyan formally charged Plaintiff with violations of the Honor Code. (*Id.* ¶ 135.) As a result of these allegations of academic misconduct, Plaintiff was referred to the Honor Board, a quasi-judicial entity that would determine whether she was guilty of the charged conduct. (*Id.* ¶ 100.) The Honor Board proceedings would allow Plaintiff and Professor Roberts to present their cases before an impartial panel. (*See id.* ¶ 103.) Wesleyan told Plaintiff to refer to the Wesleyan Student Handbook website to familiarize herself with Honor Board procedures. (*Id.* ¶ 140.)

In preparation for her hearing, Plaintiff gathered statements from student witnesses who were in the exam room with her at a time she was alleged to have cheated. (*Id.* ¶ 145.) These students stated that they had a clear view of Plaintiff, would have been able to see her access her cellphone, and did not see her access her cellphone during the exam. (*Id.* ¶¶ 147-151.) Plaintiff also sought the statement of her TA, who had been making unannounced visits to Plaintiff's classroom as she took all of the exams. (*Id.* ¶¶ 154-155.) The TA declined to get involved and directed Plaintiff to speak with Professor Roberts about any concerns. (*Id.* ¶ 162.) When Plaintiff sought to compel the TA's testimony, Lorna Scott, the Honor Board's Clerk, told Plaintiff that "[t]here is no policy about gathering information and witnesses." (*Id.* ¶ 170.) She thought it was "up to the discretion of [Plaintiff]" and whoever she asked whether to participate in the adjudication. (*Id.*) However, Wesleyan's written procedures state that the Honor Board "may require the cooperation of any member of the community in furnishing testimony or evidence directly related to the adjudication of a case." (*Id.* ¶ 171.)

3

Plaintiff's Honor Board hearing took place on August 16, 2017, before a panel of three students and one administrator. (*Id.* ¶ 233.) Plaintiff maintains this was contrary to both Wesleyan's written policies and Scott's statement to her that Honor Board cases are heard by four students and two faculty/staff members. (*Id.* ¶¶ 237-240.) Plaintiff alleges that during the hearing, Professor Roberts demonstrated bias and bigotry against students with disabilities, including Plaintiff. (*Id.* ¶¶ 246-251.)

After hearing the evidence, the Honor Board concluded that Plaintiff had cheated on five of the nine exams on which she was accused of cheating, basing its findings primarily on the Moodle logs presented. (*Id.* ¶¶ 272, 277.) Plaintiff was expelled from Wesleyan as a result of these findings. (*Id.* ¶ 280.)

After Plaintiff received the verdict from the Honor Board, she retained BDO Consulting to conduct an independent forensic analysis of her electronic devices, Wesleyan's documentation, and AT&T cellular data usage logs. (*Id.* ¶¶ 283-285.) BDO states that Wesleyan's wifi logs for June 21, June 27, June 28, and July 26, all dates on which Plaintiff was alleged to have cheated, were all deleted from Wesleyan's records. (*Id.* ¶ 286.) Peter Pate, BDO's Consulting Director, stated in a declaration that he had reviewed all the available Moodle data, wifi logs, and cellular usage data and found that the Moodle logs were inaccurate at least as to the August 4 exam, since they showed Plaintiff accessing Moodle when neither the wi-fi logs nor the data usage logs showed Plaintiff as being connected to the Internet. (*Id.* ¶¶ 294-295.) Pate also referenced the reports of a KPMG investigation, which found that Moodle timestamps were inaccurate. (*Id.* ¶¶ 308-309.)

Based on this new evidence, Plaintiff requested an appeal of the hearing decision, which Wesleyan's Vice President for Student Affairs, Michael Whaley, granted on September 7, 2017. (*Id.* ¶ 297.) However, contrary to the terms of Wesleyan's Handbook, the panel overseeing Plaintiff's appeal was identical to the panel that had already found Jane guilty of misconduct and had voted to expel her. (*Id.* ¶¶ 298-299.) As a part of her appeal, Plaintiff was permitted to make her case at a second hearing that was scheduled to take place on September 11, 2017. (*Id.* ¶¶ 302, 310.)

In response to Plaintiff's presentation of the Pate Declaration, Schnepper, Wesleyan's Academic Technology Director, authored her own declaration providing another "possible interpretation" of the data BDO had analyzed. (*Id.* ¶ 306.) Schnepper

opined that the wifi logs do not indicate the duration of Plaintiff's cellphone usage and that the data could be consistent with Plaintiff's accessing Moodle for an extended period of time, in contradiction to Pate's Declaration that Plaintiff was not connected to Wesleyan wi-fi continuously during the alleged period of time. (*Id.* ¶ 303.)

Before the Second Hearing, Scott informed Plaintiff that Plaintiff had been presented with the full universe of evidence presented against her. (*Id.* ¶¶ 310-311.) In response, Plaintiff asked Scott if there would be any new witnesses used against her to which Scott responded, "There will be no new witnesses." (*Id.* ¶¶ 313-314.) Whaley reiterated this, telling Plaintiff that the Second Hearing would be limited to consideration of AT&T records and ITS's response in her case file. (*Id.* ¶ 317.) As a result of these representations, Plaintiff did not call Pate to testify at the hearing, even though she wished to. (*Id.* ¶¶ 316-320.)

At the Second Hearing, Schnepper and Mohit Bachhav, a Wesleyan network administrator, conducted an "experiment" which purportedly demonstrated that Plaintiff still could have cheated as alleged. (*Id.* ¶ 324.) Plaintiff had never been informed that any such experiment would take place and maintains that the experiment was severely methodologically flawed. (*Id.* ¶¶ 324-325.) She reports objecting to the introduction of the experiment as "new evidence." (*Id.* ¶ 328.)

Plaintiff asserts that in addition to Wesleyan improperly introducing the experiment, it also introduced other new evidence including "unconfirmed hearsay testimony . . . concerning a Wesleyan backup server" that purportedly demonstrated that "all 144 of the access times listed on the Moodle log were accurate." (*Id.* ¶¶ 335, 338.) Plaintiff maintains that she had never been informed of the backup server data that was used against her. (*Id.* ¶ 338.) Further, a BDO analysis later confirmed that the backup server was not independent and thus "confirmed nothing." (*Id.* ¶ 343.) Despite Plaintiff's repeated objections to the introduction of this evidence, the Honor Board still considered the evidence in reaching its decision. (*Id.* ¶¶ 349-351.)

Wesleyan recorded the Second Hearing on a recording device. (*Id.* ¶ 359.) Because the Honor Board forgot to turn off the recording device prior to deliberations, the recorder allegedly captured Brown, a Wesleyan dean, laughing at and mocking Plaintiff. (*Id.* ¶ 360.) Plaintiff also alleges that the recording demonstrated that panelists were confused by the evidence presented, incorrectly summarizing the Pate declaration. (*Id.* ¶¶ 363-365.)

The Honor Board once again found Plaintiff responsible for academic misconduct on five exams and upheld its sanction of dismissal. (*Id.* ¶¶ 379-380.)

Plaintiff appealed the decision from the Second Hearing on September 28, 2017. (*Id.* ¶ 382.) In her appeal, Plaintiff argued that she was denied a fair process and offered another declaration by Pate, where he wrote that Wesleyan's wifi logs were inconsistent with the alleged misconduct and that the backup server information did nothing more than mirror the original server information and therefore did not constitute an independent verification. (*Id.* ¶¶ 383-384.) In addition, Pate pointed out the flaws in the experiment introduced at the Second Hearing and expressed concern about all the relevant data that Wesleyan deleted. (*Id.* ¶¶ 389-391.) Wesleyan denied Plaintiff's second appeal, thereby upholding her expulsion. (*Id.* ¶ 391.)

After her second appeal was denied, Plaintiff asserts that another chemistry professor discussed Plaintiff's case and sanctions with his chemistry class. (*Id.* ¶ 406.) Although the professor did not use Plaintiff's name, her information was easily identifiable. (*Id.* ¶ 407.) Only members of the Honor Board and Wesleyan's administrative staff were supposed to have access to any information about the hearings. (*Id.* ¶¶ 408-413.) Since this professor was not privy to any of the proceedings, it appeared that at least one panel participant breached the duty of confidentiality set forth in the student handbook. (*Id.* ¶¶ 432-435.)

In addition, Plaintiff learned after ordering her transcript from Wesleyan that her academic record showed two "F" grades for the courses she was alleged to have cheated in. (*Id.* ¶ 449.) She maintains that this is contrary to Wesleyan's written policy stating that students will be notified "of the outcome of an appeal" and "the sanctions . . . imposed." (*Id.* ¶¶ 450-451.)

Plaintiff argues that her improper expulsion has disrupted her life and "destroyed" her chances of becoming a doctor or a lawyer. (*Id.* ¶¶ 443-446.) She further claims Wesleyan's actions have caused her physical harm, reputational damage, economic damage, and emotional harm. (*Id.* ¶ 452.)

**II.     Discussion**

Wesleyan moves to dismiss all of Plaintiff's claims under Fed. R. Civ. P. 12(b)(6), arguing that its actions are entitled to deference under *Gupta* and that none of her eight claims is plausible. (Def.'s Mem. at 19, 23.)

### A.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To determine whether an allegation is plausible, a court must accept all the factual allegations as true, while disregarding any conclusory allegations or mere recitals of legal elements. *Id.* at 663. Then the court must read all the well-pleaded allegations and conclude whether there are sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### B.   Propriety of Wesleyan's Inclusion of Exhibits

Wesleyan spends the first fourteen pages of its motion to dismiss asserting that Plaintiff's characterization of the facts is not accurate and then attaches sixty-five pages of relevant exhibits in support of its contention. (Def.'s Mem. at 6-19.) These exhibits include the student Handbook, (Ex. A to Def.'s Mot [Doc. #54-2]), Plaintiff's Moodle activity logs, (Ex. B to Def.'s Mot. [Doc. # 54-3]), an email from Schnepper, (Ex. C to Def.'s Mot. [Doc. # 54-4]), an email sent to Plaintiff charging her with Honor Code violations, (Ex. D to Def.'s Mot. [Doc. # 54-5]), a letter from Professor Roberts, (Ex. E to Def.'s Mot. [Doc. # 54-6]), a partial transcript of the first hearing, (Ex. F to Def.'s Mot. [Doc. # 54-7]), the Pate Declaration, (Ex. G to Def.'s Mot. [Doc. # 54-8]), a partial transcript of the Second Hearing, (Ex. H to Def.'s Mot. [Doc. # 54-8]), an email from Brown, (Ex. I to Def.'s Mot. [Doc. # 54-9]), and a letter from Vice President Whaley to Plaintiff, (Ex. J to Def.'s Mot. [Doc. # 54-10]).

In addition to disputing the authenticity and accuracy of many of the exhibits, Plaintiff challenges the propriety of introducing evidence in a motion to dismiss, arguing that Wesleyan is attempting "a thinly veiled premature motion for summary judgment that relies upon improper exhibits." (Pl.'s Mem. at 7.) She maintains that at the motion to dismiss stage, the Court is only permitted to consider the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. (*Id.* (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016)).) Plaintiff then incorrectly states that any additional exhibits or

documents incorporated by reference "cannot form the basis of the Court's ruling on a motion to dismiss" because courts are required to assess the legal feasibility of a complaint, not weigh the evidence offered in support of such claims.[1]

In response, Wesleyan maintains that its motion is procedurally proper, asserting that Plaintiff cited in her Complaint each document Wesleyan attached as an exhibit to its Motion to Dismiss and that it would be fundamentally unfair to permit Plaintiff to "freely rely on and quote from documents, but preclude Wesleyan from doing the same." (Reply [Doc. # 68] at 2.) In support of its position, Wesleyan perplexingly cites a securities fraud case where the Second Circuit held that "a district court may consider relevant documents required by securities law to be filed with the SEC in determining a motion to dismiss a complaint alleging material misrepresentations and omissions in such documents." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 769-770 (2d Cir. 1990). The Second Circuit reasoned that consideration of the documents was appropriate because the documents the defendant cited in its motion to dismiss were "required by law to be filed with the SEC," undoubtedly authentic, and "the very documents that are alleged to contain the various misrepresentations or omissions." *Id.* at 774. Although the Second Circuit permitted consideration of the documents filed with the SEC, it was careful to limit its ruling to securities fraud actions where defendants seek to introduce publicly filed disclosures at the motion to dismiss stage, clarifying that the case "serve[d] as an occasion to fashion a clear rule governing the consideration of publicly filed disclosure documents when deciding motions to dismiss securities fraud actions." *Id.* at 772.

The *Kramer* court offers no suggestion that this holding would apply to a scenario such as this. Here, none of the documents Wesleyan cited have been filed with a government agency and the authenticity and accuracy of many of these documents are disputed. Moreover, the central allegations of Plaintiff's case are not about the contents of any particular document, aside from the Handbook.

---

[1] *DiFolco v. MSNBC Cable*, which Plaintiff offers in support of her proposition that the Court cannot consider documents incorporated by reference in the Complaint actually stands for the contrary point that "[i]n considering a motion to dismiss for failure to state a claim pursuant to rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." 622 F.3d 104, 111 (2d Cir. 2010).

Wesleyan's other cited caselaw is largely inapposite. In *B.B. v. The New School*, a student sued over his university expulsion. 2018 WL 2316342 (S.D.N.Y. Apr. 30, 2018). In evaluating the university's motion to dismiss, the court considered a letter that the defendant had attached to its motion, writing that "[a]lthough material outside the complaint is typically not considered on a 12(b)(6) motion, the Court may consider it here because the letter is quoted in the complaint, and because Plaintiff has relied upon the letter in framing the complaint." *B.B.*, 17-cv-8347 (AT), 2018 WL 2316342, at *2 n.4. In *McNeil v. Yale University*, Judge Bolden held that a letter by the U.S. Department of Education Office for Civil Rights could be considered at the motion to dismiss stage because it was "critically related to [the plaintiffs'] factual allegations and underlying theory: that Yale fails to comply with the dictates of Title IX." 436 F.Supp.3d 489, 515 (D. Conn. 2020). Notably, in neither of these cases did a plaintiff dispute the authenticity or accuracy of the documents the defendants included, nor were the documents as extensive as those Wesleyan seeks to introduce. So although these cases do stand for the proposition that foundational documents on which a major legal theory are based can be admitted for the purpose of evaluating the merits of a motion to dismiss, they do not indicate that transcripts of disciplinary hearings, for example, can be considered simply because the plaintiff discussed the hearing in the complaint (much less selective excerpts selected by the defendant).

The Court concludes that Defendant's Exhibits B, C, D, E, F, H, I, and J should be excluded from consideration at the motion to dismiss stage. However, Exhibits A and G, which contain an excerpt the Wesleyan Handbook and the Pate Declaration, respectively, are both heavily referenced in Plaintiff's Amended Complaint, are not disputed, and are foundational to Plaintiff's legal theories, and the Court will consider them in evaluating the merits of Defendant's motion to dismiss.

### C.    *Gupta* Deference

Wesleyan argues that its disciplinary decisions are entitled to deference under *Gupta v. New Britain General Hospital*, 239 Conn. 574 (1996). (Def.'s Mem. at 20.) In *Gupta*, a plaintiff challenged his dismissal from a hospital residency program, arguing that the residency program failed to reasonably and adequately train him and did not satisfy the standards of a teaching hospital, and thus breached the residency agreement. (*Id.* at 590.)

In granting summary judgment to the defendant, the Connecticut Supreme Court held that the plaintiff's claim, in essence, was a claim that the residency program "'fail[ed] to provide an effective education," which amounted to an educational malpractice claim that was not cognizable. *Id.* at 590-591 (quoting *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)). Educational malpractice claims, the Connecticut Supreme Court held, would require courts to undertake the "awkward task[] of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached," and "are not cognizable." *Id.* at 591-592.

Although courts will not hear "contract claims challenging the overall quality of educational programs," they will entertain claims that "the educational institution failed to fulfill a specific contractual promise distinct from any overall promise to offer a reasonable program" or that it acted "arbitrarily, capriciously, or in bad faith." *Id.* at 592-593, 595. For the second type of claim, a plaintiff must show that the educational institution's decision had "no discernible rational basis" in order to prevail. *Id.* at 596.

Subsequently, in *Doe v. Yale*, the Connecticut Supreme Court clarified that the common law duty not to cause physical injury by negligent conduct "does not disappear when the negligent conduct occurs in an educational setting." *Doe v. Yale Univ.*, 252 Conn. 641, 659 (2000). The court explained that

> the distinction between an educational malpractice claim . . . and a cognizable
> negligence claim arising in the educational context . . . lies in the duty that is alleged
> to have been breached. If the duty alleged to have been breached is the duty to
> educate effectively, then the claim is not cognizable.

*Id.* In concluding that the plaintiff's claim that the teaching hospital which employed her as a medical intern negligently caused her to contract HIV was cognizable, it explained that the plaintiff "alleged that, in the course of instructing her, the defendant caused her to sustain physical injury as a result of its negligent conduct," which does not amount to an educational malpractice claim. *Id.*

Wesleyan maintains that *Gupta* deference applies to the circumstances of this case, citing several cases in which courts, including this Court, have applied the standard to an academic institution's disciplinary decisions even where the relevant misconduct was non-academic. (Def.'s Mem. at 22-23.) In *Doe v. Quinnipiac University*, a case in which the

plaintiff argued he was improperly expelled for alleged sexual misconduct, this Court concluded that *Gupta* "bars claims challenging a school's disciplinary processes and outcomes, based on mere negligence, as opposed to arbitrary, capricious, or bad faith conduct." 404 F. Supp.3d 643, 674 (D. Conn. 2019) (citing *Bass* ex rel. *v. Miss Porter's School*, 738 F.Supp.2d 307, 327 (D. Conn. 2010)). Wesleyan therefore argues that Plaintiff's claims, which stem from a disciplinary decision related to academic misconduct, must be dismissed unless she can show arbitrary, capricious, or bad faith conduct. (Def.'s Mem. at 23.)

Because *Gupta* applies differently to Plaintiff's various tort and contract claims, the Court will discuss *Gupta*'s applicability to each of Plaintiff's causes of action.

### i.     *Plaintiff's Breach of Contract Claim (Count One)*

In her Amended Complaint, Plaintiff asserts that Wesleyan's Handbook amounts to a contract between the university and its students and that Wesleyan violated ten promises to Plaintiff contained in the Handbook by (1) failing to meet the "fair preponderance standard"; (2) failing to construct a full hearing panel; (3) failing to conduct a hearing in accordance with the standards of fair process; (4) failing to assist Plaintiff in gathering evidence and testimony in her favor; (5) failing to maintain confidentiality; (6) failing to enforce the limitations of the administrative advisor role; (7) failing to enforce the anti-discrimination measures; (8) utilizing the same Honor Board for its initial hearing and Second Hearing in violation of the terms of the handbook; (9) improperly consulting an adjudicator in drafting the Second Appeal Decision; and (10) failing to properly notify Plaintiff that she would receive two "F" grades as a part of her sanction as required by the handbook. (*Id*. at 24-31.)

Although Wesleyan acknowledged at oral argument that student handbooks are a potential basis for a breach of contract claim, it nonetheless argues that Plaintiff's breach of contract claim should be dismissed because none of these alleged breaches "fall[s] within *Gupta*'s narrow exception for 'special promises,'" (Def.'s Mem. at 25). Plaintiff maintains that her claim "falls decidedly within the second *Gupta* exception" because she alleges that Wesleyan has failed to fulfill specific contractual promises articulated in its handbook, rather than generally failing to provide a reasonable educational program. (Pl.'s Mem. at 22.)

### 1.  *Failure to Provide a Fair Process*

The Court begins its analysis with Plaintiff's claim that Wesleyan denied her a fair disciplinary process since it encompasses many of the more specific Handbook violations Plaintiff also alleges. Wesleyan argues that Plaintiff's claim for breach of contract based on the school's alleged failure to provide her a fair disciplinary process is not cognizable, relying on *Gally v. Columbia University*, which held that that the defendant university's code of conduct which stated that "all students should receive fair and equal treatment" was too general to support "a separate and independent contractual obligation" and merely served as a statement of adherence to relevant antidiscrimination laws. *Gally v. Columbia Univ.*, 22 F.Supp.2d 199, 208 (S.D.N.Y. 1998). But Plaintiff does not assert failure to provide a fair process as a standalone breach of contract claim. Rather, she brings a single breach of contract claim, citing numerous examples of Wesleyan's failure to afford her a fair disciplinary process and referring to specific violations of the Handbook in support. (Am. Compl. ¶¶ 454-473.) She references Wesleyan's failure to convene a full hearing panel, to assist her in gathering exculpatory evidence, to maintain confidentiality, to limit the role of Brown as the administrative advisor, to enforce antidiscrimination measures, and to notify her of her "F" grades as violating the rights she was afforded in the Handbook. (*Id.*)

In response, Wesleyan argues that Plaintiff's interpretations of the Handbook are either incorrect or that she does not allege sufficient facts to make a violation of the provision plausible. (Def.'s Mem. at 24.) Specifically, the Honor Board panel composition provision states, "the voting membership of the Honor Board shall consist of four undergraduate students" and "the advisory membership of the Honor Board shall consist of at least one faculty member . . . and the dean for academic advancement," but Defendant observes it is silent on the composition of any particular Honor Board panel. (Def.'s Mem. at 26-27.) Wesleyan cites several Handbook excerpts that contemplate panels composed of varying numbers, including that "[d]ecisions rendered during the hearing shall be by majority vote of the voting members present." (*Id.* at 27.) Both Plaintiff and Wesleyan's interpretations of the Handbook appear reasonable, and when contractual language is reasonably susceptible to competing interpretations, one of which would entitle the plaintiff to relief, dismissal is inappropriate. *See Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d

110, 115 (SRU) (D. Conn. 2014) (denying a motion to dismiss because the language of the contract was susceptible to more than one reasonable interpretation).

And while Wesleyan insists that it had no duty to assist Plaintiff in gathering exculpatory evidence, specifically the testimony of the TA, Plaintiff's interpretation that Wesleyan had the authority to provide her with the requested assistance is reasonable: the Honor Board "may require the cooperation of any member of the university community in furnishing testimony or evidence directly related to the adjudication of a case," is language which could communicate to the school community that the Honor Board has the capacity to compel testimony and will do so where appropriate. This interpretation is particularly plausible in light of the Handbook's express promise that students have "[t]he right to be protected by standards of justice and fairness in any proceedings with the University," which would indicate a symmetric right to present relevant evidence and testimony.

Similarly, Plaintiff's assertion that Wesleyan's failure to notify her of her two "F" grades violated its promise to provide "written notice of the results of hearings and appeals" plausibly alleges that the failing grades Plaintiff received in the two classes in which she was alleged to have cheated were the result of being found guilty of academic misconduct. Although the failing grades may have been the result of a process independent of the Honor Board, such a scenario requires further factual development.

## 2. Failure to Employ the Fair Preponderance Standard

As with the claim of failure to provide a fair process, the Court will evaluate the claim that Wesleyan failed to utilize the preponderance of the evidence standard as a broader claim encompassing many of Plaintiff's more specific allegations. Although a general claim that a university should have reached a different result in an adjudication may not be cognizable when standing alone,[2] Plaintiff references numerous allegations of objective procedural failures that, if true, would have made it impossible for an adjudicative board to fairly weigh the evidence. Plaintiff's allegations that she was denied the right to present evidence in her favor, have a full hearing panel evaluate evidence, and

---

[2] In *Doe v. Northern Mich. Univ.*, the court held that the plaintiff's claim that the university failed to employ the preponderance of the evidence standard amounted to a *subjective* claim of an unfair proceeding and thus failed to satisfy the objective standard for breach of contract. 393 F. Supp. 3d 683, 699 (W.D. Mich. 2019).

have an unbiased faculty advisor serve on the Honor Board give objective detail showing the plausibility of her allegation that her proceedings were so procedurally flawed as to deny the Honor Board the opportunity to evaluate the evidence under the fair preponderance standard.

### 3.   Utilizing the Same Honor Board Panel for the Appeal

There are two breaches of Handbook provisions that Plaintiff claims, however, which do not plausibly support a finding of contractual liability. Although Plaintiff maintains that Wesleyan improperly utilized the same Honor Board for its initial hearing and Second Hearing, the facts alleged do not support such a claim. (Am. Compl. ¶467.) The Handbook states, "If the appeal is granted, the Appeals Board has the authority to recommend a new hearing before a new board/panel." In other words, the Appeals Board has the discretion to grant a new hearing if it has granted an appeal. Plaintiff argues that Wesleyan's remand of the matter to the same hearing board was contrary to this Handbook directive. Her reading of this provision does not reasonably support the claim that the Appeals Board's authority is limited to recommending a new hearing before a new board or panel such that it is prohibited from remanding the case to the original panel. Plaintiff's claim that Wesleyan was required to order a new hearing before a new panel is not plausible.

### 4.   Allowing an Honor Board Member to Serve on the Appeals Board

Plaintiff's allegation that Wesleyan violated its promise that Appeals Board members would not have participated in the original adjudication is similarly implausible. (Am. Compl. ¶ 468.) She alleges that Whaley decided to deny her second appeal based "in part on discussing the case with the student chair" who served on her Honor Board panel and argues that this consultation amounts to the student chair serving on the Appeals Board in violation of the Handbook provision that "Appeals Board members will not have been involved in the adjudication of the case being appealed." (*Id.* ¶ 391-394.) But Plaintiff never alleges that the student chair was ever a *member* of the Appeals Board, just that Whaley consulted with him. Since the Handbook prohibits only original adjudicators from being members of the Appeals Board, Plaintiff's factual allegations do not plausibly support liability for breach of contract on this ground.

14

### 5. *Conclusion*

In light of the specific procedural violations Plaintiff alleges to support her claims that Wesleyan failed to employ the fair preponderance standard in its adjudication or afford her a fair process, Defendant's motion to dismiss Plaintiff's breach of contract claim (Count One) is denied in part. However, Plaintiff's theories of contractual liability that the Appeals Board was identical to the Honor Board, that a member of the Honor Board improperly served on the Appeals Board, and that the Appeals Board did not remand to a new board are dismissed.

### ii.      *Plaintiff's Negligence Claim (Count Two)*

Plaintiff claims that Wesleyan negligently installed, implemented, and administered Moodle as its university-wide learning management system. (Am. Compl. ¶¶ 477-499.) Wesleyan maintains that Plaintiff's negligence claim fails both because it amounts to a non-cognizable educational malpractice claim barred by *Gupta* and because Plaintiff did not plausibly allege duty and proximate cause. (Def.'s Mem. at 31-32.) Wesleyan maintains that Plaintiff's claim is functionally a claim that the University negligently selected Moodle as its educational software platform which is precisely the type of matter of academic discretion subject to deference under *Gupta*, absent any allegation that it acted arbitrarily and capriciously, in order to state a negligence claim. (*Id.* at 31-32) Defendant also argues that Plaintiff fails to allege that Defendant's negligence regarding Moodle proximately caused her dismissal from the University. (*Id.* at 31.)

Plaintiff declares that "Wesleyan fundamentally misconstrues [her] negligence claim," which is not that Wesleyan negligently selected Moodle as a software provider, but that Wesleyan "utterly failed to properly install, implement, and administer Moodle." (Pl.'s Mem. at 35-36.) She maintains that "[i]n deciding to use Moodle as a university-wide learning management system, Wesleyan assumed a duty of care to properly install, implement, and administer Moodle." (*Id.* at 36.) She dismisses Wesleyan's assertion of lack of proximate cause since she "is not claiming that Wesleyan's choice to use Moodle initiated a chain of events leading to her expulsion." (*Id.* at 38 n.17.)

Plaintiff cites *Doe v. Yale*, which reasoned that when a plaintiff alleges physical harm caused by an educational institution, the "fact that the harm is caused in an educational setting is not sufficient to *remove* the claim from that traditionally cognizable claim," and

"the fact that some of the allegations that support a claim of a failure of a defendant's duty not to cause physical injury by negligent conduct in the course of instruction may mirror some of those that would be alleged to support an educational malpractice claim, does not require the conclusion that the cause of action is one sounding in educational malpractice." *Doe v. Yale*, 252 Conn. at 663 (emphasis in original).

In *Johnson v. Schmitz*, this Court concluded that the plaintiff graduate student stated a claim for negligence where he alleged that his university neglected its duty "to establish and enforce reasonable rules, policies, and guidelines" to ensure that faculty did not plagiarize student ideas or otherwise engage in misappropriation, which was not a claimed duty to educate, "but to establish and enforce reasonable rules[,] . . . a sphere which the judicial system is capable of assessing." 119 F. Supp. 2d 90, 98-99 (D.Conn. 2000).

Defendant believes these cases to be factually distinguishable and notes *Johnson*'s warning against "assessing the reasonableness of an educational institution's decision to provide particular educational services to students," as precisely what Plaintiff accuses Wesleyan of doing. (Reply at 9-10.)

Both Parties' invocations of *Gupta* do nothing to address whether Plaintiff has alleged that Wesleyan's negligence proximately caused her injury. Regardless of whether Wesleyan's use and operation of Moodle is an academic decision entitled to deference, Plaintiff still must allege that Wesleyan's negligence proximately caused her injury, and Plaintiff has failed to plead facts plausibly showing that Defendant's conduct was a substantial cause in bringing about her injury. *See Paige v. St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 25 (1999) ("[T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries."). Although Plaintiff's Amended Complaint alleges that Moodle had known "bugs" that Wesleyan failed to address, it lacks any description of how the bugs led to the production of faulty Moodle logs on which Wesleyan relied in expelling her. Without any allegations tying Wesleyan's alleged failure to maintain Moodle with the faulty Moodle logs used to justify her expulsion, Plaintiff's negligence claim must fail.

### iii.    Plaintiff's NIED Claim (Count Three)

Defendant argues that Plaintiff's NIED claim should be dismissed because, in the educational context, allegations of arbitrary and capricious conduct without a discernible

rational basis are required and do not exist here. (Def.'s Mem. at 33 (citing *Doe v. Quinnipiac*, 404 F. Supp. 3d; *Bass* ex rel. *Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307).) Defendant contends that Plaintiff was expelled following a considerable process that involved multiple procedural protections including two appeals and that its actions had a discernible rational basis. (*Id.* at 33-35.)

In *Bass*, the plaintiff was expelled from her boarding school after the school found that she had cheated on an exam and engaged in underage drinking in violation of school rules. She brought claims against her school for breach of contract and tort claims, including NIED. *Bass* ex rel. *Bass v. Miss Porter's Sch.*, 738 F.Supp.2d at 319. The defendant sought summary judgment because her claim was "really just a cleverly disguised claim for educational malpractice" alleging that administrators negligently exercised professional judgment. *Id.* at 326. The plaintiff responded that her claim was not premised on a duty to educate because she alleged specific violations of the school's own policies and procedure. *Id.* at 326-327.  The Court found her claims were about the school administrators' negligent handling of her claims, rather than arbitrary, capricious, or bad faith conduct, and since the plaintiff violated a major school rule that would subject her to disciplinary action, the school's decision had "a discernible rational basis." *Id.*

In *Quinnipiac*, the plaintiff alleged that he had been wrongly expelled from his university after being accused of sexual misconduct and brought claims for, *inter alia*, NIED. 404 F. Supp. 3d 643, at 648-649. The defendants moved for summary judgment, arguing that *Gupta* barred this claim which they characterized as a "negligence-based claim[] of educational malpractice." *Id.* at 673. This Court held that, as in *Bass*, *Gupta* "'does not foreclose only claimed breaches of duties to educate,' but 'holds, more broadly, that a school's academic decision deserves deference from the courts." *Id.* at 674 (quoting *Bass*, 738 F.Supp.2d at 327). The Court therefore concluded that "a negligence action challenging the outcome of a school disciplinary proceeding is governed by *Gupta*'s general prohibition on negligence-based claims for academic decisions." *Id.* Since the plaintiff failed to establish that the defendants acted in a manner that was arbitrary, capricious, or in bad faith, the Court granted summary judgment to the defendants on the NIED claim. *Id.*

Plaintiff maintains that her allegations satisfy the standards set forth in *Quinnipiac* and *Bass* because Plaintiff alleges that "Wesleyan repeatedly misled and lied" to Plaintiff

throughout her disciplinary proceeding, withheld exculpatory evidence, and failed to follow its own disciplinary policies. (Pl.'s Mem. at 38-39.) Plaintiff relies on *Vega v. Sacred Heart Univ.* in which the plaintiff's NIED claim survived a motion to dismiss. 836 F. Supp. 2d 58, 63 (D. Conn. 2011). In *Vega*, Judge Janet C. Hall concluded that the plaintiff student's NIED claim related to her hazing by fellow students both on and off campus was plausible and rejected the defendant's public policy argument that the case was precluded by *Gupta.*

Despite Plaintiff's allegations that Wesleyan's conduct in investigating and adjudicating the cheating claim reflected arbitrary and capricious conduct, Wesleyan's decision to expel Plaintiff had a discernable rational basis from its professor's report documenting that Plaintiff cheated, which Wesleyan investigated, heard, and found. Whether the process of reaching its expulsion decision was based on a flawed process and/or problematic evidentiary assessment, nonetheless Wesleyan had a *discernible* rational basis for Plaintiff's expulsion, and Defendant's motion to dismiss Plaintiff's NIED claim (Count Three) is granted.

### iv. Plaintiff's Negligent Misrepresentation Claim (Count Four)

Plaintiff alleges that Wesleyan negligently made five misrepresentations to her regarding campus disciplinary policies and practices that it knew or should have known were false: (1) the Handbook statement promising disciplinary investigations and adjudications conducted in accordance with the standards of fair process; (2) Handbook statement promising confidentiality of disciplinary proceedings; (3) Whaley's statement that the Second Hearing would be limited to certain new evidence; (4) Scott's statement that Plaintiff had all the evidence that would be used against her; and (5) Scott's statement that there was no policy related to calling witnesses to testify. (Am. Compl. ¶¶ 540-586.) She further maintains that she relied on these representations to her prejudice in the disciplinary process. (*Id.* ¶¶ 584-585.)

Wesleyan argues that Plaintiff's negligent misrepresentation claim must be dismissed because no arbitrary and capricious conduct is alleged as required by *Gupta*, and

Plaintiff failed to allege that Wesleyan knew or should have known that its representations were false at the time they were made.[3] (Def.'s Mem. at 35-36; Reply at 9).

Plaintiff maintains that "Wesleyan knew or should have known that the representations contained within the handbook were false" and that she is not required to demonstrate arbitrary, capricious, or bad faith conduct. (Pl.'s Mem. at 39-40.) Plaintiff cites *Dietz v. Hamden Hall Country Day Sch.*, No. CV990425791S, 2000 WL 1198010 (Conn. Super. Jul. 25, 2000), for the proposition that a school is liable for negligent misrepresentation when it had no intention of complying with the representations made in a school policy and that *Gupta*'s bar on educational malpractice claims is not implicated in such an analysis. In *Dietz*, the plaintiff was expelled from his private secondary school after he breached a behavioral contract with the school. 2000 WL 1198010, at *1. The court distinguished the plaintiff's claim from *Gupta*, because the school "knew, or should have known[] that the conditions in the readmission agreement would not be honored by its own officials and that such a situation would deceive [the plaintiff] to his detriment." *Id.* at *2.

Plaintiff makes no claims that Wesleyan knew or should have known that its Handbook would not be honored by its own officials at the time it was issued or that Wesleyan knew or should have known that the promises were false at the time it wrote and published Handbook. Plaintiff fails to plausibly allege that Wesleyan knew the promises of a fair process and confidentiality contained in the Handbook were false at the time it wrote and published the Handbook.

Plaintiff's remaining allegations of negligent misrepresentation challenge statements made by Wesleyan officials to her regarding the adjudication that would determine whether she could continue attending the school. Plaintiff's negligent misrepresentation claims regarding these statements resemble the special promises recognized in *Gupta*'s special promises exception to otherwise barred breach of contract

---

[3] Defendant relies on *Mara v. MacNamara* in support of its assertion that *Gupta* requires Plaintiff to plausibly allege that any negligent misrepresentation was made arbitrarily, capriciously, or in bad faith. *Mara v. MacNamara*, 2015 WL 4392956, *11-*12 (D. Conn. July 15, 2015).) Because the parties in *Mara* conceded that the arbitrary and capricious standard was required, it was unnecessary to resolve the unsettled issue of law as to how *Gupta* applies to negligent misrepresentation claims. *Id.*

claims against educational institutions. Given the similarity of this claim to the *Gupta* special promises exception, the Court declines to import a heightened standard requiring arbitrary, capricious, or bad faith conduct for this negligent misrepresentation claim.

However, Plaintiff still must claim that Wesleyan knew or should have known its representations were false, that she reasonably relied on the representations, and suffered harm as a result. *See Nazami v. Patrons Mutual Ins. Co.*, 280 Conn. 619, 626 (2006). Since Plaintiff alleged that administrators exercising control over her disciplinary proceedings misrepresented that she had been provided with all the evidence that would be presented against her at the Second Hearing, [4] that there was no process available for compelling witness testimony, and that the only "new" evidence used in the Second Hearing would be the AT&T records and ITS's response that was in her case file, it is plausible that these administrators knew or should have known that the statements were false at the time they made them. (*Id.* at 315-318.)

In sum, although Plaintiff's Amended Complaint alleges no facts showing that the Handbook statements could constitute negligent representation, other statements can be pursued as special promises that are excepted by *Gupta.* Wesleyan's motion to dismiss Count Four is denied in part and granted in part.

### v. *Plaintiff's Promissory Estoppel Claim (Count Five)*

Plaintiff alleges that she detrimentally relied on Wesleyan's promises regarding the procedures governing her academic misconduct adjudication and therefore seeks relief on the basis of promissory estoppel. (Am. Compl. ¶¶ 588-608.) As Plaintiff conceded at oral argument, her promissory estoppel claim is an alternative theory of liability that can survive only if her breach of contract claim fails. (Oral Arg. Tr. [Doc. # 86] at 55.)

"[I]t is well settled that breach of contract and promissory estoppel are inconsistent theories of recovery, as promissory estoppel is appropriate only when there is an absence of consideration to support a contract." *Meadowbrook Center, Inc. v. Buchman*, 149 Conn. App. 177, 194 (2014) (citing *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 88-89 (2005)).) Since

---

[4] Although Wesleyan maintains that Ms. Scott saying "I think" converted her statement into an opinion that cannot form the basis of a negligent misrepresentation claim, "I think" could also reasonably read as modifying only the subsequent clause stating that "it is up to the discretion of you and whoever you ask."

Defendant does not allege that Plaintiff's breach of contract claim is deficient for lack of consideration, a promissory estoppel claim is an inappropriate alternative pleading in this case and Wesleyan's motion to dismiss Plaintiff's promissory estoppel claim (Count Five) is granted.

### vi.     *Plaintiff's Reckless and Wanton Misconduct Claim (Count Six)*

Plaintiff alleges that Wesleyan engaged in reckless and wanton misconduct during its investigation, in the two hearings, and in determining the sanctions in violation of its policies and procedures and taking such actions with reckless indifference to her rights. (Am. Compl. ¶¶ 609-627). She alleges that this conduct led to physical injury including "weight gain, tachycardia, anxiety, depression, insomnia, panic attacks, serious episodes of self-harm, and suicidal ideation." (*Id.*).

"[W]illful, wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Dubay v. Irish*, 207 Conn. 518, 533 (1988) (internal quotation marks omitted). Therefore, allegations of "mere mistake resulting from inexperience, excitement, . . . confusion[,] . . . thoughtlessness or inadvertence, or simply inattention" are inadequate. *Id.*

In *Elliott v. Waterbury*, the administratrix of a jogger's estate brought a claim against a municipality for wanton and reckless misconduct for failing to alleviate known dangers associated with having a pedestrian path adjacent to a property used for hunting. 245 Conn. 385, 389-390 (1998). The Connecticut Supreme Court affirmed the trial court's grant of summary judgment for the municipality, reasoning that the state's interest in maintaining hunting as a recreational activity, the fact that hunting was not barred on the relevant tract of land, and the fact that there were no complaints regarding the specific road on which the decedent was shot indicated that the municipality's conduct was not "highly unreasonable" and did not amount to an extreme departure from ordinary care. *Id.* at 416-417.

Defendant argues that Plaintiff has failed to plead a plausible claim of reckless and wanton misconduct in that her factual claims fail to show that Wesleyan's conduct was

arbitrary or capricious, highly unreasonable, or presented the high degree of danger required to show reckless and wanton misconduct. (Def.'s Mem. at 39-40).

Plaintiff urges that *Harris v. Bradley Memorial Hospital* compels the conclusion that her allegation that Wesleyan's repeated and biased violations of policy were done in a way that systematically disadvantaged her thus stating a claim for wanton and reckless misconduct. 296 Conn. 315, 348 (2010).

Plaintiff's allegation about the ways that Wesleyan repeatedly and intentionally violated its own policies and procedures in an academic misconduct adjudication and how she was disadvantaged as a result could plausibly rise to the level of wanton and reckless misconduct. Her position that a purposely flawed academic misconduct adjudication with resulting expulsion from her university implicates "a high degree of danger" to her is not speculative, nor is her claim that Wesleyan would be aware of the potential consequences of its actions to her. In alleging that Wesleyan knew or should have known that its actions violated internal policies, Plaintiff's claimed conduct is markedly different from inadvertence, inexperience, or negligence. Plaintiff points to Wesleyan's repeated breaches of its contract with her by failing to substantively comply with its policies set forth in the Handbook which could plausibly be found to be highly unreasonable such that the conduct was reckless and wanton. While a fully developed record is needed to determine the merits of Plaintiff's claims that Wesleyan possessed the requisite mental state, given the high stakes and long-lasting injurious outcome for Plaintiff, it would be premature to conclude that Plaintiff's allegations cannot plausibly show Defendant to have behaved highly unreasonably. Wesleyan's motion to dismiss Plaintiff's reckless and wanton misconduct claim (Count Six) is therefore denied.

### vii.    *Plaintiff's Breach of Fiduciary Duty Claim (Count Seven)*

Defendant argues Plaintiff's breach of fiduciary duty claims should be dismissed because "as a matter of law, schools do not owe a fiduciary duty to their students." (Def.'s Mem at 40.) In *Bass*, this Court found that a private boarding school did not owe a fiduciary duty to its minor student because no facts showed that the school had undertaken to act primarily for the benefit of the plaintiff student, although recognizing that a specific adult who supervised the student or had another kind of special relationship might have a fiduciary relationship with the plaintiff. 738 F. Supp. 2d at 330-331.

Plaintiff supports the legal viability of her fiduciary duty claim because "[t]his Court has recognized the existence of a fiduciary duty between a student and a university," (Pl.'s Mem. at 43 (citing *Johnson*, 119 F.Supp.2d at 97-98; *Johnson v. Walden*, 839 F. Supp. 2d  518, 529 (D. Conn. 2011)), and since Wesleyan had superior expertise, skill, and knowledge such that there was a unique degree of trust and confidence between Plaintiff and Wesleyan, (Pl.'s Mem. at 44).

In *Johnson*, a graduate student sued for his dissertation advisor's misappropriation of ideas he developed in his dissertation. 119 F. Supp. 2d 90, 91 (D. Conn. 2000). In denying the defendant's motion to dismiss, this Court found that greater factual development of the fiduciary claim was appropriate "[i]n light of [(1)] the Connecticut Supreme Court's disinclination to confine the scope of the fiduciary duty by precise definition" and (2) the uniquely "collaborative nature of the relationship between a graduate student and a dissertation advisor." *Id.* at 97-98.

Plaintiff has alleged no special relationship that involved a unique degree of trust and confidence between the Parties and her argument that she could have a fiduciary relationship with Wesleyan by virtue of her enrollment fails. Defendant's motion to dismiss Plaintiff's breach of fiduciary duty claim (Count Seven) is granted.

### viii.    *Plaintiff's CUTPA, Conn. Gen. Stat. § 42-110b(a), Claim (Count Eight)*

Plaintiff brings a claim under the Connecticut Unfair Trade Practice Act, asserting that Wesleyan's mishandling of her academic misconduct investigation and adjudication amounts to "unfair and deceptive acts and practices in the conduct of a trade or commerce that are immoral, unethical, unscrupulous, and offensive to public policy" that have caused her injury. (Am. Compl. ¶¶ 657-58.) Defendant posits that "education is not 'trade or commerce' within the ambit of the statute" and that a CUTPA claim in an educational setting amounts to an educational malpractice claim barred by *Gupta*. (Def.'s Mem. at 41-42 (citing *Wightwood School v. Fritz*, 1999 WL 240727, at *3 (Conn. Super. Apr 4, 1999).) While the Connecticut Supreme Court has not expressly excluded claims in an educational setting, the cases where such claims are viable are limited to the financial aspects of a school's operations.

23

Courts have permitted CUTPA claims to go forward where the challenged conduct implicated the financial aspects of the academic institution, such as false promises of licensures, *Johnson v. Walden*, 839 F. Supp. at 522-24, 532-33, or eviction from student housing without summary process, *Osberg v. Yale Univ.*, No. CV085021879S, 2009 WL 659072, at *6 (Conn. Super. Feb. 11, 2009).

Plaintiff's claim that Defendant mishandled its academic misconduct investigation does not implicate conduct analogous to deprivation of a non-academic service, a false promise of professional licensure, or otherwise a non-academic "trade or commerce" engaged in by an academic institution. The Court therefore dismisses Plaintiff's CUTPA claim (Count Eight).

## III.   Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. # 54] is GRANTED as to Counts Two (Negligence), Three (NIED), Five (Promissory Estoppel), Seven (Breach of Fiduciary Duty), and Eight (CUTPA), DENIED as to Count Six (Reckless and Wanton Misconduct), and GRANTED IN PART AND DENIED IN PART as to Counts One (Breach of Contract) and Four (Negligent Misrepresentation).

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 19th day of February 2021.