**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JANE DOE,<br>    Plaintiff,<br><br>v.<br><br>WESLEYAN UNIVERSITY,<br>    Defendant. | :<br>:<br>:    CIVIL ACTION NO.<br>:    3:19-CV-01519-JBA<br>:<br>:<br>:<br>:    MARCH 4, 2022<br>: |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

THE DEFENDANT,
WESLEYAN UNIVERSITY,


*By: /s/ James M. Sconzo*
James M. Sconzo (ct04571)
Jonathan C. Sterling (ct24576)
CARLTON FIELDS, P.C.
One State Street, Suite 1800
Hartford CT 06103
Phone: 860-392-5000
Fax: 860-392-5058
jsconzo@carltonfields.com
jsterling@carltonfields.com
*Its attorneys*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................... iv

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     BACKGROUND ......................................................................................... 2

        A.      Wesleyan's Process In Cases of  Academic Dishonesty ..................... 2

        B.      Availability Of Moodle At Wesleyan ................................................. 3

        C.      Plaintiff's Admission To Wesleyan And Disability Related
                Accommodations ................................................................................. 5

        D.      Report Of Plaintiff's Academic Misconduct ...................................... 5

        E.      Plaintiff Is Notified Of Alleged Violations Of The Honor Code And
                Receives A Fair Hearing ..................................................................... 8

        F.      Plaintiff Appeals And Receives An Additional Hearing ................... 11

        G.      Plaintiff Files A Second Appeal ....................................................... 15

        H.      Discovery Has Yielded Additional Irrefutable Evidence Of Cheating............... 16

III.    THE REMAINING CLAIMS ................................................................... 19

IV.     STANDARD OF REVIEW ...................................................................... 20

V.      ARGUMENT ............................................................................................ 21

        A.      Wesleyan's Process Is Entitled to Deference..................................... 21

        B.      Summary Judgment Should Enter As To The Remaining Portions Of
                Plaintiff's Breach of Contract Claim In Count 1 ............................... 25

                1.      Standard For Breach Of Contract Claims In The Educational
                        Context .................................................................................... 25

                2.      There Were No Special Promises Or Breaches Of Promises ................. 26

                        a.      Failure To Provide A Fair Process............................... 26

                                i.      There Was No Failure To Convene A Full Hearing
                                        Panel................................................................... 27

                                        1.      A Fourth Student Was Not Required ................. 27

                                        2.      A Second Advisory Member Was Not
                                                Required ................................................. 29

                                ii.     Wesleyan Did Not Promise Or Fail To Assist In
                                        Gathering Evidence............................................ 29

ii

        iii.      Wesleyan Maintained Confidentiality ............................. 31

        iv.     Dean Brown Did Not Exceed Her Role ......................... 33

        v.      There Was No Discriminatory Conduct ......................... 34

        vi.     Plaintiff's "F" Grades Were Entirely Appropriate........... 35

    b.     The Honor Board Applied A Fair Preponderance Standard ....... 36

  3.     Plaintiff's Contract Claims Are Truly Disguised Negligence
       Claims ................................................................. 38

C.    No Evidence Supports Plaintiff's Negligent Misrepresentation Claims.............. 40

  1.     Dean Whaley Did Not Make Any Misrepresentation............................. 40

  2.     Ms. Scott Did Not Make Any Misrepresentations About Evidence ........ 43

  3.     Ms. Scott Did Not Make Any Misrepresentations About
       Compelling Witnesses ................................................. 45

D.    Plaintiff's Reckless And Wanton Misconduct Claim Is Not Plausible................ 45

  1.     There Is No Evidence Of The Requisite Mental State............................. 45

  2.     There Was No Risk Of Bodily Harm...................................... 46

E.    There Is No Genuine Issue Of Fact As To Whether Plaintiff Cheated, And
    This Entitles Wesleyan To Summary Judgment As To all Plaintiff's
    Claims As Well As To Certain Of Wesleyan's Special Defenses ...................... 47

VI.   CONCLUSION .......................................................................... 50

## TABLE OF AUTHORITIES

### FEDERAL CASES

*456 Corp. v. United Natural Foods, Inc.*, No. 3:09cv1983, 2011 WL 87292
(D. Conn. Jan 11, 2011)................................................................................40

*Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307 (D. Conn. 2010).................................22

*C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142 (9th Cir. 2016)........................................28

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).............................................23

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass 2016) ......................................23

*Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016)..............................................23

*Doe v. Colgate Univ.*, 760 F. App'x 22 (2d Cir. 2019)..................................................20

*Doe v. Northern Michigan Univ.*, 393 F.Supp.3d 683 (W.D.Mich. 2019)...................37

*Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799 (E.D. Pa. 2017)...........37

*Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2021 WL 664010, at *13
(D. Conn. Feb. 19, 2021).................................................................................20

*Dongguk Univ. v. Yale Univ.*, 734 F.3d 113 (2d Cir. 2013).........................................46

*Duchimaza v. United States*, 211 F. Supp. 3d 421 (D. Conn. 2016) ...........................49

*EEOC v. Joseph Horne Co.*, 607 F.2d 1075, 1076 (4th Cir.1979), rev'd on other grounds sub
nom. EEOC v. Associated Dry Goods Corp., 449 U.S. 590 (1981)..............................28

*Feibleman v. Trustees of Columbia Univ. in City of New York*, No. 19-CV-4327 (VEC),
2020 WL 882429 (S.D.N.Y. Feb. 24, 2020) ...................................................26

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001)..................................20

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494 (2d Cir.2001) ...........................33

*Hutchinson v. Univ. of Saint Joseph,* No. 3:21-CV-325(RNC), 2022 WL 19339
(D. Conn. Jan. 3, 2022)...................................................................................26

*Lacroix v. City of New Haven*, No. 3:06cv481(JBA), 2008 WL 11473268
(D.Conn. Feb. 2, 2008) ...................................................................................24

*McNeil v. Yale Univ.*, 436 F.Supp.3d 489 (D.Conn. 2020), vacated in part on other grounds
 by 2021 WL 5286647 (2nd Cir. Nov. 15, 2021)............................................34

*Michel v. Yale Univ.*, No. 3:20-CV-01080 (JCH), 2021 WL 2827358 (D. Conn. July 7, 2021)...25

*Paine Coll. v. S. Ass'n of Colleges & Sch. Comm'n on Colleges, Inc.,* 810 F. App'x 852
(11th Cir.), cert. denied, 141 S. Ct. 850 (2020) ..............................................28

*Peralta v. Cendant Corp.*, 123 F. Supp. 2d 65 (D. Conn. 2000) .................................34

*Routh v. Univ. of Rochester,* 981 F. Supp. 2d 184 (W.D.N.Y. Nov. 5, 2013) .............................. 26

*Spiegel v. Schulmann*, 604 F.3d 72 (2d Cir. 2010) ....................................................... 32

## STATE CASES

*Borrelli v. H & H Contracting, Inc.*, 100 Conn.App. 680 (2007), appeal dismissed,
285 Conn. 553, 940 A.2d 787 (2008) .................................................... 25

*Brock v. Waldron,* 127 Conn. 79 (1940) ........................................................... 46

*Conklin v. Woodcock Nature Center*, No. 319509, 1997 WL 200732
(Conn. Super. April 15, 1997) .......................................................... 46

*Craine v. Trinity Coll.,* 259 Conn. 625 (2002) ..................................................... 36

*Dubay v. Irish,* 207 Conn. 518 (1988*)* .......................................................... 46

*Faigel v. Fairfield Univ.,* 75 Conn. App. 37 (2003) ............................................. 25

*Gazo v. City of Stamford*, 255 Conn. 245 (2001) ........................................... 38, 39

*Glazer v. Dress Barn, Inc*., 274 Conn. 33 (2005) ............................................. 50

*Gupta v. New Britain General Hosp.,* 239 Conn. 574 (1996) ............................. *passim*

*Guy v. Reed*, No. 51 94 25, 1992 WL 335341 (Conn. Super. Nov. 10, 1992*)* ............... *50*

*Hope Academy v. Friel*, No. CV030081183S, 2004 WL 1888909 (
Conn.Super. Jul. 22, 2004) ....................................................... 25, 26

*Household Fin. Co. v. Callin*, No. CV075005926S, 2008 WL 725134
(Conn. Super. Ct. Feb. 25, 2008) ....................................................... 49

*Kramer v. Petisi*, 285 Conn. 674 (2008) ........................................................ 49

*Matthiessen v. Vanech*, 266 Conn. 822 (2003) ................................................ 46

*McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.,*
93 Conn.App. 486, cert. denied, 277 Conn. 928 (2006) ...................................... 50

*McDade v. Cleveland State Univ.*, No. 14AP-275, 2014 WL 4557015
(Ohio App. Sept. 16, 2014) ............................................................ 37

*Menard v. State*, 208 Conn. App. 303 (2021) .................................................. 47

*Meyers v. Cornwell Quality Tools, Inc.,* 41 Conn.App. 19 (1996) ............................ 40

*Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282 (2014) ......... 25

*Moore v. Continental Cas. Co.*, 252 Conn. 405 (2000) ....................................... 47

*Nazami v. Patrons Mutual Ins. Co.*, 280 Conn. 619 (2006) .................................. 40

*Okafor v. Yale Univ.*, No. CV980410320, 2004 WL 1615941 (Conn. Super. Jun. 25, 2004) ....... 25

*Packer v. Bd. of Edu. of Town of Thomaston*, 246 Conn. 89 (1998) .......................... 23

*Pelletier v. Galske*, 105 Conn.App. 77 (2007), cert. denied, 285 Conn. 921 (2008)......................38

*Rafalko v. Univ. of New Haven*, 129 Conn. App. 44 (2011)...........................................................23

*Ravitch v. Stollman Poultry Farms, Inc*., 165 Conn. 135 (1973) ...................................................49

*Smith v. Bridgeport Futures Initiative, Inc.*, No. 326697, 1996 WL 493229

(Conn. Super. Aug. 13, 1996)......................................................................................................... 39

*Weiner v. Clinton*, 106 Conn.App. 379, cert. denied, 282 Conn. 928 (2008)................................38

## **OTHER AUTHORITIES**

Fed. R. Civ. P. 56.......................................................................................................................1, 20

W. Prosser & W. Keeton, Torts (5th Ed.)......................................................................................46

S. Williston, Contracts (4th Ed. Lord 2000) .................................................................................25

Pursuant to Fed. R. Civ. P. 56, the Defendant, Wesleyan University ("Wesleyan" or the "University"), submits this Memorandum of Law in Support of its Motion for Summary Judgment as to the remaining counts of Plaintiff's March 13, 2020 Amended Complaint.

## I.      PRELIMINARY STATEMENT

Academic integrity is at the core of Wesleyan's mission.  Every student attending Wesleyan pledges to adhere to the standards of academic integrity set by Wesleyan's Honor Code. Cheating on examinations is an explicit violation of the Honor Code.

A student-run Honor Board twice found Plaintiff responsible for cheating on multiple examinations in two courses.  The Honor Board applied a preponderance standard to evaluate the evidence of cheating submitted to it.  It did not operate as a court of law or apply a proof beyond a reasonable doubt standard.  There is no dispute that Plaintiff received notice, an evidentiary hearing, a second hearing following an appeal, and that she then filed a second appeal.  The evidence before the Honor Board included Wesleyan's electronic records showing Plaintiff signing-onto Wesleyan's internet access during her exams and viewing course materials to help her answer exam questions.  Caught red-handed, Plaintiff refused to accept responsibility and instead made numerous evolving excuses not supported by any facts.  The Honor Board decided Plaintiff's excuses made no sense and that the electronic evidence proved it was more likely than not she cheated.  The factual record as confirmed by discovery demonstrates that Wesleyan's disciplinary process was fair and that the Honor Board reasonably found, based on clear evidence, that Plaintiff cheated.  This case is simple and the Court must not substitute its judgment for that of the Honor Board.

Plaintiff's criticisms of the process and outcome are based upon supposed technical breaches of the Student Handbook and "negligent misrepresentations" by administrators. However, there is no substance to these claims, which are built upon allegations that have been

debunked in discovery and upon Handbook provisions and other statements that have been thoroughly misconstrued.  Summary judgment should enter as to all of these claims.

If there were any question about Plaintiff's cheating -- there is not -- discovery has proven even more conclusively that Plaintiff cheated on multiple exams.  There is now no serious dispute over that.  Discovery has validated the electronic evidence that was before the Honor Board, and now Plaintiff's *own* independent electronic records -- to which the Honor Board did not have access -- have also verified her cheating.  The search history from the iPhone she was using shows that, during exams, Plaintiff not only accessed the course materials but also searched the Internet for relevant chemistry terms and information to assist her answering exam questions.  This irrefutable evidence adds to the already "open and shut" case that was before the Honor Board, and compels the granting of summary judgment.

## II.      BACKGROUND

### A.    Wesleyan's Process In Cases of  Academic Dishonesty

All Wesleyan students agree to an Honor Code.  It is contained in the Student Handbook (the "Handbook").  (2016-17 Handbook, portions attached as Exhibit 1, pp. 4-5.)[1]  "Violations of the Honor Code are among the most serious offenses an individual may commit at Wesleyan."  *Id*. at 7.  "[C]heating during an exam" violates the Honor Code.  (*Id*. at 5; Second deposition of Plaintiff, "PL II," attached as Exhibit 2, at 11.) "[U]pon witnessing or otherwise becoming aware of an apparent violation, members of the community have an obligation to report the violation…."  *Id*. at 4.

---

[1] Plaintiff admits that, upon her acceptance to Wesleyan, she received the Handbook.  (Amended Complaint, "AC," ¶ 27.)  She also alleges the Handbook is a binding contract (*see id*. at Count 1) between the parties, and because the Honor Code is part of the Handbook, Plaintiff must admit that she was bound by the Honor Code.

An Honor Board, comprised of a voting membership of students and an advisory membership of faculty and administration members, is charged with adjudicating alleged Honor Code violations.  *Id*. at 5.  The Handbook contains the procedure for hearings on Honor Code charges, which provides considerable fair process to those accused.  *Id*.  That process includes advance notice of the charges to the accused student, a hearing at which witnesses and other evidence may be presented, with the ability to cross examine witnesses, and a right to appeal the decision to an Appeals Board.  *Id*. at 6-7.  The Honor Board "is responsible for determining if it is more likely than not that the violation occurred…by majority vote of the voting members present."  *Id*.  "The party bringing the charges need not provide evidence beyond a reasonable doubt in a hearing."  *Id*.  "The Honor Board shall invoke penalties at its discretion, up to and including suspension or dismissal from the University."  *Id*. at 7.

In the event of an appeal, the Appeals Board does not conduct a *de novo* review of the Honor Board findings, and "will not substitute its own judgment for that of the original hearing body."  (*Id*.; Deposition of Michael Whaley, "MW," attached as Exhibit 3, at 77-78.)  Rather, an appeal may be based upon only: an alleged violation of due process; new evidence not reasonably available at the time of the hearing; and/or procedural error (if the error adversely affected the outcome of the hearing).  *Id*.  "If the appeal is denied, the sanctions will be imposed and the University will consider the case closed."  *Id*.

## B. Availability Of Moodle At Wesleyan

In 2010, Wesleyan made "Moodle"[2] available to its community.  Moodle is a free and open-source online platform.  (AC ¶¶ 43, 475; https://docs.moodle.org/38/en/About_Moodle.) "Moodle…is a popular [learning management system] that can be used for task assignments,

---

[2] Moodle is the acronym for Modular Object-Oriented Dynamic Learning Environment.

quizzes, content delivery, and communication."   Yoni Har Carmela & Tammy Harel Ben-Shaharaa, *Reshaping Ability Grouping Through Big Data*, 120 Vand. J. Ent. & Tech. L. 87, 104 (2017).   For example, professors post on Moodle many things related to their courses, such as syllabi, assignments, problem sets, practice exams, grades.   To access these items, students connect to Moodle through their computing devices.   Moodle is web-based with a mobile-compatible interface that can be accessed on any device.   https://docs.moodle.org/38/en/About_Moodle. Access is logged by Wesleyan: "Moodle logs students' every keystroke, including view and download commands, start and end time, time on task, and evaluation of assignments." 120 Vand. J. Ent. & Tech. L. at 104.

When a student accesses Moodle on campus through Wesleyan's "AirWes" wireless internet network, a username and password are required and the access is logged through the Aruba ClearPass wireless authentication system.   (Deposition of Matthew Elson, "ME," attached as Exhibit 4, at 25-26; *see* Expert Report of John Medeiros, "Medeiros Report," attached as Exhibit 5, at 22.)   The access is also logged by Dynamic Host Configuration Protocol ("DHCP") servers that record the name, IP address, and MAC address of the device connected to the network. (Medeiros Report at 22.)   Further, Wesleyan's "Single Sign On" server logs the username of the user logging-in.   (Medeiros Report at 22-23.)   All of these servers are synched together.   (*See* Deposition of David Baird, "DB," attached as Exhibit 6, at 171-72.)   In Summer 2017, all of Wesleyan's servers had Eastern Time as their setting, with the Moodle, Aruba ClearPass, DHCP and Single Sign On authentication servers having been set to Eastern Time by its Unix System Administrator, Matthew Elson.   (ME at 10, 40, 249.)   Thus, the logs of activity that Moodle generated for Summer 2017 were expressed in Eastern Time.   (*Id*. at 237, 249-50; *see* DB at 169, 171.)   Indeed, if Moodle were set to a time zone other than Eastern, that would become

immediately evident to every one of the thousands of campus Moodle users within the platform, and would cause a collapse in the back-ups of the servers.  (*See* DB at 171-72.)

Of course, accessing Moodle during an exam would constitute cheating and violation of the Honor Code, unless such access was permitted by the professor.

### C. Plaintiff's Admission To Wesleyan And Disability Related Accommodations

Plaintiff enrolled in Wesleyan in the Fall of 2016.  (AC ¶ 44.)  Plaintiff alleges she has a developmental coordination disorder, which is a neurodevelopmental disorder that significantly impairs her fine motor skills. (AC ¶ 21.)   Wesleyan granted Plaintiff certain academic accommodations based on her alleged impairment.  (AC ¶ 23.)  These accommodations included receiving extended time on examinations and taking examinations in a distraction-reduced environment.  (AC ¶ 45; PL II at 17-18.)

### D. Report Of Plaintiff's Academic Misconduct

After her first year, in the summer of 2017, Plaintiff enrolled in two summer semester chemistry courses, CHEM 141 and CHEM 142, and accompanying the lab course.  (PL II at 18.) CHEM 141 ran from May 29 to July 1 and CHEM 142 ran from July 6 to August 4.  (AC ¶ 47.) These courses were taught by Professor Andrea Roberts.  (AC ¶ 47.)  Prof. Roberts utilized Moodle for CHEM 141 and CHEM 142.  (*See* AC ¶ 58.)  Prof. Roberts took the Honor Code seriously. (PL II at 53.)  For each examination in these classes, all students were required to acknowledge in handwriting on the cover of their "blue book" their adherence to the Honor Code.  *Id*. at 54. Moreover, Prof. Roberts' course syllabi expressly referenced the Honor Code:

> Wesleyan has and upholds a Code of Academic Conduct. We put a great emphasis on academic integrity in this course. To that end, we expect that you will act with the highest level of academic integrity. You will neither accept nor give **ANY** aid during an exam. This includes, but is not limited to electronic devices, notes or other forms of cheating. Your work will be **exclusively** your own (unless we designate otherwise to you).

> **Any suspected violation in the Honor Code is taken very seriously and will be swiftly brought to the attention of the Honor Board.**

(Emphasis in original.)  (Syllabi Attached as Exhibit 7.)

Paul Brauchle was the Teaching Assistant for these classes.  (Deposition of Andrea Roberts, "AR," attached as Exhibit 8, at 19; Deposition of Paul Brauchle, "PB," attached as Exhibit 9, at 24.)  His role included proctoring examinations for the students, including Plaintiff, who received distraction-reduced testing environments, extra time for exams, or other accommodations.  (AR at 23-24; PB at 24.)  Except for one exam in CHEM 141, Plaintiff took exams by herself in Exley 150, which is a very large lecture hall with stadium-style seating descending downward about 100 feet to the bottom or front of the classroom.  The entry doors to the room are at the top of the stairs and have no windows.  (AR at 28-29, 74; PB at 67; Declaration of Michael Whaley, "Whaley Dec.," attached as Exhibit 10 at ¶ 10 and exhibit A.)  Plaintiff always sat at the bottom of the room, about 100 feet away from the doors that Mr. Brauchle would periodically enter to check-in with her during exams.  (AR at 74; PB at 70.)  For one exam, on June 21, 2017, Plaintiff was in a classroom with two other students.  (AR at 28-29.)

Mr. Brauchle's "main duty was not to sit in the room with the student and monitor whether or not they were cheating for the entire test."  (PB at 68-69.)  He tried "not to disturb the students, because they had accommodations for low distraction rooms."  (PB at 65.)  Rather, approximately every thirty (30) minutes, he would enter the classrooms to see if a student had any questions about the exam, or if corrections or clarifications needed to be made to the exam.  (PB at 67-68.)  As such, Plaintiff could have cheated without Mr. Brauchle detecting it.  (PB at 123, 143.)  However, Mr. Brauchle and Prof. Roberts expected that students would abide by the Honor Code and not cheat on exams.  (PB at 68-69.)

Students with no accommodations took exams in a separate lecture hall and were proctored by Prof. Roberts, who stayed in the room for the entire exam.  (PB at 24-25.)

The final examination for CHEM 142 was on August 4, 2017, and Plaintiff spent from 9:00 AM until approximately 12:30 PM taking the exam.  (PB at 100; PL II at 110; AR at 71.)  During that exam, Mr. Brauchle observed another extra-time student ("Mary Moe") with her phone out; (PB at 98); and he reported this to Prof. Roberts.  (AR at 59.)  To be fair, Prof. Roberts reviewed the Moodle logs for Mary Moe and Plaintiff, because those were the only students that had taken the exam in a room that was not proctored for the entire exam.  (AR at 59, 62-63.)

The logs showed that Plaintiff had frequently accessed Moodle during the exam, and specifically materials that would help her on the exam.  (AR at 66-68, 87; PB at 98.)  Prof. Roberts then looked at the logs of Moodle access for other exams and discovered Plaintiff had accessed Moodle during many other exams.  (Moodle logs, attached as Exhibit 11, at PST 0861-0865 and PST 0870-0875.)  Prof. Roberts then emailed Dean David Phillips, stating, in part: "I have a very serious Honor Board case I need to bring against a student."  (AR at 98-99.)

On August 6, 2017, Prof. Roberts emailed Lorna Scott, Administrative Assistant to the Vice President of Student Affairs, reporting that Plaintiff had cheated by accessing Moodle during examinations.  Plaintiff was copied on the emails.  (AC ¶¶ 53-55; AR at 96, 100.)  Prof. Roberts attached two letters to her emails, both of which are dated August 4, 2017.  The letters allege Moodle access by Plaintiff during CHEM 141 and 142 exams on June 14, 21, 28 and 29, July 12, 19, 26, and August 2 and 4, 2017.  (AC ¶¶ 57-59, 61-63; Exhibit 11.)  Prof. Roberts attached to her letters the Moodle logs showing Plaintiff's activity history.  (Exhibit 11; *see* AC ¶ 84.)

Wesleyan sought to immediately investigate the cheating allegations, enlisting help from

its information technology ("ITS") department.  On August 8, 2017, Ms.  Scott emailed Plaintiff:

> I spoke a bit with Dean Philips yesterday about your situation, and he mentioned that you'd be willing to have ITS research why it appeared that you were logged into Moodle's various answer keys and course info at the time of exams. Would you be able to send me the address (IP address?) and number of your cell phone so ITS can compare it to what they find on Moodle? This will help all of us clarify exactly what happened.

(AC ¶ 114; Email attached as Exhibit 12)  Rachel Schnepper, Wesleyan's Director of Academic

Technology, coordinated ITS's investigation, which determined, as stated in her August 9, 2017

e-mail, that the Moodle logs indeed showed "active and engaged use" of Moodle by "someone

with [Plaintiff's] username and password…from their cell phone using Wesleyan internet during

the time of the exam…."  (AC ¶¶ 127-34; Email attached as Exhibit 13)

## E.   Plaintiff Is Notified Of Alleged Violations Of The Honor Code And Receives A Fair Hearing

Following this investigation, on August 9, 2017, Wesleyan notified Plaintiff of the charges

that she violated the Honor Code.  (Letters attached as Exhibit 14; AC ¶ 135.)  Plaintiff was further

notified of an Honor Board hearing scheduled for August 16, 2017 (the "First Hearing").  (Exhibit

14; AC ¶ 233.)  The notice informed Plaintiff about the process:

> You are entitled to present any information at the hearing that you believe is relevant to the alleged violation. If you wish, a member of the Wesleyan community may be a process advisor and accompany you to the hearing for support. The materials submitted by the professor that are pertinent to these allegations are available for your review in the Student Affairs Office. Please visit the website [http://www.wesleyan.edu/studentaffairs/studenthandbook/index.html] referenced above to familiarize yourself with the procedures of the Honor Board.

(Exhibit 14, at WES0002250 and WES0002259.)  Plaintiff had already been provided with copies

of the Moodle logs, the primary evidence against her, ten (10) days before the hearing.  (*See* Letters

from Prof. Roberts, attached as Exhibit 11.)  Plaintiff was subsequently provided with additional

8

evidence in the form of Wesleyan WiFi logs prior to the hearing (AC ¶ 227), and she received additional information as it became available.  (*See* emails attached as Exhibit 15.)

The Honor Board members present for the First Hearing included three student panelists, Chair Gabby Vargas, Gabe Kachuck, and Matthew Chun, as well as Dean Louise Brown, as an advisor to the panel.  (AC ¶ 234; Transcript of First Hearing, "TR. 1," relevant portions attached as Exhibit 16, at 3-4.)  Plaintiff had a full opportunity to present her case to the Honor Board at the First Hearing.  She attended the First Hearing in-person and was accompanied by an advisor, Dean David Phillips, her Class Dean.  (AC ¶ 242.)  Plaintiff made an opening statement, had the opportunity to present witnesses and evidence, and indeed called one student witness who testified by phone.  (*See* Tr. 1 at 71.)  Plaintiff questioned witnesses and the Honor Board members present. (*See, e.g*., Tr. at 40-45.)  And Plaintiff made a closing statement.  (Tr. 1 at 115-124.)  Prof. Roberts presented her claims against Plaintiff and several Wesleyan information technologists spoke about Moodle, access to Moodle, access to Wesleyan's internet, and WiFi.  (AC ¶ 234.)

During the First Hearing, Plaintiff testified: "I think I understand why this was brought to the Board" and admitted "*[t]here clearly was Moodle activity on my account during the exam*…." (Emphasis added.) (Tr.1 at 6.)  However, Plaintiff  made multiple confusing, incredible and conflicting excuses as to why the activity was present: there was a "spasm" of activity on her phone that accessed web pages (Tr. 1 at 9); her allegedly broken or incorrectly-placed screen protector affected the phone's "digitizer and…proximity sensor" (Tr. 1 at 10); there was "ghost activity" that opened web pages (Tr. 1 at 10); her phone was in her backpack under her desk and she "was kicking the bag," which caused the activity (Tr. 1 at 13)[3]; and, there was a "hardware problem"

---

[3] Plaintiff and her mother joked in text messages that this was Plaintiff's "banana theory," *i.e*., that a banana in her backpack acted like a finger when it touched the screen on her iPhone and that may have accounted for the access shown on the Moodle log.  (*See* text message attached as Exhibit 17.)

with the phone's web browser (Tr. 1 at 107.)  Plaintiff offered argument, but no evidence, to support those excuses.

These speculative arguments might, at best, have explained some random Moodle access, but not the calculated type of activity shown in the logs.  (Tr. 1 at 39.)  For example, Prof. Roberts explained that that content of the material accessed (as depicted on the Moodle logs) during the final examination corresponded directly to the order and content of the questions on the examination.  (*See* Tr. 1 at 76; see also 80-82, 104.)  In addition, Prof. Roberts had shared a document she created correlating the course materials accessed by Plaintiff to the exam questions.  (AR at 89, Exhibit 9 from AR, attached as Exhibit 18.)  ITS witnesses also explained that WiFi logs showed Plaintiff's phone accessing Wesleyan WiFi on August 2 and 4, 2017 through the Exley 150 (exam room) access point during the exams.[4]  (Tr. 1 at 53-54.)

Plaintiff maintained that "in a lot of cases" the Moodle activity showed "no pattern." (Tr. 1 at 70.)  An Honor Board member asked Plaintiff her interpretation of the following sequence of activity in the Moodle log during the August 4th examination, at approximately 10:51 AM:

- opening file,
- practice exam 1 answer key,
- home page,
- practice exam 2 answer key,
- home page,
- exam 2 answer key,
- home page,
- exam 3 answer key,
- home page,
- exam 4, answer key,
- home page,
- problem set 4 answer key,
- home page,
- problem set 4,
- home page
- answer key problem set 4 …

---

[4] Earlier WiFi logs were not available because the retention policy at the time was one week, which had concluded before Plaintiff's cheating was first discovered.  (ME at 70-71.)

10

(Paraphrasing Tr. 1 at 70-71; *see also* Moodle logs, attached as Exhibit 11, at PST 0861-0865 and PST 0870-0875.)   Plaintiff incredibly responded that she believed the access was "random." (Tr. 1 at 71.)

However, Plaintiff admitted to having Moodle open on her cell phone during examinations, because she would "go through [her] Moodle to … have the last minute cram session … and try to read as many files as [she] could." (Tr. 1 at 36.) She also admitted to opening Moodle or reviewing study guides after she received the examination in the exam room. (Tr. 1 at 96-97.) Plaintiff also admitted that she was not given permission – and it was against the rules – to have her phone or any study materials with her during examinations. (Tr. 1 at 96-97.)

After thorough deliberations, on August 21, 2017, the voting members of the Honor Board who were present for the First Hearing found it more likely than not that Plaintiff cheated on five (5) of the nine (9) exams in violation of the Honor Code.  (AC ¶ 272.)  Plaintiff was found not responsible on four (4) dates because Prof. Roberts had make an inadvertent error and listed the June 28 exam as occurring on June 29,[5] and because the Moodle activity shown for the three (3) other dates, June 14, July 12 and 19, fell outside the exam times.  (AR at 194-98.)  "Given the extent and seriousness of the violations, the sanction [imposed was] dismissal from the University."  (AC ¶ 280; August 21, 2017 Letter to Plaintiff attached as Exhibit 19.)

### F.  Plaintiff Appeals And Receives An Additional Hearing

On September 4, 2017, Plaintiff appealed the Honor Board's decision.[6]  (AC ¶ 290).  She attached to her appeal a declaration from a consultant her lawyer had hired, Gary Pate of BDO

---

[5] However, the Moodle log does show activity during the June 28, 2017 exam, so Plaintiff benefitted from this inadvertent error.  (*See* Exhibit 11, at PST 0861-0865 and PST 0870-0875.)

[6] Pursuant to the Handbook, appeals may be made on the following grounds: "1) Violation of fair process; 2) New Evidence that was not reasonably available at the time of the hearing; 3) Procedural error (if the error adversely affected the outcome of the hearing).  (Handbook at 7.)

Consulting.  (AC ¶ 291; Appeal and Declaration attached as Exhibit 20.)  Although Plaintiff unabashedly alleges in her Amended Complaint that "Pate conclusively determined that the Moodle logs were inaccurate" (AC ¶ 294), Mr. Pate's declaration was not so certain.  Mr. Pate equivocated that "the Moodle logs are *likely* inaccurate."  (Emphasis added, Declaration of Gary Pate, "Pate Decl.," attached as part of Exhibit 20, at WES00011230 ¶ 9.)  Mr. Pate based his "opinion" on Wesleyan's WiFi logs, as well as data logs from Plaintiff's mobile phone carrier, AT&T, arguing the records showed wireless access times *only* at 9:12 AM and 11:57 the morning of the examination.[7]  *Id.*

Vice President for Student Affairs, Dean Michael Whaley, received the appeal and, given the new information, he asked ITS to review the declaration and provide a response.  (MW at 65-66.)   On September 6, 2017, Dr. Schnepper sent an email to Dean. Whaley and Ms. Scott (and copying Mr. Elson and Mr. Bachhav):

> We have found that BDO's analysis of the Wi-Fi records is **one possible interpretation** of the records. The Wi-Fi records report that a cell phone registered to [Plaintiff] accessed Wesleyan Wi-Fi on August 4th at 9:12 am and again at 11:57 am. What the records do not indicate is how long the cell phone was on the Wi-Fi. One interpretation of these records is that the cell phone accessed the Wi-Fi at 9:12 and then again at 11:57. Another possible interpretation is that the cell phone accessed it from 9:12 am till 11:45, stopped being used, and then was not used again till 11:57. These logs do not show duration of use.

(Emphasis added.) (AC ¶ 303; Email attached as Exhibit 21)

An Appeals Board, including Dean Whaley, reviewed the BDO report and decided to remand the case for a further hearing.  (MW at 79-80, 119-20.)  They determined that the BDO report was new information not available at the initial hearing that should be considered by the Honor Board.  (MW at 122.)  On September 7, 2017, Dean Whaley informed Plaintiff:

---

[7] The appeal also alleged certain "procedural errors" that denied her a "fair hearing," including the evidence presented by Dr. Schnepper and Prof. Roberts.  (Exhibit 20.)

> After careful review, your case is being remanded back to the Honor Board so that they may review and consider the new information from BDO (as well as any other information you wish to share). You should be aware that I've shared BDO's report with our IT experts who have filed a brief response in the case file. Therefore, please be sure to review this information prior to when the Board convenes again.

(AC ¶ 299, MW at 84; letter, Exhibit 3 from MW, attached as Exhibit 22.)[8]

A second Honor Board hearing was held on September 13, 2017 (the "Second Hearing"), at which Plaintiff was afforded another opportunity to present her case.  (AC p. 36, ¶ "X".)  The Second Hearing was before the same Honor Board that presided over the First Hearing, but this time Mr. Kachuck was the Chair.  (AC ¶ 298.)  Plaintiff had the opportunity to make an opening statement, present evidence, call witnesses (but did not), question witnesses and the Honor Board members present, and make a closing statement.  Plaintiff admitted in the Second Hearing: "I understand why I was found in violation in the first hearing."  (Transcript of Second Hearing, "TR. 2," relevant portions attached as Exhibit 23, p. 38.)  She then presented a new series of contradictory and implausible arguments. Plaintiff exaggerated when describing the BDO declaration.  She insisted that BDO found it technically "impossible" that she had cheated, even though the declaration did not say that.[9]  (Tr. 2 at 5.)  Contrary to her testimony at the First Hearing, Plaintiff now agreed that the Moodle activity was "not random."  (Tr. 2 at 28.)  She also agreed that her backpack "kicking theory" was "incorrect."  (Tr. 2 at 26.)  But Plaintiff presented strange new theories.  She now speculated that the Moodle logs might be showing incorrect times because she had traveled to the United Kingdom and changed her Siri voice to have a British accent, or had changed her "SIM card or something."  She speculated that the time zone in her iPhone may have changed by five hours -- to England time -- and therefore the Moodle logs possibly reflected times

---

[8] The appeal was granted on the basis of the BDO report, but the supposed "procedural errors" alleged by Plaintiff in her appeal letter were not the basis for granting the second hearing.  *Id.*

[9] Gary Pate agreed in his deposition that Plaintiff mischaracterized his opinion.  ((Deposition of Gary Pate, "GP," attached as Exhibit 24, at 103-04.)

5-6 hours before the early morning exams.  (Tr. 2 at 29-32.)[10]  Yet she conceded that BDO would not "definitely…put their stamp on this theory."  (Tr. 2 at 28.)  Plaintiff also argued that "Moodle is notoriously known for being inconsistent," and cited to a KPMG report that BDO referenced in its declaration, which purportedly discredited Moodle. (Tr. 2 at 20, 44-45.)  Nevertheless, Plaintiff conceded that she was unable to explain the time zone theory or the analyses in the KPMG report.[11]  (Tr. 2 at 46-47.)  Plaintiff further admitted that BDO could not confirm the time zone theory.  (Tr. 2 at 46.)

Mr. Pate's argument that the logs showed access times *only* at 9:12 AM and 11:57 on the morning of the examination was also discredited.   (*See* Pate Dec., ¶ 9.)  Mr. Pate had concluded that because the WiFi logs showed entries only that those times, she was not accessing Wesleyan WiFi at any other time that morning.[12]  *Id*.  Wesleyan ITS staff testified to the contrary.  They conducted an exercise that morning using an iPhone accessing Moodle on Wesleyan WiFi that confirmed their understanding of how the Wi-Fi logs worked.  The resulting WiFi log showed only the initial WiFi access time, despite continuous access.  Thus, this demonstrated that the Wi-Fi log's listing of access at 9:12 AM and 11:57 AM on the exam date did not mean *only* access at those times, but rather *initial* access at those times, which could have then continued.  This disproved any argument that the WiFi logs (or AT&T logs) exonerated her.  (Tr. 2 at 9.)  As such, *none* of Plaintiff's wildly varying theories were credible.  Mr. Kachuck testified in his deposition that Plaintiff's arguments in the Second Hearing amounted to "a lot of technical misdirection to

---

[10] This was Plaintiff's so-called "time zone" theory.  It never made sense and has been disproven during this litigation. Plaintiff's current expert, James Vaughn initially endorsed a variation on this "time zone theory," but now does not. (Deposition of James Vaughn, "JV," attached as Exhibit 25 at 47, 61-62.)  He was asked in January 2022, "So as you sit here today, do you believe that the settings were in Eastern time and the Moodle logs are in Eastern time?" and responded "Yes." (JV at 47.)

[11] The KPMG report was written in 2014, and Mr. Pate did not know what version of Moodle was operating at Wesleyan, three years later in 2017, so the report has no relevance and there is no evidence of Moodle issues at Wesleyan. (GP at 93.)

[12] He also concluded that, because the AT&T logs did not evidence cellular data use, she was not connected to the Internet.

try to make us feel like we didn't understand what Moodle was or how WiFi or AT&T worked…."

(Deposition of Gabe Kachuck, "GK," attached as Exhibit 26, at 87.)

On September 14, 2017, Dean Brown, sent Plaintiff a letter reporting the decision of the

voting members of the Honor Board who were present for the Second Hearing:

> After much consideration of the new evidence, the Board upholds the original
> decision of 'more likely responsible than not.' While important for consideration,
> the new evidence does not undermine the integrity of the Moodle logs which were
> used as primary evidence in reaching the original findings. The sanction of
> 'dismissal' as the sanction for violating the Honor Code still stands, despite the new
> information provided by BDO's report and your time zone theory.… Under the
> procedures of the Wesleyan University Honor System, a student found in violation
> may appeal the decision to Vice President Michael Whaley. If you choose to do
> this, submit your written appeal to Lorna Scott, Office of Student Affairs, by
> Thursday, September 21, 2017.

(Letter attached as Exhibit 27; AC ¶¶ 379-80.)  Plaintiff requested an extension of time up to

September 28, 2017 to appeal the Honor Board's decision, which was granted.  (*See id*.; AC ¶ 382;

MW at 149.)

## G.  Plaintiff Files A Second Appeal

On September 28, 2017, Plaintiff appealed the September 14 decision, making many of the

arguments she raises in this lawsuit.  (AC ¶ 382; Letter, Exhibit 6 from MW, attached as Exhibit

28.)   An Appeals Board panel, comprised of Vice President Whaley, a student and a faculty

member convened and deliberated.  (MW at 55.)  They reviewed the case file, listened to portions

of the transcript from the Second Hearing and also spoke with Mr. Kachuck as due diligence so

that they fully understood the rationale for the underlying decision.  (MW at 63-65, 67, 71, 150-

51, 166.)  Mr. Kachuck identified the Moodle logs as the most compelling evidence reviewed by

the Honor Board.  (MW at 165.)  The Appeals Panel concluded that the Honor Board's decision

would stand.  (MW at 80.)  From the Appeals Panel's perspective, "the most compelling piece of

evidence in the decision of the honor board was the Moodle log showing [Plaintiff] accessing exam

materials on which she was being tested." (MW at 171-73.) On October 6, 2017, Dean Whaley

wrote to Plaintiff, addressing the contentions her letter. He advised her that the Appeals Board

had "carefully reviewed [her] letter, all the materials in the case file, listened to the recording of

[the] most recent hearing, and interviewed the Honor Board chairperson." (Letter, Exhibit 7 from

MW, attached as Exhibit 29; MW at 165; AC ¶ 391.) Dean Whaley advised her that Dean Brown,

as administrative advisor to the Honor Board, serves *ex officio* and is empowered to participate

fully in hearings and deliberations, and her participation in the hearing was "appropriate and

unbiased." *Id*. Dean Whaley further stated that Plaintiff had access to the evidence that served as

the basis for the charges against her, and no procedural errors were found. (Exhibit 29; MW at

165; AC ¶ 391.) The letter concluded:

> The Appeals Board is satisfied that the members of the Honor Board understood
> the substance of the allegations against you as well as the information and theories
> constituting your defense provided during your testimony. They carefully weighed
> all of the information and had a solid rationale for their decision. As such, the
> Appeals Board will not take action on this matter and the Honor Board's decision
> in this case will stand.

*Id*.

The sanction of dismissal was imposed based on Plaintiff's "regular[,] consistent and

significant act[s]…over the course of two classes, multiple examinations that constitute a great

part of the grade," which were a "flagrant violation of the honor code." (GK at 99-100.) Dean

Whaley agreed that the sanction, for conduct that included cheating spanning two different classes

and several exams, was appropriate and that this was one of the most egregious cheating cases he

had encountered at Wesleyan (having been employed there since 1997). (MW at 13, 96-97, 187.)

**H. Discovery Has Yielded Additional Irrefutable Evidence Of Cheating**

During discovery in this matter, new evidence was disclosed to Wesleyan that conclusively

proves Plaintiff cheated on numerous exams and in multiple ways.

In August 2017, BDO created a mirror image of the iPhone that Plaintiff was using during her CHEM 141 and 142 classes.  (GP at 43:8-45:18; Pate Dec. at ¶¶ 6-7.)  In early 2021, Wesleyan learned that that mirror image no longer exists, because in 2017 Plaintiff or her former legal counsel instructed BDO to destroy that image.[13]  (GP at 22-23.)  In November 2020, the Court ordered Plaintiff to produce mirror images of her electronic devices.  (Dkt. No. 83.)  Instead, in early 2021 Plaintiff produced a collection of documents and multimedia files in PDF format ("the PDF Production").  (Declaration of John Medeiros, "Medeiros Dec.," attached as Exhibit 30, ¶¶ 7-8 & 13-14.)  The PDF Production included a spreadsheet created by BDO listing Plaintiff's web history that had been extracted from the BDO mirror image of the iPhone (the "Web History Report," with authentication attached as Exhibit 31).  (GP at 45, 56, JV at 48.)[14]

The Web History Report removes any possible doubt that Plaintiff cheated.[15]  It shows that Plaintiff accessed various course materials on Moodle during multiple CHEM 141 and 142 examinations, and the web history matches the Moodle logs down to the same day, hour, and minute.  (Medeiros Dec. ¶ 20; *see* Exhibit 11, Medeiros Report[16] at 20 and Exhibit D, attached as Exhibit 32.)  The Web History Report also shows that, in addition to accessing Moodle during the exams, Plaintiff also searched the Internet for specific chemistry terms and phrases and answers to

---

[13] Wesleyan is pursuing a spoliation claim with respect to this failure to preserve.  Plaintiff also intentionally spoliated her phone and other evidence she knew to be highly relevant.  Although summary judgment should be granted notwithstanding this spoliation, Plaintiff's attempts to benefit in her Honor Board case and this litigation should be sanctioned, as more fully set forth in the memorandum of law being filed to support the motion for spoliation.

[14] Throughout the two Honor Board hearings, Plaintiff, her lawyer and BDO had the highly relevant web history.  Despite being under a duty of candor, Plaintiff never permitted the Honor Board to examine her iPhone or even the web history.  In discovery, Mr. Kachuck expressed that this was "troubling."  (GK at 123-24.).

[15] As discussed in more depth below, Wesleyan was not and is not required to prove that Plaintiff cheated; rather, it must show that it acted with a "discernable rational basis" in conducting its disciplinary proceedings," and in applying a preponderance of the evidence standard to the evidence before the Honor Board.  (*See* Section V.A., infra.)

[16] As Mr. Medeiros explains in his report, at pages 22-27, several other internal Wesleyan logs (DHCP, Aruba Clear Pass, Single Sign On ("SSO") and Single Sign On Central Authentication Server ("CAS")), which were not before the Honor Board, corroborate the Moodle logs and thereby Plaintiff's cheating.

problems exactly how they appeared on the exam.  (Medeiros Dec., ¶ 22; Exhibit 31.)  The evidence of purposeful cheating shown in the Web History Report is astounding.  For example, in the July 26, 2017 CHEM 142 exam, the following question was asked: "rank the value of the indicated quantities from largest to smallest" for "[t]he change in entropy associated with the following processes: making ice cubes in the freezer, pistachio ice cream melting in a cone on a hot summer day, cutting a bagel exactly in half."  (Exam questions attached as Exhibit 33, at Part I.)  The Web History Report shows that, during the exam time, Plaintiff conducted Google searches for the directly correlated terms "entropy freezing ice," "entropy cutting a bagel," "entropy of melting ice cube," and "entropy of melting ice cream."  (Web History Report at P00015105, lines 677, 678, 683 and 687; *see* Exhibit 15, at WES0001750 (table created by Plaintiff stating exam times as alleged by her).[17]  This proof of Plaintiff's intentional and strategic cheating cannot be refuted.

Moreover, the Web History also makes clear that Plaintiff was extensively cheating during the July 12 and 19 exams, for which she had been found not responsible by the Honor Board.[18] (*See* Exhibit 31 at P00015119-15125 and P00015115-15113; Exhibit 15, at WES0001750.)

The Web History Report is a smoking gun.[19]

---

[17] Another striking example relates to question 2.b. on the August 4, 2017 CHEM 142 final, which asked about the rate of effusion of Nitrogen.  (Exam questions attached as Exhibit 34, at PST 0642.)  At 9:11, eleven minutes into the exam, Plaintiff searched Google for "rate of effusion of N2."  (Web History Report at P00015083, line 302.) Throughout the period of the exam, Plaintiff Googled several other chemistry terms that related to exam questions, including, among others, "zinc" (*see* Web History Report at P00015083, line 299; Exhibit 34, at PST 0642, question 4b), "nickel" (*see* Web History Report at P00015082, lines 287, 288 and 284; Exhibit 34, at PST 0642, question 4b), "buffer definition" (*see* Web History Report at P00015082, line 279; Exhibit 34, at PST 0643, question 4a), and "gibbs free energy nacl disassociation" (*see* Web History Report at P00015079, line 199; Exhibit 34, at PST 0644, question 3a).

[18] The Web History Report does not go far enough back to show whether there was activity during the June 14, 2017 exam.

[19] Plaintiff has argued that the Web History Report is expressed in UTC time and therefore does not evidence cheating during exams.  However, because the Web History Report entries showing Moodle access exactly match the Moodle log entries, and the Moodle logs are confirmed to be in Eastern time, the Web History Report entries must be in Eastern time.  Moreover, Wesleyan has requested, in its spoliation motion, for the Court to preclude Plaintiff from making this meritless argument, because she has destroyed evidence that would show the iPhone's time zone setting.

18

The electronic evidence now in the record establishes Plaintiffs cheating on the five (5) exams she was found responsible for as follows:

| Exam Date/ Class | Evidence before the Honor Board | Additional Evidence from Discovery |
|---|---|---|
| CHEM 141, 6/21/2017 | Moodle Logs | DHCP logs, SSO logs, CAS Logs, Aruba Clear Pass logs, Web History Report |
| CHEM 141, 6/28/2017 | Moodle Logs | DHCP logs, SSO logs, CAS Logs, Aruba Clear Pass logs, Web History Report |
| CHEM 142, 7/26/2017 | Moodle Logs | DHCP logs, SSO logs, CAS Logs, Aruba Clear Pass logs, Web History Report |
| CHEM 142, 8/2/2017 | Moodle Logs, WiFi Logs | DHCP logs, SSO logs, CAS Logs, Aruba Clear Pass logs, Web History Report |
| CHEM 142, 8/4/2017 | Moodle Logs, WiFi Logs | DHCP logs, SSO logs, CAS Logs, Aruba Clear Pass logs, Web History Report |

## III.     THE REMAINING CLAIMS

On February 19, 2021, the Court dismissed many of Plaintiff's claims, leaving some or parts of the following in the March 13, 2020 Amended Complaint:

| Count | Cause of Action |
|---|---|
| 1 | Breach of contract |
| 4 | Negligent misrepresentation |
| 6 | Reckless and wanton misconduct |

With respect to Count 1, two claims remain regarding breach of contract:

- that Wesleyan breached the Handbook by failing to provide a "fair process," by: 1) failing to convene a full hearing panel; 2) failing to assist Plaintiff in gathering exculpatory evidence; 3) failing to maintain confidentiality; 4) failing to limit the role of Dean Brown as the administrative advisor; 5) failing to enforce antidiscrimination measures; and 6) failing to notify Plaintiff she would received "F" grades as a sanction; and
- that Wesleyan breached the Handbook by failing to employ the fair preponderance standard.

With respect to Count 4, three claims remain regarding negligent misrepresentation:

- that Wesleyan misrepresented that Plaintiff had been provided with all the evidence that would be presented against her at the Second Hearing;
- that Wesleyan misrepresented that there was no process available for compelling witness testimony; and
- that Wesleyan misrepresented that the only "new" evidence used in the Second Hearing would be the AT&T records and ITS's response that was in her case file.

With respect to Count 6, the Court allowed the reckless and wanton misconduct claim to survive dismissal based upon Plaintiff's allegation that Wesleyan "repeatedly and intentionally violated its own policies and procedures;" i.e., the alleged "breaches of its contract with her by failing to substantively comply with its policies set forth in the Handbook which could plausibly be found to be highly unreasonable such that the conduct was reckless and wanton." *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2021 WL 664010, at *13 (D. Conn. Feb. 19, 2021) (the "*MTD Decision*").  The Court held that "a fully developed record is needed to determine the merits of Plaintiff's claims that Wesleyan possessed the requisite mental state;" i.e., willfulness. *Id*.

As set forth below, the record developed in discovery compels the granting of summary judgment as to the remaining portions of Counts 1 and 4 and all of Count 6.

IV.      STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" to survive summary judgment.  (Internal quotation marks omitted.) *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).   Summary judgment is no less applicable in the context of cases challenging school discipline.   *See, e.g., Doe v. Colgate*

*Univ.*, 760 F. App'x 22 (2d Cir. 2019) (affirming summary judgement in "reverse Title IX" case that included contract claims).

## V.       ARGUMENT

Plaintiff's remaining claims relate to supposed flaws in Wesleyan's disciplinary process. The premise of these claims is that Plaintiff did not cheat and "Wesleyan failed to conduct Jane's judicial hearings in accordance with the standards of fair process as required by the Handbook." (*See* AC, ¶¶ 291-97, 307, 343, 375-76, 461.)  However, the undisputed material facts establish that Plaintiff received a correct and fair process and that the Honor Board reasonably found, based on a preponderance of the evidence standard, that she had cheated.  This Honor Board's decision is entitled to deference and Wesleyan is entitled to summary judgment.

### A.  Wesleyan's Process Is Entitled to Deference

Wesleyan is entitled to substantial deference in adjudicating violations of its Honor Code pursuant to the precedent of *Gupta v. New Britain General Hospital*, 239 Conn. 574 (1996), and its progeny.  This Court applied *Gupta* in the *MTD Decision* and eliminated many of Plaintiff's claims on that basis, leaving only those claims that it could not find precluded in the context of a Rule 12(b)(6) motion.  The remaining claims, which amount to straw-grasping, are each analyzed in detail below.  However, it is important to review the general framework of deference because Plaintiff has pursued her case in discovery as if the University is held to a standard of perfection in exercising its academic discretion, which is contrary to established law.  There is no genuine issue of material fact that the Honor Board's determination had a discernible rational basis, which is the correct standard.  There is also no genuine question that, at a minimum, Wesleyan substantially complied with its policies and procedures and Plaintiff received a fair process.

In *Gupta*, the Connecticut Supreme Court expressly rejected tort and contract claims challenging an academic institution's overall educational policies, curriculum, and program.

"Because…tort principles are difficult, if not impossible, to apply in the academic environment, courts have almost universally held that claims of 'educational malpractice' are not cognizable." (Citation and quotation marks omitted.) *Id*. at 591.   Based on the same "jurisprudential considerations that shed doubt on the viability of the tort of educational malpractice…, contract claims challenging the overall quality of educational programs 'have generally been rejected' [as well]." *Id*. at 592-593.   Recognizing both the deference afforded to academic decision-makers and the difficulty of applying tort and contract principles to the academic context, the *Gupta* court recognized only two situations where courts may entertain a cause of action for institutional breach of a contract for educational services.   "The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field.   The second would arise if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id*. (Internal citations omitted.)[20]

Courts, including this one, have applied *Gupta*'s deferential standard to an academic institution's disciplinary decisions, and required only that those decisions have a "discernable rational basis." *See, e.g., MTD Decision* at *6-*7; *Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 327 (D. Conn. 2010) (under *Gupta*, "[t]he plaintiff bears a heavy burden in proving that [her] dismissal resulted from arbitrary, capricious, or bad faith conduct on the part of the [school]. To prevail, [s]he must show that the [school's] decision had no 'discernable rational basis.' " *Gupta*, 239 Conn. at 596…. Because the Handbook provides that dismissal is warranted upon violation of any Major Rule, and because Plaintiff violated a Major Rule when she consumed alcohol, Porter's

---

[20] The first exception does not even arguably apply here.  *See Faust v. Connecticut Junior Republic Ass'n.*, No. CV 990336698S, 2000 WL 254570, at *2 (Conn. Super. Feb. 23, 2000) (striking negligence claim and holding first *Gupta* exception not met).  The second exception, related to contract claims, is discussed below in section V.B..

determination to dismiss Plaintiff does not lack a "discernable rational basis."). "To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions." *Doe v. Brown University*, 210 F. Supp. 3d 310, 331 (D.R.I. 2016). Indeed, the United States Supreme Court has cautioned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999), *see also, Rafalko v. University of New Haven*, 129 Conn. App. 44, 48 (2011) ("A court must be careful not to substitute its judgment improperly for the academic judgment of the school."); *Packer v. Bd. of Edu. of Town of Thomaston*, 246 Conn. 89, 126 (1998) (Norcott, J., concurring) (collecting cases; "It is a well established principle that courts should exercise caution in interfering with school discipline."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass 2016) ("[I]t is not generally the role of the federal courts to tell a private university how to conduct its affairs.").

The Handbook's Honor Code unequivocally prohibits cheating, and states that sanctions up to dismissal may be imposed for violations. (Handbook at 5, 7.) Plaintiff was provided with notice of the charges against her, was provided with an advisor, made opening and closing statements, presented evidence and witnesses, questioned witnesses and the Honor Board, received a full evidentiary hearing, appealed and received a second hearing (by which time she had become represented by counsel and had retained an expert witness, (PL I at 114)) that was in full compliance with fair process, and had a second appeal that was heard by the University. The decision of the voting members of the Honor Board present for the Second Hearing was based primarily on the Moodle logs, which clearly show Plaintiff impermissibly accessing relevant information during exams.

In the hearings, Plaintiff asserted wildly shifting and evolving explanations and speculation for the access shown in the Moodle logs, which diminished her credibility before the Honor Board.

In the Second Hearing, Plaintiff herself abandoned the theories she asserted in the First Hearing (for example, that the activity on her phone was "random," and occurred because she was kicking her backpack). (*See* Tr. 2 at 26, 28.) In the Second Hearing, she had a new theory that the Moodle logs might be showing incorrect times because she changed her Siri voice to have a British accent. BDO would not support that theory (which is wrong on its face because her phone's setting would not affect how Wesleyan's independent servers logged her access) and no other expert or credible evidence supports that "theory." The statements that were in BDO's declaration presented to the Honor Board have also been conceded to be false by Mr. Pate and/or Mr. Vaughn, such as that the Wifi logs disprove access during exam times. (*See* JV at 99; GP at 85.) Therefore, every single argument that Plaintiff presented to the Honor Board has been removed from the case. Any other theory that Plaintiff claims survives was concocted in discovery and not before the Honor Board. Under these facts, there is no question that the Honor Board acted with a discernable rational basis.

Based upon the findings that Plaintiff had cheated on multiple exams in multiple classes, a sanction of dismissal was imposed. There is no evidence in the record of any similarly situated students[21] who were treated differently, and this serious sanction was appropriate given her level of misconduct. The Honor Board was thoughtful and thorough and did not "rubber-stamp" its decision; indeed, it found insufficient evidence to sustain the allegations with respect to four (4) of the tests. (*See* AR at 194.)

---

[21] Plaintiff makes allegations in her Complaint about other Honor Board cases and points out that there were no other dismissals between 2013 and 2016 for cheating. (AC ¶ 395-99.) However, these allegations are not part of the claims that survived dismissal, which are limited to only certain discrete contractual and negligent misrepresentation claims. Regardless, none of the other cases alleged by Plaintiff involved similarly situated students and there is no admissible evidence to support the claim that Plaintiff's sanction was "arbitrarily severe." For example, the other matters involved some combination of: cheating on assignments rather than exams; less frequency of cheating; cheating in only one course; adjudication by different Honor Boards; and/or, contrition by the student. Indeed, Dean Whaley testified that Plaintiff's case was unlike any other he has seen during his time at Wesleyan, dating back to 1997. (MW at 13, 213.) These differences defeat any claim of arbitrariness. *See Lacroix v. City of New Haven*, No. 3:06cv481(JBA), 2008 WL 11473268, at *4 (D.Conn. Feb. 2, 2008) (summary judgment based on lack of similarly-situated comparators).

Based on all of this, the Court should defer to the Wesleyan's disciplinary process and grant summary judgment.

**B.** **Summary Judgment Should Enter As To The Remaining Portions Of Plaintiff's Breach of Contract Claim In Count 1**

Summary judgment should enter on Plaintiff's breach of contract claim because there is no evidence that any special promises were made, or that any promises, special or otherwise, were breached.

### 1.   Standard For Breach Of Contract Claims In The Educational Context

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Michel v. Yale Univ.*, No. 3:20-CV-01080 (JCH), 2021 WL 2827358, at *6 (D. Conn. July 7, 2021) (quoting *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly*, P.C., 311 Conn. 282, 291 (Conn. 2014)). The "general rule with respect to compliance with contract terms ... is not one of strict compliance, but substantial compliance." (Internal quotation marks omitted.) *Borrelli v. H & H Contracting, Inc.*, 100 Conn.App. 680, 692 n. 6 (2007), appeal dismissed, 285 Conn. 553, 940 A.2d 787 (2008), quoting 15 S. Williston, Contracts (4th Ed. Lord 2000) § 44:52, pp. 217–18; *see Okafor v. Yale Univ.*, No. CV980410320, 2004 WL 1615941, at *7 (Conn. Super. Jun. 25, 2004) (summary judgment on contract claim in cheating case where "defendant substantially complied with the rules and regulations it set up for disciplinary procedures against students….").

Under a "narrow" exception to *Gupta* a plaintiff can pursue a breach of contract claim if they can show that the "educational institution failed to provide specifically promised educational services." *Hope Academy v. Friel*, No. CV030081183S, 2004 WL 1888909, at *2 (Conn.Super. Jul. 22, 2004). Characterizing the second *Gupta* exception as an "exacting standard," the Connecticut Appellate Court has made clear that, "to limit judicial intervention into educational

decision making, the student must… allege nonperformance of a special promise, a promise outside the purview of normal educational expectations." *Faigel v. Fairfield University*, 75 Conn. App. 37, 38 (2003). Under this exception, "[g]eneral or vague promises do not suffice." *Hope Academy*, 2004 WL 1888909 at *2; *see also Hutchinson v. Univ. of Saint Joseph*, No. 3:21-CV-325(RNC), 2022 WL 19339, at *2 (D. Conn. Jan. 3, 2022) ("Viewed most favorably to plaintiffs, the "course listings" and "course syllabi" reflect a mutual assumption that in-person classes would be the norm. But they do not contain a promise by USJ to provide exclusively in-person instruction analogous to the promises made in the cases cited in *Gupta*."). As such, "[w]hen a disciplinary dispute arises between the student and the university, judicial review of the institution's actions is limited 'to whether the [institution] acted arbitrarily or whether it substantially complied with its own rules and regulations." *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 208 (W.D.N.Y. Nov. 5, 2013). Plaintiff has not pointed to any "special promises" that were not substantially complied with by Wesleyan.

### 2.   There Were No Special Promises Or Breaches Of Promises

None of Plaintiff's remaining breach of contract theories fall within *Gupta*'s narrow exception for "special promises" or are supported by evidence of any breach.

### a.   Failure To Provide A Fair Process

The Court allowed Plaintiff's claim that she was denied a fair process to remain as a grouping of more specific alleged breaches of the Handbook. *MTD Decision* at *7-*8. As an initial matter, "[a] commitment to provide a "fair and impartial" process is too generic to be an enforceable promise…." *Feibleman v. Trustees of Columbia Univ. in City of New York*, No. 19-CV-4327 (VEC), 2020 WL 882429, at *18 (S.D.N.Y. Feb. 24, 2020) (citing cases). Therefore, Wesleyan is entitled to summary judgment as to the broad claim that a fair process was not provided. Nor do Plaintiff's subsidiary process claims have any merit, as set forth below.

### i. There Was No Failure To Convene A Full Hearing Panel

Plaintiff claims that Wesleyan failed to construct a "full Hearing Panel"[22] at the First Hearing as required by the Handbook. (AC ¶ 460.) More specifically, Plaintiff claims that a fourth student panelist and a second advisory member were absent from her hearings. (AC ¶ 235-40.)

### 1. A Fourth Student Was Not Required.

The text of the Handbook demonstrates there is no promise, much less a "specific" promise, that all members of the Honor Board will be present for all hearings. The Handbook language contemplates that all voting members may not be present for every hearing, stating that "[d]ecisions rendered during hearings shall be by majority vote *of the voting members present*." (Handbook, p. 7.) If all four (4) members were required to attend every hearing, the "of the voting members present" would be superfluous. Indeed, other language in the Handbook provides that the full Honor Board may not be present for a particular hearing, stating: "Any board member who feels he/she cannot be impartial in a given case shall excuse himself/herself from the hearing." *Id.* Deposition testimony was also clear that the Honor Board did not require all four members to attend each hearing. (GK at 13-14; Deposition of Gabby Vargas, "GV," attached as Exhibit 35, at 15-16; Whaley Dec. at ¶ 7.) Indeed, Plaintiff never made any objection, though she certainly could have, to the absence of a fourth panelist.

Moreover, this claim fails because Plaintiff cannot prove any damages or harm as a result of having three voting student Honor Board panelists instead of four, because, even if the fourth member was present and voted to exonerate Plaintiff, a majority of the panel still would have found her responsible. The Handbook specifies that "[d]ecisions rendered during hearings shall be by majority vote…" *Id.* In this case, the voting members of the Honor Board present were unanimous

---

[22] "Hearing Panel" is not a term used in the Handbook.

(3 to 0) in it decision.  (Declaration of Louise Brown, attached as Exhibit 36, ¶ 7.)  Advisory members do not vote.  (MW at 168.)  Therefore, even if a fourth panelist was present, and voted against the finding, that would not have altered the majority vote outcome, and there was no harm to Plaintiff.  *See Paine Coll. v. S. Ass'n of Colleges & Sch. Comm'n on Colleges, Inc.*, 810 F. App'x 852, 858 (11th Cir.), cert. denied, 141 S. Ct. 850 (2020) ("the decision was unanimous, meaning regardless of which of the two unelected members had served, the vote would have been in favor of affirming the removal of Paine's accreditation…"); *EEOC v. Joseph Horne Co.*, 607 F.2d 1075, 1076 (4th Cir.1979), rev'd on other grounds sub nom. *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590 (1981) (affirming finding that since "the two votes approving denial of the petition would likely have prevailed in any event, any absence of the third member was immaterial and only a de minimis deviation from EEOC's then regulation.").

In the *MTD Decision*, the Court stated that "[b]oth Plaintiff and Wesleyan's interpretations of the Handbook appear reasonable, and when contractual language is reasonably susceptible to competing interpretations, one of which would entitle the plaintiff to relief, dismissal is inappropriate." *Id.* at *8.  The additional evidence recited above now establishes that Wesleyan's interpretation is the only reasonable one.  Certainly, it was within Wesleyan's academic discretion to interpret the terms of its own Handbook in this way.  *See C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1148 (9th Cir. 2016) ("Federal courts owe significant deference to a school's interpretation of its own rules and policies.").  As such, summary judgment should enter for Wesleyan as to this claim.

## 2.   A Second Advisory Member Was Not Required

Even more far-fetched is Plaintiff's claim that it was a breach of contract to have only one Honor Board advisor present.

There is no dispute that Dean Brown, an advisory member, was present at both Plaintiff's hearings.  The Handbook contains no "special promise" that a second advisory member will attend a hearing.  Indeed, for example, the Handbook provides "The role of the faculty and administrative advisor_(s)_ is to brief the board before each hearing to ensure a clear understanding of the regulation(s) in question and of the hearing procedures."  (Emphasis added, Handbook at 6.)  This text recognizes that, for a particular matter, "advisor" may be singular or plural, and negates the claim that two advisors need to attend every hearing.

Regardless, the advisory members are "ex officio," meaning that they do not vote.  (Handbook at 5.)  As such, there is no evidence that the presence of some additional unidentified advisor would have resulted in the Honor Board not finding her responsible.  And, Plaintiff never objected to the absence of a second advisory member.   Because Plaintiff cannot meet the requirement of showing damages for this breach of contract claim, it fails for this reason as well.

### ii.   Wesleyan Did Not Promise Or Fail To Assist In Gathering Evidence

Plaintiff claims that "Wesleyan failed to assist [her] in obtaining the cooperation of members of the university community to provide testimony or evidence directly related to the adjudication of a case, an affirmative duty stated in the Handbook."  (AC ¶ 462.)  Plaintiff is referring to her allegation that Mr. Brauchle was not compelled to attend her hearing.  (AC ¶ 153-74.)

The Handbook language upon which Plaintiff relies does not make the promise she alleges.  Rather, it states: "The board <u>may</u> require the cooperation of any member of the university community in furnishing testimony or evidence directly related to the adjudication of a case."

(Emphasis added.) (AC ¶ 33; Handbook p. 6.)   The key word here is "may," which makes requiring cooperation permissive, but not mandatory.   In its *MTD Decision*, the Court stated that this "is language which could communicate to the school community that the Honor Board has the capacity to compel testimony and will do so where appropriate."   *Id*. at *8.   However, the clear language in the Handbook left to the Honor Board the determination as to when compelling testimony was "appropriate," and that judgment was exercised consistent with the requirement of "substantial compliance."   The Honor Board did not believe that Mr. Brauchle was a necessary witness, because the Moodle evidence was clear and he was not in the room the entire time, and even when he came in the room he may not have seen her cheating but that did not prove anything. (GK at 35-36; GV at 43-44.)   Therefore, no "breach of contract" can be shown.

Moreover, the evidence demonstrates that Plaintiff did not request that Mr. Brauchle attend the hearing.   (PB at 122.)   Mr. Brauchle testified that, if he were asked by Plaintiff to attend the hearing, he would have done so.   (PB at 114-15.)   Regardless, Mr. Brauchle testified that he did not have "exculpatory evidence" or evidence that was materially relevant.   Mr. Brauchle did not stay in the exam room with Plaintiff and watch her; rather she was in a large lecture hall, positioned 100 feet from doors that had no windows on them, and Mr. Brauchle came into the room only every half hour or so.   (PB at 67-70.)   As he explained,

> I don't believe it would have been helpful….I didn't have very much relevant information….just because I didn't see her on her phone in the few times that I was in the exam room while she was taking the exams, it doesn't mean she wasn't on her phone.

(PB at 123.)   Thus, he certainly would not have been able to say that Plaintiff did not cheat, because he was not in the room for the majority of the exam times.   (PB at 143-44.)   Indeed, had he attended, he would not have been a helpful witness to Plaintiff and would have made the case against her even *stronger*.   Based on the Moodle logs he had seen evidencing Plaintiff's access during the

exam, he knew Plaintiff cheated.  (PB at 143.)  Therefore, if he was asked whether he believed that Plaintiff had cheated, he would have said yes.  (PB at 143.)  Plaintiff admitted in texts with her mother that Mr. Brauchle was not an important witness, writing: "I think we can forget about Paul at this point," to which her mother stated "I agree on Paul. You don't need him. Just make sure to say you tried to get him."  (PL II at 74; Exhibit 45 from PL II, texts attached as Exhibit 37.)  In other words, they were simply laying a trap, to make a record and this whole argument is meaningless.  Finally, Plaintiff made this point by having a student witness testify that she did not see Plaintiff cheat during the one exam that the two sat together in (on June 21, 2017).  (Tr. at 109-113.)  Plaintiff also submitted a statement from another student in that same room, during the same exam, saying she did see not Plaintiff cheat.  (Statements attached as Exhibit 38.)  Plaintiff cannot show that she was deprived of any materially relevant or exculpatory evidence, and there is no evidence of damages caused by any alleged breach of the Handbook.  Summary judgment should enter as to this claim.

### iii.  Wesleyan Maintained Confidentiality

The Handbook states that "[t]he University requires that judicial boards and administrative staff maintain confidentiality regarding judicial matters,"[23] and that judicial information may only be disclosed to University personnel who, at the discretion of the Dean, "have a legitimate need to know."  (Handbook at 7.)  Plaintiff claims that "Wesleyan failed to maintain confidentiality regarding the outcome of Jane's hearing and appeal" and her "disciplinary records, process, charges, findings, and sanction as required by the Handbook."  (AC ¶ 463-64.)  This allegation refers to her claim that "[d]uring the Fall 2017 semester, Introduction to Chemistry Professor Anthony P. Davis openly discussed Jane's disciplinary process and sanction during a class

---

[23] This language does not impose any confidentiality obligations on, for example, faculty or witnesses.

session." (AC ¶ 406.)  She alleges that the Handbook was violated because Prof. Davis must have learned of the information from some unidentified Board member or administrative staff.  (*See* AC ¶¶ 406-42.)  Plaintiff has no admissible evidence to support these allegations.

Plaintiff's testimony confirms that she has no admissible evidence on this claim, only speculation.  In the first session of her deposition, Plaintiff testified that a student in Prof. Davis' class[24] told Plaintiff that Prof. Davis had disclosed the outcome of Plaintiff's case.  (First Deposition of Plaintiff, "PL I" attached as Exhibit 39, at 113-14.)  Plaintiff admitted that she had no evidence she was identified by name, but rather claimed that people "put two and two together" and figured out it was her, given her absence from campus.  (PL I at 114.)  In the second session of her deposition, she admitted the student she obtained the information through was not actually in Prof. Davis' class, but had heard it from other students.  (PL II at 54.)  Plaintiff said that she also heard this from other "people," but she did not know whether any of them heard it from Prof. Davis.  (*Id*. at 55.)  Thus, this claim is based entirely upon inadmissible speculation and inadmissible double hearsay, by both the supposed other "people" and by Plaintiff, and therefore summary judgment must enter.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence." (internal quotation marks and citation omitted)).  Furthermore, there is no evidence that Prof. Davis heard the information he supposedly disclosed from an administrator or judicial board member.

Even apart from these dispositive arguments, there is no evidence that provides a shred of particularity about what Prof. Davis allegedly said that would lead to students "putting two and two together" to identify Plaintiff, who was not named.  Absent such details, this claim is entirely

---

[24] Plaintiff could not even recall the name of the professor at her deposition, but based on the complaint, Wesleyan will assume she was referring to Prof. Davis.

speculative and summary judgment should enter.  *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273

F.3d 494, 502 (2d Cir.2001) (holding that grant of summary judgment is appropriate "where the

nonmoving party adduces nothing more than speculation to support its claims").  This is especially

true because the Handbook specifically states that periodic summaries of cases are distributed to

the campus community, with names and identifying information omitted.  (Handbook, p. 5.)  There

is no evidence (not even inadmissible evidence) that Prof. Davis disclosed anything or, if he did,

that what he disclosed was anything other than what would have been available in the summaries

published to members of the Wesleyan community.  For all of these reasons, summary judgment

should enter on this claim.

### iv.  Dean Brown Did Not Exceed Her Role

Plaintiff also claims that "Wesleyan failed to enforce the limitations clearly defined in the

Handbook when Dean Brown exceeded her role as administrative advisor to the Honor Board."

(AC ¶ 465.)  This vague allegation is based on the following language from the Handbook:

> The role of the faculty and administrative advisor(s) is to brief the board before
> each hearing to ensure a clear understanding of the regulation(s) in question and of
> the hearing procedures. The advisor(s) shall advise the chair during hearings to see
> that the board follows procedures correctly. The advisors may offer information
> and assist the chair in facilitation. They may also offer advice or clarification
> regarding appropriate sanctions or questions regarding policies and procedures
> during deliberations in closed session.

(Handbook p. 5; AC ¶ 347.)

Plaintiff does not allege, and the Handbook does not contain, any "special promise" that

Dean Brown would refrain from doing certain things.  Indeed, her role is broadly defined to include

advising and offering information, which are imprecise terms left open to interpretation, and which

cannot support a contract claim as an exception to *Gupta*.  As Dean Whaley testified, as advisor to

the Honor Board, Dean Brown had "full voice but no vote in the decision of the honor board."

(MW at 168.)  Thus, she was permitted to ask questions of Plaintiff and witnesses, offer her

33

opinions, and fully participate in the deliberations. *Id*. There is no evidence that Dean Brown exceed her broadly defined role. Certainly, there is no genuine dispute that Dean Brown and the University "substantially complied" with the role described, and that is all that is required, even if there was a "special promise" imbedded in the language in question. Moreover, Mr. Kachuk testified that Dean Brown did not attempt to change the minds of the student panelists or influence them and that she did not influence them. (GV at 22; GK at 145-46.) For all of these reasons, summary judgment should enter as to this claim.

### v. There Was No Discriminatory Conduct

Plaintiff claims that "Wesleyan failed to enforce the anti-discrimination measures noted in the Handbook when [Prof.] Roberts made discriminatory and hostile statements about Jane and Jane's disability." (AC ¶ 466.) As an initial manner, courts have held that a non-discrimination policy is not a specific promise and does not fall within the *Gupta* exception, so summary judgment should enter for that reason alone. *McNeil v. Yale University*, 436 F.Supp.3d 489, 531-33 (D.Conn. 2020) (citing cases), vacated in part on other grounds by 2021 WL 5286647 (2nd Cir. Nov. 15, 2021); *Peralta v. Cendant Corp.*, 123 F. Supp. 2d 65, 84 (D. Conn. 2000) (Arterton, J.) ("[a]s any promises in the [anti-harassment] policy are general statements of adherence to the anti-discrimination laws, standing alone they do not create a separate and independent contractual obligation.").

Regardless, there is no evidence of any "discrimination" against Plaintiff. Plaintiff alleges that a colloquy at the First Hearing with Prof. Roberts included some sort of discriminatory statement by her, but the allegations simply do not contain any such statement. Instead, they describe a legitimate discussion about the room where Plaintiff took the exams she was alleged to have cheated on, and Plaintiff was the one who raised an alleged issue with her own fine motor skills (using that as a reason why she could not have cheated). (*See* AC ¶¶ 248-51.) There is no

evidence of any discriminatory remarks or slurs, much less ones that could be legally actionable, which requires "severe, persistent, or pervasive" harassment.  *See* U.S. Dep't of Educ., Reminder of Responsibility, available at http://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html ("When harassing conduct is sufficiently severe, persistent, or pervasive that it creates a hostile environment, it can violate a student's rights under the Section 504 and Title II regulations."). Indeed, the evidence shows that Prof. Roberts treated Plaintiff fairly with respect to her disability. Although Plaintiff was not entitled to a separate room to take her exams, rather a reduced-distraction environment, she was allowed her own room.  (*See* Exhibits 11, at PST 0860 and PST 0869.)  In fact, Prof. Roberts did not even know the extent of Plaintiff's disability.  (AR at 93.) Before Plaintiff's cheating surfaced, Prof. Roberts had even asked Plaintiff to serve as a teaching assistant for the upcoming semester.  (Tr. 1 at 15.)  There is simply no evidence of discriminatory animus by Prof. Roberts against Plaintiff and, based on this record, summary judgment must enter on this claim.

### vi.  Plaintiff's "F" Grades Were Entirely Appropriate

Plaintiff claims that, "[i]n violation of the terms of the Handbook, Wesleyan failed to properly notify [her] of the full outcome of her appeal by neglecting to inform her that two "F" grades would be part of her sanction."  (AC ¶ 469.)  She bases this on the Handbook language stating that the student will be notified "of the outcome of the appeal," and "[i]f the appeal is denied, the sanctions will be imposed and the University will consider the case closed."  (AC ¶ 450.)

In the *MTD decision*, the Court observed: "Although the failing grades may have been the result of a process independent of the Honor Board, such a scenario requires further factual development." *Id*. at *8.  The evidence shows that the Fs were in fact a part of a separate academic process that Wesleyan was well within its prerogative to proceed by.  On October 11, 2017, Dean

Brown advised Dean Phillips, who in turn advised Prof. Roberts, to fail Plaintiff in the summer classes as a result of the Honor Board's findings.  (*See* e-mails (WES-3200) attached as Exhibit 40.)   Dean Whaley testified that because Plaintiff cheated on so many exams it was appropriate and usual to give Plaintiff failing grades in the classes.  (MW at 195-96.)  Thus, even though the sanction letter did not specify that Plaintiff would fail the classes, those grades were appropriate from an academic standpoint and Wesleyan had the discretion to fail Plaintiff.  (MW at 196*; see Craine v. Trinity Coll.*, 259 Conn. 625, 663 (2002) (stating that giving a poor grade to a student in class is an academic decision that deserves deference from the courts).

Moreover, Plaintiff cannot show any damages relating to the inclusion of the "F" grades on her transcript, because she was accepted to another university without disclosing her Wesleyan transcript, from which she graduated, and she has not disclosed her transcript to her present employer.  (PL II at 49, 138-9.)  Accordingly, for a variety of reasons, this claim fails as well.

### b.  The Honor Board Applied A Fair Preponderance Standard

Plaintiff claims that Wesleyan failed to meet the "fair preponderance" standard when it found her responsible for cheating on the June 21, 2017 exam.  (AC ¶ 459.)  The relevant Handbook language states that the "board will make decisions…based on the evidential standard of 'fair preponderance.' The board is responsible for determining if it is more likely than not that the alleged violation occurred."  (Handbook, p. 6.)  Thus, the language commits to the Honor Board the authority to decide whether the preponderance standard was met, and the Honor Board did indeed employ this standard to Plaintiff's case.  (GV at 24, GK at 19.)  At the Second Hearing, Mr. Kachuck made clear that the preponderance standard was being applied.  (Tr. 2 at 38-39.)  Indeed, consistent with the application of the preponderance standard, the Moodle logs provided powerful evidence that the panel found determinative.  (GV at 24, 47-48, 56; GK at 19, 35-36.)

There is no allegation that the Honor Board used some different standard; rather, Plaintiff claims that the Honor Board should have credited her evidence over the other evidence.  Whether some other fact-finder might find the preponderance standard was not met is not a violation of the Handbook, and summary judgment should enter.  *See Doe v. Northern Michigan Univ.*, 393 F.Supp.3d 683, 699 n5 (W.D.Mich. 2019) ("Plaintiff argues that if Defendants had used a preponderance of the evidence standard, they would have reached a different result. However, that allegation is merely 'Doe's subjective claim of an unfair proceeding that reached the wrong conclusion,' which is not sufficient to establish a breach of contract claim under the prevailing objective standard."); *McDade v. Cleveland State Univ.*, No. 14AP-275, 2014 WL 4557015, at *4 (Ohio App. Sept. 16, 2014) ("[T]he issue is not whether she is to be believed or the instructors and the dean are to be believed; rather, the issue is whether CSU acted arbitrarily in dismissing her from the program."); *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 819 (E.D. Pa. 2017) (allegations that the university "misconstrued the evidence and misassessed credibility" were insufficient. The court reasoned that "such alleged errors, even if they occurred, do not give rise to a reasonable inference that the [university was] not convinced by a preponderance of the evidence, based on their view of the evidence.").

Plaintiff directs this "fair preponderance" claim to the June 21 exam only, but the fact of her cheating on that exam is fully supported by not only the Moodle log, but also the significant evidence of cheating on other exams, in the same manner.  Plaintiff provided the same shifting, incredible excuses with respect to all of these examinations.  Moreover, even if somehow something less than a fair preponderance standard was used to evaluate one exam, she was found to have cheated on four (4) others, so she cannot show any damages as a result.

In the *MTD Decision*, the Court agreed that "a general claim that a university should have reached a different result in an adjudication may not be cognizable when standing alone…."  *Id.*

at *8.  However, the Court pointed to Plaintiff's "numerous allegations of objective procedural failures that, if true, would have made it impossible for an adjudicative board to fairly weigh the evidence."  *Id.*  As set forth in the Memorandum, Plaintiff's claims of "procedural failures" are unsupported, and her fair preponderance claim must thus fail as well.  This is particularly true because, again, a breach of contract claim does not lie where there has been substantial compliance, and there is no serious question that was the case here.  Summary judgment should enter on this claim.

### 3.  Plaintiff's Contract Claims Are Truly Disguised Negligence Claims

Plaintiff's breach of contract claims fail for the further reason that they are actually negligence claims (which are precluded under *Gupta*), masquerading as contract claims.

"Tort claims cloaked in contractual language are, as a matter of law, not breach of contract claims."  *Weiner v. Clinton*, 106 Conn.App. 379, 383, cert. denied, 282 Conn. 928 (2008).  "When a defendant's liability to the plaintiff is premised…on principles of tort law ... the plaintiff may not convert that liability into one sounding in contract merely by talismanically invoking contract language in his complaint .... [C]onsequently a reviewing court may 'pierce the pleading veil' to ensure that such is not the case." (Citation omitted; internal quotation marks omitted.) *Pelletier v. Galske*, 105 Conn.App. 77, 81 (2007), cert. denied, 285 Conn. 921 (2008).  To determine whether a contract claim is a disguised tort claim, courts will look to the "gravamen of the action" as alleged in the complaint.  *Id*.  Even where "the gravamen of the…contract theory is … a tort arising out of…contract" rights, such a claim may not proceed.  *Gazo v. City of Stamford*, 255 Conn. 245, 263 (2001).  For example, in *Gazo*, a pedestrian alleged that he fell on an icy and snowy sidewalk in Stamford.  He alleged a failure to maintain the sidewalk was a breach of a maintenance contract.  The court examined the nature of the "contract" claim, including the damages sought, and concluded that this was in reality merely a disguised negligence claim, and struck it on that basis.

The court focused on the damages claimed by the plaintiff, noting that "[t]he usual recovery for breach of a contract is the contract price or the lost profits therefrom." *Id*. The court observed that:

> The plaintiff does not seek the contract price ... Instead, the plaintiff seeks recovery for his physical and mental pain and suffering, lost wages and medical bills resulting from [the defendant's] negligence. Although contract damages ordinarily consist of consequential losses ... they ordinarily do not encompass such losses as pain and suffering. It is clear, therefore, that although the plaintiff has cast this claim in contractual language, in essence he seeks a tort recovery.

(Citations omitted .) *Id*. at 265-66.

As in *Gazo*, Plaintiff's "breach of contract" claims are simply mislabeled negligence claims. Plaintiff's claim is, at its core, that the University failed to conduct adequate disciplinary proceedings, not that some "contract" was breached. Plaintiff seeks the following damages for her breach of contract claim: "loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages." (Complaint at ¶ 471.). Like in *Gazo*, it is clear Plaintiff is not seeking "the contract price or …lost profits" but is instead seeking damages for injuries to her education and career. *See Gazo*, 255 Conn. at 264 n8; *Smith v. Bridgeport Futures Initiative, Inc.*, No. 326697, 1996 WL 493229, at *3 (Conn. Super. Aug. 13, 1996) ("the plaintiff may not recover damages for "unemployment, loss of esteem, damage to her professional career and reputation [and] mental and physical suffering" in a breach of contract action). Plaintiff's allegations amount to an attack on Wesleyan's standard of care and her vague request for "damages" based on how the disciplinary process allegedly affected her, demonstrates that Plaintiff's claim is truly one for negligence.

Because all or some of Plaintiff's "contract" claims are truly disguised claims for negligence, they should be dismissed pursuant to *Gazo* and *Gupta*. This is particularly true with regard to Plaintiff's claims that: Wesleyan failed to assist her in gathering evidence; Dean Brown

exceeded her role; and, that a fair preponderance standard was not used.  Viewed without the "breach of contract" label attached, it is clear that the claims are truly ones for negligence in the academic context, which *Gupta* precludes.

### C. No Evidence Supports Plaintiff's Negligent Misrepresentation Claims

Plaintiff has not alleged any representations that Wesleyan knew or should have known were false when made.  Therefore, summary judgment should enter on her negligent misrepresentation claims.

"[A]n action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact, (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."  *Nazami v. Patrons Mutual Ins. Co.*, 280 Conn. 619, 626 (2006). "Even though 'a promise to do an act in the future' can be a misrepresentation of fact, only if the promisor knows or should know that the statement is false at the time it is made, i.e. only if the promise is 'coupled with a present intent not to fulfill it,' is that statement a misrepresentation of fact." *456 Corp. v. United Natural Foods, Inc.*, No. 3:09cv1983, 2011 WL 87292, at *3 (D. Conn. Jan 11, 2011) (quoting *Meyers v. Cornwell Quality Tools, Inc.*, 41 Conn.App. 19, 29 (1996)).

The evidence does not support Plaintiff's three remaining claims of negligent misrepresentations.

#### 1. Dean Whaley Did Not Make Any Misrepresentation

Plaintiff claims that Wesleyan misrepresented to her that she had been provided with all the evidence that would be presented against her at the Second Hearing.  More specifically, she asserts Dean Whaley stated that the Second Hearing would be limited to certain new evidence recently submitted by Plaintiff in the form of AT&T records and ITS's response in the case file. *MTD Decision* at *11-*12.  This claim is unsupported.

The Second Hearing was convened to address BDO's report.  (*See* Exhibit 20.)  Among the contentions in the report was that the WiFi log did not show access during the August 4 exam times, but only access at the beginning and towards the end of the exam.  (*See* Exhibit 20 at, WES0001230 ¶ 8.c.)  On the morning of the Second Hearing, which Mr. Bachhav was to attend, Mr. Baird had been discussing with Mr. Bachhav how WiFi connections are logged and that continuous access is not logged.  (DB at 116.)  Mr. Baird walked around campus with his phone to show a simple example of this, and Mr. Bachhav reviewed the resultant logs.  (DB at 113-14.)  As Mr. Baird testified, the "experiment was really just confirming what Mohit understood to be what was logged by the Wi-Fi network."  (DB at 130.)  At the Second Hearing, after Plaintiff described BDO's report, Mr. Kachuck requested that ITS respond to BDO's arguments.  (Tr. 2 at 9.)  Upon that request, Mr. Bachhav explained the experiment and that "the wireless system won't give you logs for every connection."  (Tr. 2 at 9-10; Deposition of Mohit Bachhav, attached as Exhibit 41 at 124-25.)

The precise language of the alleged "misrepresentation" by Dean Whaley was the following language from his September 7, 2017 letter: "After careful review, your case is being remanded back to the Honor Board so that they may review and consider the new information from BDO (as well as any other information you wish to share)."  (Exhibit 22; AC ¶¶ 299, 372, 373.)  Plaintiff cannot point to any documentary evidence that was introduced at the Second Hearing apart from what she already had been provided.  Rather, her quibble is that the results of the "experiment," which was conducted on the morning of the hearing, were shared.  Plaintiff's claim plainly fails because Dean Whaley's letter was sent six (6) days before the experiment even occurred.  Therefore, even if the letter could somehow be construed as a representation about what would be presented at the hearing, it would have been impossible for Dean Whaley to know that

the experiment would be presented, as it had not yet been conducted.  Summary judgment must enter for this reason alone.

But, even if the experiment had already happened, and Dean Whaley knew about it, that would not mean that Dean Whaley misrepresented anything.  This was not Wesleyan introducing "new evidence," but rather rebuttal of Plaintiff's new evidence, and a confirmation of a "working rule of IT."  (Tr. 2 at 11.)  In fact, Plaintiff had *herself* presented the results of an experiment of her own to the Board at the First Hearing.  (Tr. 1 at 25.)  As Dean Whaley explained,

> witnesses are presented and questions are asked as part of the hearing process.  And as part of that dynamic, there's always additional information that comes forward, is elucidated, et cetera, that the board considers.  I've said again and again that a student does not necessarily have in front of them a transcript of intended testimony, questions and responses that the board may ask, et cetera, before a hearing takes place. But that doesn't make the hearing, you know, illegitimate or a violation of fair process, in my view.

(MW at 147.)  The Honor Board thoughtfully considered whether the "experiment" was new evidence and determined that it was not, but rather, as Mr. Kachuck explained, was "anecdotal confirmation of what seems to be the understanding of the way a connection works on campus." (Tr. 2 at 13; see GV at 95; GK at 76-77.)  Importantly, Plaintiff responded to this explanation by Mr. Kachuck as follows: "Right."  (Tr. 2 at 17.)  Then, he asked her, "is that okay?" to which she replied "Yeah That's fine."  (Tr. 2 at 17.)  Thus, she agreed to the introduction of this evidence and cannot challenge it now.

Another very important point here is that results of the experiment are irrefutable. Plaintiff's disclosed expert, James Vaughn, testified consistent with the "experiment," that he expects that the WiFi logs do not track every minute that someone is on the WiFi, only when they connect to the WiFi, and disconnections would not be recorded.  (JV at 99; *see also* deposition of Rachel Schnepper, attached as Exhibit 42, at 89, 171.)  Indeed, in his deposition, Mr. Pate has now conceded that he does not know if disconnections are logged.  (GP at 85-86.)  Plaintiff cannot

show harm from the introduction of evidence that her own experts cannot refute. For all of these compelling reasons, summary judgment should enter.

### 2. Ms. Scott Did Not Make Any Misrepresentations About Evidence

Plaintiff makes the related claim that Ms. Scott misrepresented to her "that she had all of the evidence that would be presented at the Appellate Hearing in her possession prior to the appellate hearing." (AC ¶ 574.) This representation was allegedly made in her e-mail of September 12, 2017. What Ms. Scott's e-mail actually said was "You should have everything that was presented – everything in your file." (Email attached as Exhibit 43.) She claims this was a misrepresentation because she was not provided with the "experiment" before the hearing. (AC ¶ 325.) However, for the reasons stated above, even if the "experiment" was "evidence," it had not yet occurred when Ms. Scott sent her e-mail. Regardless, Ms. Scott never represented Plaintiff had all the evidence, rather she said that Plaintiff "should have everything that *was* presented – everything in [her] file." (Emphasis added.) Therefore, she could not have possibly known her statement was false, and it was objectively not false when made. This defeats Plaintiff's claim.

Moreover, for the other reasons described above, including that all possible testimony cannot be predicted, that this was rebuttal and confirmation (and not "new evidence"), and that the experiment's results are irrefutable, summary judgment should enter as to this claim as well.

### 3. Ms. Scott Did Not Make Any Misrepresentations About Compelling Witnesses

Plaintiff claims that Ms. Scott advised her, in reference to Mr. Brauchle: "there was no policy related to calling witnesses to testify." (AC ¶ 579.) Plaintiff claims this was a "false" statement because the Handbook contains a policy stating: "The [Honor] board may require the

cooperation of any member of the university community in furnishing testimony or evidence directly related to the adjudication of a case." (AC ¶ 582; Handbook p. 6.)[25]

The context here is important. Ms. Scott was not an administrator, but rather an Administrative Assistant and Clerk to the Honor Board. (Deposition of Lorna Scott, "LS" attached as Exhibit 44, at 13.) On August 10, 2017, Plaintiff had e-mailed Ms. Scott and Dean Phillips as follows:

> I would like my TA/proctor (for all the exams), Paul Brauchle, to confirm some facts and to help explain the events but he told me that TA's do not get involved in these things. I have some questions that I would like him to help me confirm. He was also present in my exam room/could view me taking the exam through a window.[26] Is this a school policy? If so, is there any other process by which I can get this information?

(E-mail attached as Exhibit 45.) Plaintiff misstates Ms. Scott's response, which was

> As far as your question about being able to ask Paul, the TA some questions, that is entirely up to you and him. There is no particular policy about gathering information and witnesses, I think it is a matter that is up to the discretion of you and whoever you ask.

(Exhibit 46.)

Regardless, Plaintiff never asked Ms. Scott to request the Honor Board to tell Mr. Brauchle to testify. (LS at 192.) Ms. Scott explained that she interpreted Plaintiff's e-mail as inquiring about gathering evidence and speaking to witnesses pre-hearing, not at the formal Honor Board hearing. (LS at 59-60, 192.) Ms. Scott's response that it was up to her was therefore entirely appropriate and did not implicate the policy about "furnishing testimony or evidence directly related to the adjudication of a case." There is no evidence that Ms. Scott knew or should have known she was misrepresenting anything. As such, there was no negligent misrepresentation.

---

[25] Of course, Plaintiff knew Mr. Brauchle was not a necessary witness, as she had discussed with her mother in text messages. (Exhibit 37.)

[26] Plaintiff's statements that Mr. Brauchle was in her exam room and could view her taking the exam are, of course, false. Mr. Brauchle was in Plaintiff's exam room only occasionally, and Exley 150, where she took all but one exam, had no windows on the doors. (PB at 67.)

As an Administrative Assistant and Clerk, Ms. Scott had no authority over the Honor Board, and had not memorized, nor was she responsible for memorizing, the Handbook.  (*See* LS at 20, 33.)   On the other hand, Plaintiff had the Handbook, which includes the provision she criticizes Ms. Scott for not alerting her to.  (AC ¶ 27.)  Thus, she could not reasonably rely on Ms. Scott's response to her ambiguous e-mail as leading her to believe this written language was not part of the Handbook.  If she had questions, reading the Handbook would be the most logical thing she could have done.  Indeed, Plaintiff's supposed reliance is even more unreasonable because Ms. Scott was not equivocal; she wrote: "I think" in response to the question.  e lack of reasonable reliance dooms Plaintiff's claim.

Moreover, this claim fails because, as stated above, Mr. Brauchle would not have been a helpful witness to Plaintiff anyway, and did not have materially relevant or exculpatory evidence. Therefore, Plaintiff not speaking with him did not result in any pecuniary harm, so her claim fails for that reason as well.

### D.  <u>Plaintiff's Reckless And Wanton Misconduct Claim Is Not Plausible</u>

Wesleyan is also entitled to summary judgment as to Plaintiff's final surviving claim, for "reckless and wanton misconduct."

#### 1.  There Is No Evidence Of The Requisite Mental State

There is no evidence that Wesleyan's conduct approached the high standard set by Connecticut courts to show recklessness and wantonness.

> "Willful," "wanton" or "reckless" conduct has been defined as that which "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent … It is at least clear … that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention.

*Dubay v. Irish.* 207 Conn. 518, 533 (1988) quoting W. Prosser & W. Keeton, Torts (5th Ed.) § 34, p. 214.

In the *MTD Decision*, the Court allowed this claim to proceed based on alleged "repeated breaches of its contract." The Court observed that "a fully developed record is needed to determine the merits of Plaintiff's claims that Wesleyan possessed the requisite mental state…." *Id.* at *13. As described above, Wesleyan did not breach any contracts or make any misrepresentations, and, at a minimum, it substantially complied with all of its policies. Plaintiff received all of the Student Rights set forth in the Honor Code. She had two hearings and filed two appeals. The evidence was compelling and straightforward, and plainly supported the finding against her. There is no evidence of any "extreme departure for ordinary care" or "aggravated negligence." Accordingly, Wesleyan is entitled to summary judgment as to Plaintiff's claim. *See Conklin v. Woodcock Nature Center*, No. 319509, 1997 WL 200732, at *3 (Conn. Super. April 15, 1997) (summary judgment where plaintiff was unable to show defendant intended or was substantially certain injury would befall particular plaintiff).

**2.   There Was No Risk Of Bodily Harm**

Connecticut courts, as well as the Second Circuit, have found that an unreasonable risk of "bodily harm" is essential for a reckless and wanton misconduct claim. *Brock v. Waldron,* 127 Conn. 79, 84 (1940); *see also Matthiessen v. Vanech,* 266 Conn. 822, 833-34 (2003) (upholding "serious danger to others" jury charge in case involving bodily injuries from car accident); *Dongguk University v. Yale University*, 734 F.3d 113, 132 (2d Cir. 2013) (affirming dismissal of plaintiff's reckless and wanton conduct claim given the absence of evidence or allegations that defendant-university's conduct created a risk of bodily harm).

Plaintiff assets that the alleged physical manifestations of the emotional harm she suffered, such as "weight gain, tachycardia, anxiety, depression, insomnia, panic attacks, serious episodes

of self-harm, and suicidal ideation" were physical injuries.  (AC ¶ 626.)  However, this argument has been rejected by Connecticut courts in other contexts.

In *Moore v. Continental Cas. Co.*, 252 Conn. 405 (2000), the Connecticut Supreme Court, following "the majority of jurisdictions that have considered this question," held that emotional distress unaccompanied by physical harm does not fall within the definition of "bodily injury," as used in an insurance policy.  *Id*. at 411-12.  In *Moore*, the policy in question use the word "bodily" in its ordinary sense, i.e., suggesting "something physical and corporeal, as opposed to something purely emotional."  *Id*. at 410.  *Moore* also recognized that "emotional distress ordinarily might be accompanied by some physical manifestations, such as an altered heart rate and altered blood pressure," but held that this does not mean that "bodily harm" or "bodily injury," as used in the insurance policy, encompasses the alleged emotional distress.  *Id*. at 415.  *In Menard v. State*, 208 Conn. App. 303 (2021), the court interpreted the statutory text "bodily injury" and held that although PTSD manifested in physical ways, a "bodily injury" must have been physical in nature under the insured motorist statute.  *Id*. at 315-23.

Plaintiff's alleged harms were the secondary result of alleged emotional distress and not of any physical harm inflicted by Wesleyan.  Thus, there is no evidence that Wesleyan's actions presented a high degree of danger of "bodily harm," and summary judgment should enter for this reason as well.

### E. There Is No Genuine Issue Of Fact As To Whether Plaintiff Cheated, And This Entitles Wesleyan To Summary Judgment As To all Plaintiff's Claims As Well As To Certain Of Wesleyan's Special Defenses

The Moodle logs, which provided ample grounds to satisfy the preponderance standard, are now buttressed by the entirely independent BDO Web History, which together conclusively demonstrate that Plaintiff cheated extensively on exams.  No rational fact-finder could determine otherwise.  This evidence defeats all of Plaintiff's claims for multiple reasons.

There is no question that, on their face, the Moodle logs show Plaintiff accessing relevant content during exam times; Plaintiff has admitted that.  (Tr. 1at 6; PL II at 78.)  The Web History Report also shows cheating activity during the exams she was found responsible on, as well as during the July 12 and 19, 2017 exams.  (*See* Web History Report; Section I.H., *supra*.)  The activity shown in the Web History Report not only validates the Moodle logs, but further shows Plaintiff was "Googling" chemistry terms during exams, during exam times, which correlate closely to exam questions.  *Id*.  This overwhelming forensic evidence demonstrates she cheated.

Plaintiff has made multiple attempts to discredit this evidence, but each has failed and/or been withdrawn by Plaintiff or her experts in their entirety.  For much of this litigation, Plaintiff claimed that the Moodle logs are actually in UTC, which is four (4) hours ahead of Eastern Time, despite the constant use of the platform by virtually all members of the University's student body and faculty.  (*See* https://www.nhc.noaa.gov/aboututc.shtml.)  However, that theory has now been abandoned by her only disclosed expert witness, who concedes that the evidence does not support it.  (JV at 61-62.)  Indeed, Mr. Elson testified that he set the time zone for Moodle and it was set in Eastern in 2017, as were all the servers at Wesleyan.  (ME at 10, 40, 237, 249-50.)  The report of Mr. Medeiros establishes this as well.[27]  (Exhibit 5.)   There is simply no question the Moodle logs are in Eastern time.  However, even if Plaintiff's baseless theory was correct, the Moodle logs would still show Plaintiff violated the Honor Code.  This is because they show Moodle activity at times four (4) hours later (i.e. UTC time) on the dates of exams.  (*See, e.g.*, Exhibit 11, at PST 0874, showing Moodle activity at 13:07 and 13:09 on August 4, which is during the exam time.)

---

[27] There is substantial additional evidence supporting that the Moodle logs are in Eastern Time.  For example, if the Moodle logs were in UTC, it would have been impossible for Prof. Roberts to send an e-mail to Dean Phillips at 1:05 PM on August 4, 2017 (as she did), telling him she had discovered a serious Honor Code violation, because that activity would not occur until at a time four hours after exam.  (*See* Exhibit 11; AR at 98-99.)

Now, Plaintiff speculates that the Moodle logs are inaccurate, but the evidence refutes this. As set forth in the Supplemental Report of Mr. Medeiros, the forensic evidence demonstrates that the Moodle logs are consistent with the other internal logs and accurate.  (*See* Supplemental Report, attached as Exhibit 45 at 2-7.)  Messrs. Baird and Elson have testified that Wesleyan has never had any problems or complaints about inaccurate Moodle logs.  (DB at 155, 169, 171; ME at 240-41.)   Indeed, the Moodle logs match, minute by minute, the entirely independent Web History Report.  (Medeiros Dec. ¶ 20; Section I.H, *supra*.)  All of this eliminates any doubt that the Moodle logs and Web History Report conclusively show Plaintiff cheating on exams.[28]

Plaintiff's breach of contract claims are precluded because her cheating violated the Honor Code, and she therefore cannot enforce other provisions of the Handbook's Honor Code.  *See Ravitch v. Stollman Poultry Farms, Inc.*, 165 Conn. 135, 149 (1973) ("A party cannot recover on a contract unless he has fully performed his obligations under it, has tendered performance, or has some legal excuse for not performing.").  Similarly, her negligent misrepresentation claims are barred because her own misconduct in cheating was the cause of her disciplinary proceedings and any resultant finding, which is dispositive of Wesleyan's comparative negligence defense (its Fifth Affirmative Defense).  *See Kramer v. Petisi*, 285 Conn. 674, 681-82 (2008) (applying comparative negligence principles to negligent misrepresentation claims).  Moreover, Plaintiff's cheating conclusively demonstrates her unclean hands, and Wesleyan is entitled to summary judgment as to that defense as well (its Third Affirmative Defense).  *See Household Fin. Co. v. Callin*, No.

---

[28] Plaintiff's expert Mr. Vaughn issued a supplemental report challenging the accuracy of the Moodle logs, claiming that certain entries appear in audit logs that do not appear in the Moodle logs, even though the overwhelming number of entries appear in both logs.  (Supplemental report attached as Exhibit 46.)  When Mr. Vaughn was deposed, he testified that he does *not* opine to a reasonable degree of scientific certainty that the Moodle logs were inaccurate.  (JV at 46.)  Rather, he testified: "they might be inaccurate. I'm not saying they are 100 percent inaccurate, but my opinion is they could be inaccurate."  (JV at 45.)  Regardless, this opinion has been thoroughly refuted by Mr. Medeiros' supplemental report.  (Exhibit 45 at 2-7.)  Mr. Vaughn's claim that an inconsistency between a few log entries somehow possibly renders the entirety of the Moodle logs "inaccurate" is simply advocacy and, at best, unsupported *ipse dixit* and inadmissible.  *See also, e.g., Duchimaza v. United States*, 211 F. Supp. 3d 421 (D. Conn. 2016) (concluding that expert's opinion was "just his own *ipse dixit*").

CV075005926S, 2008 WL 725134 (Conn. Super. Ct. Feb. 25, 2008) (granting summary judgment as to unclean hands defense).  Plaintiff's reckless and wanton misconduct claim therefore also fails because it is based upon the contract and misrepresentation claims.  Furthermore, all of these claims fail because the dispositive evidence of Plaintiff's guilt negates the element of causation of damages or harm, which is essential to each claim.  *See McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn.App. 486, 504 (causation of damages is a crucial element in a prima facie case for breach of contract) cert. denied, 277 Conn. 928 (2006); *Guy v. Reed*, No. 51 94 25, 1992 WL 335341, at *2 (Conn. Super. Nov. 10, 1992) ("A causal connection between the conduct and the resulting injury is a necessary element in a cause of action for reckless and wanton misconduct."); *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 78–79 (2005) (noting that causation is an essential element of a negligent misrepresentation claim).  Any damages suffered by Plaintiff are because she cheated, and not because of any process concerns.

As described above in Section V.A., the Court should defer to Wesleyan's academic discretion, and even if there were a fact issue regarding whether Plaintiff cheated, summary judgment would still be appropriate.  However, the unassailable evidence establishes that there is no such fact question.

## VI.    CONCLUSION

For the foregoing reasons, Wesleyan is entitled to summary judgment as to all remaining counts in Plaintiff's Amended Complaint.

THE DEFENDANT,
WESLEYAN UNIVERSITY

By: /s/ James M. Sconzo
     James M. Sconzo (ct04571)
     Jonathan C. Sterling (ct24576)
     CARLTON FIELDS, P.C.
     One State Street, Suite 1800
     Hartford, CT  06103-3102
     Telephone:(860) 392-5000
     Facsimile:  (860) 392-5058
     E-mail:    jsconzo@carltonfields.com
               jsterling@carltonfields.com

     Its Attorneys

51

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 4th day of March, 2022, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


*/s/ James M. Sconzo*
James M. Sconzo