UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANE DOE, | Civil No. 3:19-cv-01519 (JBA) |
| *Plaintiff,* | July 8, 2022 |
| *v.* | |
| WESLEYAN UNIVERSITY, | |
| *Defendant.* | |

**RULING ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND SPOLIATION SANCTIONS**

Plaintiff Jane Doe, a former student, brings claims against Defendant Wesleyan University related to her expulsion from Wesleyan after she was found responsible for cheating on multiple examinations. After the Court dismissed some, but not all, of Plaintiff's claims, Defendant now moves for summary judgment on Plaintiff's remaining claims. (Mem. of L. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Summ. J. Mem.") [Doc. # 235-1].) Separately, Defendant moves for sanctions against Plaintiff for the alleged spoliation of evidence related to Plaintiff's claims. (Mem. of L. in Supp. of Def.'s Renewed Mot. for Sanctions ("Def.'s Sanctions Mem.") [Doc. # 233-1].). Plaintiff opposes both motions. (Pl.'s Mem. of L. in Opp'n to Def.'s Mot. for Summ. J ("Pl.'s Summ. J. Opp'n") [Doc. # 234]; Pl.'s Mem. of L. in Opp'n to Def.'s Mot. for Sanctions ("Pl.'s Sanctions Opp'n") [Doc. # 246].) For the following reasons, the Court GRANTS Wesleyan's motion for summary judgment [Doc. # 235] and motion for sanctions [Doc. # 233].

**I.**   **Factual Background**

**A.  Cheating Allegations and Investigation**

Plaintiff enrolled as a first-year student at Wesleyan in the fall of 2016. (Pl.'s Loc. R. 56(a) Stmt. [Doc. # 243-31] ¶ 26.) In the summer of 2017, she took three chemistry courses taught by Professor Andrea Roberts. (*Id.* ¶¶ 31-32.) Like any other of Wesleyan's course offerings, Plaintiff's chemistry courses required her to acknowledge Wesleyan's prohibitions against cheating. (*Id.* ¶¶ 35-36.) As Professor Robert's course syllabi explained: "You will neither accept nor give ANY aid during an exam. This includes, but is not limited to electronic devices. . . . Any suspected violation [of] the Honor Code . . . will be swiftly brought to the attention of the Honor Board." (*Id.* ¶ 36.) To facilitate instruction for these courses, Professor Roberts used Moodle, a learning management system that can be accessed through internet-connected devices for task assignments, quizzes, content delivery, and communication. (*Id.* ¶¶ 16-17.) Professor Roberts also employed a teaching assistant ("TA"), Paul Brauchle, to aid her instruction in Plaintiff's summer courses. (*Id.* ¶ 37.) On examination days, Mr. Brauchle would proctor examinations, moving at thirty-minute intervals between different testing rooms to assist students with potential questions, but he did not "sit in the room with []student[s] and monitor whether or not they were cheating for the entire test." (Brauchle Dep., Def.'s Ex. 9 [Doc. # 235-11] at 67-69.)

As an accommodation for her disability, Plaintiff was placed in a distraction-reduced testing room for many of her examinations, where she took the test either alone or with a small number of other students. (Pl.'s Stmt. ¶¶ 29, 39, 41.) During one examination, Mr. Brauchle noticed another student using a cell phone in the same testing room as Plaintiff and he reported this observation to Professor Roberts. (*Id.* ¶ 49.) While Professor Roberts investigated that student's Moodle log, she also looked at Plaintiff's Moodle log activity for that course, which revealed evidence of Plaintiff's use of the Moodle site during the exam to

access "materials that would help her on the final exam." (Roberts Dep., Def.'s Ex. 8 [Doc. # 235-10] at 66:22-24, 68:16-18.) Professor Roberts also found evidence that Plaintiff accessed Moodle during other examinations. (*See* Def.'s Ex. 13 [Doc. # 235-15].)

On August 6, 2017, Professor Roberts notified both Plaintiff and Lorna Scott, the Administrative Assistant to Wesleyan's Vice President of Student Affairs, of her belief that Plaintiff had accessed Moodle during various examinations. (Pl.'s Stmt. ¶ 54.) Professor Roberts also informed Professor Westmoreland, the chairperson of the chemistry department, that she found suspicious activity on a student's Moodle Log but did not disclose the student's name. (Roberts Dep., Pl.'s Ex. 4 [Doc. # 243-5] at 225). In response to Professor Roberts's allegations, Wesleyan initiated an investigation into Plaintiff's alleged misconduct. Wesleyan's information technology services department ("ITS") confirmed that the Moodle logs reflected "active and engaged" access of the Moodle site using an internet-connected cell phone logged in with Plaintiff's Wesleyan internet credentials during one of the exams in question. (Pl.'s Stmt. ¶ 54.)

**B. Hearings Before the Wesleyan Honor Board**

On August 9, 2017, Wesleyan formally charged Plaintiff with violations of the Honor Code. (Aug. 9, 2017 Notification Letter, Def.'s Ex. 14 [Doc. # 245-16].) Specifically, Plaintiff was accused of violating Subsection 1 of the Honor Code, which prohibits "[t]he attempt to give or obtain assistance in a formal academic exercise without due acknowledgement . . . . [including but] not limited to[] cheating during an exam"; and Subsection 5, which prohibits "[d]eception concerning adherence to the conditions set by the instructor for a formal academic exercise." (*Id.*) As a result of these allegations of academic misconduct, Plaintiff was referred to the Honor Board, a quasi-judicial entity that would determine whether she was responsible for the charged conduct. (*Id.*) According to the Wesleyan Student Handbook,

"[t]he voting membership of the Honor Board Shall consist of four undergraduate students, each serving a two-year term." (Student Handbook, Def.'s Ex. 1 [Doc. # 235-3] at 3.)

In preparation for her hearing, Plaintiff gathered statements from student witnesses who were in the exam room with her at a time of her alleged cheating. These students stated that they had a clear view of Plaintiff, would have been able to see her access her cell phone, but they did not see her access her cell phone during the exam. (Pl.'s Ex. 27 [Doc. # 243-28].) Plaintiff also reached out to her TA who had been making unannounced visits to Plaintiff's classroom as she took the exams. (Brauchle Dep. at 24; Def.'s Ex. 37 [Doc. # 238-6].) The TA declined to get involved. (Pl.'s Ex. 6 [Doc. # 243] at 13; Doe Dep., Def.'s Ex. 2 [Doc. # 235-4] at 74:17-20.) Plaintiff then asked Lorna Scott, who also served as the Honor Board's Clerk, about whether it is true what Brauchle told her—that TA's "do not get involved" in Honor Board matters. (Pl.'s Ex. 6 at 13.) Plaintiff also asked if there were "any other processes by which I can get this information." (*Id.*) Ms. Scott told Plaintiff that it was "up to you and him" with respect to her questions for him and that "[t]here is no particular policy about gathering information and witnesses." (*Id.* at 17.) Ms. Scott later testified by deposition that she interpreted Plaintiff's question as asking about Plaintiff's ability to request statements from witnesses, to which her answer was that it was up to Plaintiff and that witness's discretion. (Scott Dep., Def.'s Ex. 44 [Doc. # 238-13] at 59:20-25, 60: 2-3.) Wesleyan's Student Handbook states that the Honor Board "may require the cooperation of any member of the community in furnishing testimony or evidence directly related to the adjudication of a case." (Student Handbook at 4.) Notably, Plaintiff never requested the Board to require the TA's testimony. (Scott Dep. at 192:10-12.)

Plaintiff's Honor Board hearing took place on August 16, 2017, before a panel of three students (rather than the four specified by the Student Handbook) and one administrator. (First Honor Bd. Hr'g Tr., Def.'s Ex. 16 [Doc. # 235-18].) After hearing the evidence, the Honor

Board concluded that Plaintiff had cheated on five exams she took as part of two of her summer chemistry courses, basing its findings primarily on the Moodle logs presented. (Aug. 21, 2017 Decision Letter, Def.'s Ex. 19 [Doc. # 235-21] at 2.) On August 21, 2017, Wesleyan notified Plaintiff of its decision to dismiss her as a result of these findings. (*Id.*)

After Plaintiff received the decision from the Honor Board, she retained BDO Consulting to conduct an independent forensic analysis of her electronic devices, Wesleyan's documentation, and AT&T cellular data usage logs. (Sept. 4, 2017 Letter, Def.'s Ex. 20 [Doc. # 235-22].) Gary Pate, BDO's Consulting Director, found that the Moodle logs were inaccurate at least as to the August 4 exam because they showed Plaintiff accessing Moodle when neither the wi-fi logs nor the data usage logs from her cell phone reflected a connection from Plaintiff's cell phone to the internet. (*Id.* at 6-8.)

Based on this new evidence, Plaintiff requested an appeal of the hearing decision. (*Id.*) Wesleyan did not grant an appeal, but instead remanded the case to the Honor Board so that they could review the new evidence that Plaintiff wished to present. (Sept. 7, 2017 Letter, Def.'s Ex. 22 [Doc. # 236-2].) In response to Plaintiff's inquiry as to whether she had been "provided with the entire universe of evidence to be presented against me at the hearing," Lorna Scott informed Plaintiff that she "should have everything that was presented – everything in your file." (Pl.'s Ex. 6 at 14.) However, at the second hearing, members of Wesleyan's ITS team testified to an experiment they had conducted earlier that day which purportedly demonstrated that Plaintiff still could have cheated as alleged. (Second Hr'g Tr. [Doc. # 236-3] at 9-13; Pl.'s Stmt. ¶ 115 (explaining the significance of the experiment).) Plaintiff had never been informed that any such experiment would take place. The Honor Board Chairperson for Plaintiff's hearing, Gabriel Kachuck, testified by deposition that he did not consider this experiment to be new evidence that would necessitate affording Plaintiff further process. (Kachuck Dep., Def.'s Ex. 26 [Doc. # 236-6] at 76-77.) Further, Kachuck and

Dean Louise Brown (the non-voting advisor to the Honor Board present), verbally concluded during the hearing that the experiment was not new evidence but "confirmation" of an existing understanding of how certain processes operate. (Second Hr'g Tr. at 11:7-19.)

After considering her new evidence, as well as the ITS response, the Honor Board once again found Plaintiff responsible for academic misconduct on five exams and upheld its sanction of dismissal. (Sept. 14, 2017 Letter, Def.'s Ex. 27 [Doc. # 236-7].) Plaintiff appealed that decision, arguing that she was denied a fair process and refuted the evidence against her. (Sept. 28, 2017 Letter, Def.'s Ex. 28 [Doc. # 236-8]), which Defendant denied, upholding her dismissal, (Oct. 6, 2017 Email, Def.'s Ex. 29 [Doc. # 236-9]).

After her second appeal was denied, Plaintiff claimed in deposition testimony that another chemistry professor discussed Plaintiff's case and sanctions with his chemistry class. (Doe Dep. at 54.) Although the professor did not use Plaintiff's name, Plaintiff testified that her information was easily identifiable and that multiple students brought this to her attention. (*Id.*) The Student Handbook states that "[t]he University requires that judicial boards and administrative staff maintain confidentiality regarding judicial matters" and that reported students have a right to "confidentiality regarding the outcome of their hearing." (Student Handbook at 4.) Because this professor was not privy to any of the proceedings, it appeared to Plaintiff that at least one panel participant breached the duty of confidentiality set forth in the Student Handbook.

In addition, Plaintiff learned after ordering her transcript from Wesleyan that her academic record showed two "F" grades for the courses she was alleged to have cheated in. (Am. Compl. [Doc. # 50] ¶ 449.) The Student Handbook's written policy states that students have a right to written notice of the results of hearings and appeals. (Student Handbook] at 4.)

### C. Alleged Destruction of Evidence

When Plaintiff first hired BDO after receiving the results of her first hearing, BDO created a forensic mirror image of Plaintiff's iPhone (the "mirror image"). (*See* Pate Dep., Def.'s Ex. 1 [Doc. # 233-2] at 45:3-18.) From this mirror image, BDO then created a report of Plaintiff's Internet browsing history, the Web History Report. (*See id.* at 56:6-9; Vaughn Dep., Def.'s Ex. 3 [Doc. # 233-4] at 48:15-22.)

In October 2017, Plaintiff hired her present counsel, Kimberly Lau. (Doe Dep., at 122:16-17.) Wesleyan's counsel sent Attorney Lau several written reminders to "make certain" that Plaintiff "preserved all evidence pertaining to this matter, including, but not limited to . . . her phone and laptop . . . communications with consultants/experts, such as BDO . . . and anything else that may be relevant to this matter." (*See* Dec. 15, 2017 email from Att'y Sconzo, Def.'s Ex. 5 [Doc. # 233-6].)

During the course of discovery, Wesleyan discovered that data was deleted from Plaintiff's iPhone (the cell phone she was accused of cheating with). Specifically, her internet history from July 12 to August 4, 2017, including dates on which she took exams, were erased from her web history. (Pate Dep. at 68:16-69:3.) Moreover, the Mirror image that BDO created in August 2017 disappeared. (Pate Dep. at 42:4-12; Vaughn Dep. at 31:17-22.) Although Plaintiff's counsel and Plaintiff represent that neither ordered the destruction of the mirror image and Plaintiff's counsel made diligent efforts to recover it, (*see* Lau Decl., Pl.'s Ex. 1 [Doc. # 150] ¶¶ 5-6), Wesleyan came to the conclusion that Plaintiff or Plaintiff's counsel must have ordered its destruction because BDO has a policy against destroying data without client approval: "BDO has never destroyed [or] deleted any data without client approval." (Pate Dep. at 22: 11-12; 42:4-11 ("[Plaintiff's former counsel] would have been informed of the options on or about October 28th, and he would have been given two weeks

to respond.").) BDO's engagement letter also stated: "BDO will continue to retain electronic data until the Client indicates that we should return or destroy." (Pate Dep. at 47:2-10.)

In November 2020, the Court ordered Plaintiff to produce a mirror image of her devices [Doc. # 83]. Plaintiff hired iDiscovery Solutions, Inc. ("IDS") to extract information from her iPhone and her laptop, which created a mirror image of the iPhone and her laptop; but that examination did not recover the iPhone's Internet history from the relevant dates in 2017. (Vaughn Dep. at 33:20-35:15.) IDS recovered a deleted a copy of a Web History Report associated with Plaintiff's iPhone among deleted items on Plaintiff's laptop. (Doe Dep. at 121:5-8; Medeiros Decl., Def.'s Ex. 6 [Doc. # 233-7] at 12.) IDS could not, however, recover the underlying native web browsing data from the iPhone which had been permanently deleted.

## II.   Procedural History

Plaintiff instituted this action on September 26, 2019 and filed an amended complaint on March 13, 2020. Plaintiff brought claims sounding in breach of contract, negligence, negligent infliction of emotional distress ("NIED"), intentional infliction of emotional distress, negligent misrepresentation, promissory estoppel, reckless and wanton misconduct, breach of fiduciary duty, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). (Am. Compl. [Doc. # 50].) On May 3, 2020, Wesleyan moved to dismiss all claims in Plaintiff's Amended Complaint [Doc. # 54], which the Court granted in part and denied in part on February 19, 2021 [Doc. # 90]. Pursuant to the Court's Ruling, Counts Two (Negligence), Three (NIED), Five (Promissory Estoppel), Seven (Breach of Fiduciary Duty), and Eight (CUTPA) were dismissed. What remains are Counts One (Breach of Contract), Four (Negligent Misrepresentation), and Six (Reckless and Wanton Misconduct).

**III.**   **Standard of Review**

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *William v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

Initially, the moving party bears the burden of showing that it is entitled to summary judgment. *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[T]he movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272-73 (citing *Celotex*, 477 U.S. at 323). If the movant makes either showing, the burden shifts to the nonmovant to demonstrate that there is a genuine issue of material fact reflected by record evidence. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 274 (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

## IV.   Discussion

### A.   Motion for Summary Judgment

As an initial matter, because this case arises in the context of breached of contract and tort allegations between a student and an educational institution, the Court is bound by *Gutpa v. New Britain General Hospital*, 239 Conn. 574 (1996). Pursuant to *Gutpa*, courts generally will not interfere when claims, whether brought in contract or tort, are made against an academic institution regarding the nature and content of its educational programs or the criteria which the institution applies in determining whether a student meets its academic requirements. *Id.* at 590-92. However, as the Court observed in its Ruling on Defendant's motion to dismiss, *Gupta* carved out two exceptions. First, courts may entertain a cause of action for breach of contract against a school where "the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id.* at 592-93. Second, a student may receive relief for a "substantial departure from academic norms," which "may implicate due process." *Id.* at 595. While the Court previously held that Plaintiff had plausibly alleged claims that fall within the exceptions provided in *Gupta*, the Court's present task is to evaluate Plaintiff's remaining claims against the summary judgment record to determine whether there is sufficient evidence to support those claims.

### 1.   Breach of Contract

In its Ruling on Wesleyan's motion to dismiss, the Court held that Plaintiff's allegations that Wesleyan breached a special promise made to her when it failed to afford

her a fair process fell within a *Gupta* exception.[1] (Ruling [Doc. # 90] at 15.) Wesleyan now argues that it is entitled to summary judgment as to these claims because, it maintains, Plaintiff was given a fair process, Wesleyan's Honor Board used the appropriate standard, and Plaintiff's claims are in fact negligence claims in disguise. (Def.'s Summ. J. Mem. at 25-38.)

A student may sue her college or university for breach of an implied contract "under special circumstances." *Faigel v. Fairfield Univ.*, 75 Conn. App. 37, 38 (2003). "[T]here seems to be no dissent from [the] proposition that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution." *Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320-21 (2010). Integral to evaluating whether there has been a breach of a contractual relationship between a student and her academic institution are the "oral and written expressions of the parties in light of the policies and customs of the particular institution." *Id.* However, in line with *Gupta*, Connecticut courts seek to "limit judicial intrusion into educational decision making" by requiring student plaintiffs to establish "nonperformance of a special promise, a promise outside the purview of normal educational expectations." *Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 320 (D. Conn. 2010).

Even where a student has established the existence of a special promise between her and an academic institution, she must still demonstrate the other elements for a breach of contract claim—"performance by one party, breach of the agreement by the other party, and

---

[1] With respect to Plaintiff's claim that Wesleyan breached its agreement to employ the fair preponderance standard in its adjudication, the Court determined that this claim amounted to an argument that "her proceedings were so procedurally flawed as to deny the Honor Board the opportunity to evaluate the evidence under the fair preponderance standard." (Ruling at 15.) As such, the Court treats her claim of a "procedurally flawed" process as part and parcel to the special promise of a fair process generally.

damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014). In addition, strict compliance on the part of the institution is not necessary; instead, its obligation is one requiring substantial compliance. *See Pack 2000, Inc. v. Cushman*, 311 Conn. 662, 675 (2014) (outlining the general rule of substantial compliance in Connecticut); *see also Okafor v. Yale Univ.*, No. CV–98–0410320–S, 2004 WL 1615941, at *7 (Super. Ct. June 25, 2004) (applying the substantial compliance rule to breach of contract claim between a student and a university). Thus, "a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." *Pack 2000, Inc.*, 311 Conn. at 675.

Plaintiff argues that there is a triable dispute that Wesleyan breached its promise, found in its Student Handbook, to provide her with a fair process for the adjudication of the cheating accusations against her. She maintains that she was not afforded a fair process because Wesleyan (1) failed to conduct a full hearing panel, (2) failed to meet its promise to assist in gathering evidence, (3) failed to maintain her confidentiality, (4) allowed Dean Brown to exceed her role as an non-voting member on the Honor Board, (5) engaged in discriminatory conduct against her, and (6) inappropriately sanctioned her with failing grades in her two classes. (Pl.'s Summ. J. Opp'n at 12-20.) Finally, Plaintiff argues that the disciplinary hearing was outcome-driven and tainted with certain administrators' presumptions of Plaintiff's guilt before she was given a hearing.[2] (*Id.* at 21-22.) Collectively, these assertions comprise Plaintiff's breach of contract claim. But individually, each fails to muster the evidentiary support in the record needed for trial resolution.

---

[2] Plaintiff makes clear that she is not seeking to relitigate whether the Honor Board weighed the evidence properly.

First, given the full record evidence, Plaintiff's claims that Wesleyan allowed Dean Brown to exceed her role as an advisor to the Honor Board and inappropriately sanctioned her with failing grades in her two classes, do not meet the narrow *Gupta* exception for breaches of a special promise. "The role of the faculty and administrative advisor(s) is to brief the board before each hearing to ensure a clear understanding of the regulation(s) in question and of the hearing procedures . . . . The advisor(s) shall advise the chair during hearings to see that the board follows procedures correctly [and] may offer information and assist the chair in facilitation." (Student Handbook at 3.) Plaintiff's arguments boil down to a claim that Dean Brown exerted outsized influence over the proceedings in violation of the Student Handbook. (Pl.'s Summ. J. Opp'n at 18.)[3] But the record does not demonstrate that the Student Handbook does anything more than explain Dean Brown's role as an advisor. By its terms, the Handbook uses broad language requiring an advisor to offer advice and to facilitate the hearing. It does not specify the outer boundary separating mere facilitation and the improper influence on the proceeding that Plaintiff claims. Setting that boundary, like evaluating an institution's training or motivations for discipline, requires an "expert evaluation" that is "not readily adapted to the procedural tools of judicial or administrative decisionmaking" prohibited by *Gupta*. 239 Conn. at 594 (quoting *Bd. of Curators v. Horowitz*, 435 U.S. 78, 90 (1977)). Thus, whether Dean Brown engaged in the conduct Plaintiff claims, her conduct did not affect a special promise made to Plaintiff that she would receive a fair hearing.[4]

---

[3] Plaintiff argues that Dean Brown exceeded this role by "(1) improperly preventing both Jane and the student members of the Honor Board from asking questions; (2) improperly threatening to shut down the Appellate Hearing; (3) discouraging the student members of the Honor Board from attempting to understand the evidence at issue; and (4) improperly influencing the student members of the Honor Board." (Pl.'s Summ. J. Opp'n at 18.)

[4] Plaintiff argues that the Court rejected this notion in its Ruling on the Motion to Dismiss by allowing the breach of contract claims to move forward in part considering Plaintiff's

Likewise, the record does not support Plaintiff's argument that she should not have been given failing grades because she had already been notified of her dismissal and that this lack of notice violated a contractual entitlement. The Student Handbook's written policy states that students have a right to written notice of the results of hearings and appeals. (Student Handbook at 4.) Although the sanction letter did not specify that Plaintiff would fail the classes, Wesleyan exercised its discretion to fail Plaintiff given the number of exams she had been found responsible for cheating on. (Whaley Dep., Def. Ex., [Doc. # 235-5] at 196:11-17.) Considering that this was a decision by a university to enter a specific grade for a student, an evaluation of whether it was appropriate is beyond the scope of *Gupta*'s exception. *See Hope Academy v. Friel*, No. CV030081183S, 2004 WL 1888909 (Conn. Super. July 22, 2004) ("The court is not in position to apply objective standards to analyze the allegations regarding . . . whether a student was appropriately evaluated . . . .").

As to Plaintiff's remaining assertions, the record does not reveal a genuine dispute of fact. With respect to Plaintiff's claim that the Honor Board's proceedings were tainted with bias and outcome-driven behavior, Plaintiff relies on emails sent between Professor Roberts and various staff involved in the process. However, there is no evidence that the voting members of the Honor Board engaged in behavior such that their independence can seriously be questioned. Next, while the Student Handbook does state: "The voting membership of the Honor Board shall consist of four undergraduate students, each serving

---

allegations that she was promised a fair process. However, the Court merely agreed that it was plausible that the totality of Defendant's alleged breaches of its Student Handbook amounted to a breach of its promise to conduct a fair process. (Ruling on Motion to Dismiss [Doc. # 90] at 12 (Plaintiff "brings a single breach of contract claim, citing numerous examples of Wesleyan's failure to afford her a fair disciplinary process and referring to specific violations of the Handbook in support.").) Plaintiff's contention that Dean Brown exceeded her role does not constitute the whole of Plaintiff's claim that Wesleyan breached its promise, but instead it is just one factor.

a two-year term" (Student Handbook at 3), and Plaintiff's hearings included only three members, all three members voted to find her responsible for cheating. Two members of the Honor Board and Dean Whaley indicated that four voting members were not always required to vote on every case. (*See*, *e.g.*, Decl. of Michael Whaley, Def.'s Ex. 10 [Doc. # 235-12] ¶ 9 ("Honor Board hearings have regularly proceeded with less than all four (4) members present.").) But even assuming that the Student Handbook is at least ambiguous as to whether four members were required to vote on her case, the majority was present and unanimously voted to sanction Plaintiff, reflecting Wesleyan's substantial compliance with its promise to provide Plaintiff with a fair process in this respect.

Next, the Student Handbook does not provide Plaintiff a right to assistance in the gathering of evidence. It states merely that the Honor Board "*may* require the cooperation of any member of the community in furnishing testimony or evidence directly related to the adjudication of a case." (Student Handbook at 4.) Read most favorably for Plaintiff, this language communicates that the Honor Board has permission, but is not required, to compel testimony. In any event, there is no dispute that Plaintiff did not ask the Board to exercise its authority to do so, thus there is no evidence of a breach of any kind with respect to the Honor Board's authority to compel witness statements. (Scott Dep. at 192:10-12.)

Moreover, there is no triable dispute as to whether Defendant failed to maintain Plaintiff's confidentiality. The Student Handbook requires that "[s]tudent judicial records" be kept "confidential" and available to "persons who have permission from the student" or "other university administrators and faculty members who have a legitimate need to know." (Student Handbook at 4.) Plaintiff argues that Professor Roberts's "admission" that she informed Professor Westmoreland, the chemistry department chairperson, and Professor Davis, a colleague in the chemistry department of her case demonstrates breaches of confidentiality under the Student Handbook. (Pl.'s Summ. J. Opp'n at 16-17.) Plaintiff's

argument lacks merit given the broad language of the Student Handbook. Professor Roberts testified by deposition that she informed Professor Westmoreland "immediately" that she found suspicious activity on a student's Moodle log but did not disclose the student's name. (Roberts Dep., Pl.'s Ex. 4 [Doc. # 243-5] at 225.) Based on this evidence, this disclosure occurred before Plaintiff's judicial record included an adjudication and sanction, and therefore it is outside the scope of the Student Handbook's strictures.

As for Professor Roberts's disclosure to Professor Davis, Plaintiff argues that, while Professor Roberts testified that she never disclosed Plaintiff's name when discussing details of her case, the "Wesleyan student body was able to connect Jane's dismissal to Davis's comments." (Pl.'s Summ. J. Opp'n at 17.) But the evidence on which Plaintiff relies for that fact is a text message from an unidentified other student stating that an "intro chem" professor informed students that "someone got expelled for cheating." (Pl.'s Ex. 29 [Doc. # 243-30].) Evidence of that sort is inadmissible at trial. Considering the undisputed facts that neither Professor Roberts nor Professor Davis explicitly disclosed to others the details of Plaintiff's case, there is nothing left for a jury to decide with respect to Plaintiff's claimed breach of confidentiality.

Finally, there is no evidence that Wesleyan discriminated against Plaintiff during her proceedings. Plaintiff points to exchanges between Professor Roberts, Plaintiff, and Dean Brown during her hearing where Plaintiff argues that Professor Roberts "accused Jane of utilizing her disability accommodation to cheat" on her exams and that Dean Brown mocked Plaintiff. (Pl.'s Summ. J. Opp'n at 18.) The transcript, fairly read, does not support those claims. Professor Roberts's statements were a description of how Plaintiff could have cheated given that she was secluded in a big lecture hall and a demonstration of how quickly Plaintiff could have downloaded information from her phone. (*See* Pl.'s Ex. 9 [Doc. # 243-10] at 30:20-25-31:1-25.) There is no indication of Professor Roberts's animus towards people

with disabilities. In fact, she did not once mention Plaintiff's disability (outside of a reference to the room Plaintiff took the exam purportedly due to her accommodations). Moreover, Plaintiff argues that Dean Brown mocked her during this exchange:

> **Professor Roberts**: So I would also argue that I'm twice her age and I'm a lot slower.

> **[Plaintiff]**: But I also have fine motor skill issues. That's why I have extra time. **Dean Brown**: OK. I – all right. We'll address that later.

(*Id.* at 31:22-25-32:1-2.) Nothing about Dean Brown's response indicates discriminatory animus. Instead, it depicts Dean Brown's intention to move on to a new line of inquiry.

In sum, while Wesleyan's process may not have been perfect, Plaintiff was entitled not to a perfect process but a fair one. When considering the fairness of the process Plaintiff received, the Court must be cautious not to entertain subjective considerations unmoored from an objective breach of contract analysis. Measured against the objective indicators of fairness found in Wesleyan's Student Handbook, Wesleyan has carried its burden to show that there is no triable dispute that it substantially complied with its Student Handbook because it honored Plaintiff's entitlement to formal adjudication, staffed her hearings with the majority of the Honor Board, followed the Student Handbook's broad guidelines for conducting those hearings, and notified her of her sanction. Plaintiff's arguments to the contrary ask for either an Honor Board process to which she was not entitled or the Court to act beyond the scope of its authority under Connecticut law.

Therefore, Wesleyan is entitled to summary judgment on Plaintiff's breach of contract claim.

### 2. Negligent Misrepresentation

Wesleyan argues that summary judgment on Plaintiff's remaining negligent misrepresentation claim is appropriate because Plaintiff has not demonstrated any representations that Wesleyan knew or should have known were false when made. (Def.'s

Summ. J. Mem. at 40.) Specifically, Wesleyan argues that (1) its representatives did not state to Plaintiff that no new evidence would be presented at her hearing, (2) its representatives did not know about the evidence because it did not exist at the time the statements were made, and (3) its representative did not make a misrepresentation about compelling witnesses. With respect to compelling witnesses, Wesleyan argues that its representative gave an opinion about Plaintiff's options and that Plaintiff could have read the Student Handbook to be sure. (Def.'s Summ. J. Reply [Doc. # 250] at 8-10.)

In opposition, Plaintiff argues that it is undisputed that, "despite [] assurances, during the Appellate Hearing, Wesleyan nonetheless blindsided Jane by—for the first time— introducing new evidence (which neither Jane nor her expert had seen before) in the form of a highly-technical experiment that Wesleyan's IT staff conducted for the purpose of responding to the report" issued by her expert. (Pl.'s Summ. J. Opp'n at 23.) Plaintiff further argues that the standard is whether Defendant knew or had the duty to know the untruth of their statements and failed to exercise reasonable care or competence in communicating information. (*Id.* at 24.) Finally, regarding the alleged misrepresentation about compelling witnesses, Plaintiff argues that Plaintiff never had an opportunity to find out whether the TA's testimony would be useful and that "one reasonable inference is that had the Hearing Board heard Brauchle's testimony, it might have reached a different result."[5] (*Id.* at 26.)

---

[5] Notably, Plaintiff misstates the reasonable inference a jury could draw with respect to the TA's testimony. The TA testified by deposition that he did not see Plaintiff cheating, but that he only entered the testing room every thirty minutes. (Brauchle Dep. at 124-26.) Plaintiff argues that the fact that the TA did not witness her cheating despite being in a position to observe such activity leads to an inference that the Board would have decided differently. But the Board had considered letters from two students who had taken their exams in the same room as she did (arguably in a better position to observe her activity) and who represented that they did not observe Plaintiff cheating. (*See* Pl.'s Ex. 27.) Yet, the Board still found that Plaintiff cheated. It is unlikely, given the TA's deposition testimony, that there is

To prove a claim of negligent misrepresentation, Plaintiff must demonstrate that Wesleyan knew or should have known its representations were false, that she reasonably relied on the representations, and suffered harm as a result. *See Nazami v. Patrons Mutual Ins. Co.*, 280 Conn. 619, 626 (2006). "Even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *Craine v. Trinity Coll.*, 259 Conn. 625, 660-61 (2002). Therefore, "[o]ne who, in the course of his business, profession or employment supplies false information for the guidance of others [] is subject to liability [] if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Id.* However, "[t]here must be justifiable *reliance* on the misrepresentation for a plaintiff to recover damages." *Mips v. Becon, Inc.*, 70 Conn. App. 556, 558 (2002).

In its ruling on Wesleyan's motion to dismiss, the Court held that it was plausible that Defendant's representatives knew or should have known that they provided Plaintiff with false statements about her second hearing. (Ruling at 18-20.)  The Court considered three alleged misrepresentations:

> administrators exercising control over her disciplinary proceedings misrepresented that she had been provided with all the evidence that would be presented against her at the Second Hearing, that there was no process available for compelling witness testimony, and that the only "new" evidence used in the Second Hearing would be the AT&T records and ITS's response that was in her case file.

(*Id.* at 20.) These alleged misrepresentations stem from communications by Lorna Scott, the Honor Board administrative assistant, and Dean Whaley in his letter to Plaintiff detailing the scope of Plaintiff's new hearing. The summary judgment record, however, does not support allegations that Ms. Scott or Dean Whaley understood or should have understood their

---

a genuine dispute as to the materiality of his testimony and the prejudice Plaintiff suffered in its absence.

statements to be false at the time that they communicated them or that Plaintiff relied on those statements to her detriment.

In response to Plaintiff's inquiry as to whether she had been "provided with the entire universe of evidence to be presented against me at the hearing," Ms. Scott informed Plaintiff that she "should have everything that was presented – everything in your file." (Pl.'s Ex. 6 at 14.) Further, the letter Plaintiff received on September 7, 2017 stated: "After careful review, your case is being remanded back to the Honor Board so that they may review and consider the new information from BDO (as well as any other information you wish to share)." (Sept. 7, 2017 Letter.) Plaintiff argues that these communications constituted misrepresentations which Ms. Scott and Dean Whaley should have known were false because at the second hearing, members of Defendant's ITS team testified to an experiment they had conducted earlier that day which purportedly demonstrated that Plaintiff still could have cheated as alleged. (Second Hr'g Tr. at 9-13.) Plaintiff was not made aware that this testimony would be provided.

However, the experiment did not take place until *after* Ms. Scott's and Dean Whaley's statements. There is no record evidence suggesting that either knew that this experiment would take place or had a present intent to misrepresent facts. *See 456 Corp. v. United Natural Foods, Inc.*, No. 3:09cv1983, 2011 WL 87292, at *3 (D. Conn. Jan. 11, 2011) ("Even though 'a promise to do an act in the future' can be a misrepresentation of fact, only if the promisor knows or should know that the statement is false at the time it is made, i.e. only if the promise is 'coupled with a present intent not to fulfill it,' is that statement a misrepresentation of fact." (quoting *Meyers v. Cornwell Quality Tools, Inc.*, 41 Conn. App. 19, 29 (1996))). Thus, Ms. Scott's and Dean Whaley's statements appear to be representations of the facts as those individuals understood them at the time.

While there may be a dispute as to whether the experiment was considered by the board as "new evidence," (*see* Kachuck Dep. at 76-77), whether the evidence was "new" is not the question. The record does not reflect that Ms. Scott or Dean Whaley knew or had the means to know that this experiment would be conducted; and even if they had known, that they were in a position to provide Plaintiff advance notice of the contents of what essentially was testimonial rebuttal evidence from ITS.

This issue is unlike *Craine v. Trinity College*, which Plaintiff relies on as an instructive comparison to her case. 259 Conn. 625, 660-61 (2002). There, the Connecticut Supreme Court affirmed a judgment in favor of a former assistant chemistry professor on a negligent misrepresentation claim based on evidence that the university gave her inaccurate guidance as to what research to pursue when seeking tenure. *Id.* at 661. Although the university provided evidence that it had discretion to deny tenure and thus, their guidance might not have been knowingly false, the court held that the jury could conclude that the guidance misled her to believe that if the plaintiff devoted her time and energy to the publication process, tenure would be forthcoming. *Id.* Moreover, the court held that the jury could have concluded that if the defendant had been more specific in its evaluation of the plaintiff's candidacy, she might have been able to allocate her time in a way to address more effectively the defendant's concerns. *Id.* at 661-62.

Unlike in *Craine*, where the plaintiff was harmed because the defendant misrepresented its own standards for tenure consideration and caused her to spend her energies developing the wrong qualifications, the record does not demonstrate that Plaintiff, had she known about the experiment, could have prepared more effectively or that the outcome would have been materially altered. In other words, Plaintiff has not demonstrated that she relied on these statements and suffered harm from her reliance. Because the experiment was explained through the testimony of ITS personnel, there likely was no

feasible way that Plaintiff could prepare to rebut testimony that was not yet given. As Dean Whaley testified by deposition: "a student does not necessarily have in front of them a transcript of intended testimony, questions and responses that the board may ask, et cetera, before a hearing takes place." (*See* Whaley Dep. at 147.) Also, even assuming this experiment was new evidence, as explained by the ITS witness at the second hearing, the experiment was conducted to disprove a theory Plaintiff had advanced in her own defense. (Second Hr'g Tr. at 9.) Contrary to *Craine*, there is no genuine dispute as to whether Plaintiff was misled to her detriment because she was made aware that Wesleyan's IT experts would provide statements responding to her expert's report at the hearing. (*See* Sept. 7, 2017 Letter ("You should be aware that I've shared BDO's report with our own IT experts who have filed a brief response in the case file.").) In fact, IT experts had attended and testified during her first hearing. (*See generally* First Honor Bd. Hr'g Tr.)

Additionally, Plaintiff's arguments mischaracterize the record evidence with respect to Ms. Scott's statement about whether and how she could seek her TA's statements. Plaintiff asked Ms. Scott about whether it is true what Brauchle told her—that TA's "do not get involved" in Honor Board matters. (Pl.'s Ex. 6at 13.) Plaintiff also asked if there were "any other processes by which I can get this information." (*Id.*) Ms. Scott told Plaintiff that it was "up to you and him" with respect to her questions for him and that "[t]here is no particular policy about gathering information and witnesses." (*Id.* at 17.) Scott later testified by deposition that she interpreted Plaintiff's question as an inquiry about Plaintiff's ability to request statements from witnesses, to which her answer was that it was up to Plaintiff's and that witness's discretion. (Scott Dep. at 59:20-25, 60:2-3.) Although Wesleyan's written procedures state that the Honor Board "may require the cooperation of any member of the community in furnishing testimony or evidence directly related to the adjudication of a case," (Student Handbook at 4), Plaintiff never requested the Board to require that the TA testify,

22

(Scott Dep. at 192:10-12). Finally, it is undisputed that the Student Handbook was readily accessible to Plaintiff for her review to understand her rights and the scope of the Board's authority, yet Plaintiff chose to rely on her own interpretation of Ms. Scott's statements rather than the Student Handbook. *Mips*, 70 Conn. App. at 558 ("There must be *justifiable* reliance on the misrepresentation for a plaintiff to recover damages." (emphasis added)). Thus, the record does not support Plaintiff's argument that Ms. Scott knew that her statement would mislead Plaintiff into thinking that the Board could not compel a witness's testimony, or that Plaintiff justifiably relied on Ms. Scott's statements instead of the Student Handbook's provisions.

Therefore, Wesleyan is entitled to summary judgment with respect to Plaintiff's negligent misrepresentation claim.

### 3.  Reckless and Wanton Conduct

Wesleyan argues that it is entitled to summary judgment on this claim because Plaintiff has not set forth evidence that Wesleyan's conduct "approached the high standard" to show recklessness and wantonness. (Def.'s Summ. J. Mem. at 45.) Wesleyan contends that it substantially complied with all its policies and that Plaintiff received two hearings and was able to file two appeals. (*Id.* at 46.) Wesleyan argues that there is no evidence of any "extreme departure for ordinary care" or "aggravated negligence" or risk of bodily harm. (*Id.*)

Plaintiff counters by relying on the Court's observation in its Ruling on Defendant's Motion to Dismiss that "Wesleyan may be liable for reckless and wanton misconduct if it repeatedly and intentionally violated its own policies in a manner that Wesleyan knew or should have known created a high degree of danger." (Pl.'s Summ. J. Opp'n at 27 (citing Ruling at 21-22).) Plaintiff argues that a "jury is certainly permitted to infer that Wesleyan knew or should have known that expulsion—especially if done through a process in which the

student is repeatedly misled and ambushed, as Jane has more than adequately demonstrated—creates a significant risk to a student's mental health." (*Id.*)

"[W]illful, wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Dubay v. Irish*, 207 Conn. 518, 533 (1988) (internal quotation marks omitted). Therefore, allegations of "mere mistake resulting from inexperience, excitement, . . . confusion[,] . . . thoughtlessness or inadvertence, or simply inattention" are inadequate. *Id.*

The Court concludes that the record evidence does not support Plaintiff's argument that Wesleyan representatives acted with the requisite mental state to support Plaintiff's claim. As previously discussed, the record does not set forth evidence that Wesleyan repeatedly failed to follow its own policies. Wesleyan notified Plaintiff of the charges against her, allowed her to present a defense, granted her a second hearing when she furnished new evidence after she had been found responsible of cheating, and informed her of the ultimate outcome of the proceedings.

Where there is a dispute as to whether Wesleyan complied with its policies, that noncompliance did not materially affect the outcome of her case. For example, while there is a dispute as to whether Plaintiff should have received a hearing consisting of four rather than just three Honor Board members, the vote against her was unanimous, rendering immaterial the fourth vote.[6] Moreover, the experiment conducted by Defendant's ITS personnel was responsive to the evidence that Plaintiff introduced in her defense and there is no record evidence that supports her claim that she was materially misled by Defendant during the

---

[6] During oral argument, Plaintiff's counsel suggested that the fourth voting member could have swayed the others to vote differently. There is no evidence from which a jury may draw this inference, as it is based on speculation and rhetoric.

pendency of her second hearing. Finally, any error on the part of Wesleyan's representatives in misinforming her on her right to obtain a statement from her TA is undermined by the fact that she did submit statements from two students who took exams with her, who arguably were in a better position to observe her cheat. Construing the facts in Plaintiff's favor, if Wesleyan deviated from its usual policies, Wesleyan's conduct did not amount to highly unreasonable conduct involving an extreme departure from ordinary care, but rather the evidence supports Wesleyan's occasional inattention at best.[7]

Therefore, Wesleyan is entitled to summary judgment with respect to Plaintiff's Reckless and Wanton Conduct claim.

### B. Spoliation Sanctions

Wesleyan also argues that Plaintiff spoliated evidence relevant to this lawsuit. According to Wesleyan, sometime in late October or early November, Plaintiff or Plaintiff's counsel destroyed the forensic mirror image of her iPhone that her BDO consultants created in August 2017 as well as web history from her iPhone corresponding with the period between July 12 to August 4, 2017, including dates on which she took exams. (Def.'s Sanctions Mem. at 9-10.) Wesleyan argues that this evidence was strategically destroyed and that the evidence is relevant because it was the most direct proof of Plaintiff's cheating, providing independent confirmation of the Moodle logs and the web history data it was able to recover from Plaintiff's iPhone. (*Id.* at 14-15.)

Plaintiff counters that Wesleyan did not demonstrate that the web history was destroyed after Plaintiff's obligation to preserve attached because the web history deletions

---

[7] In addition, Plaintiff's Complaint alleged that she suffered physical injury including "weight gain, tachycardia, anxiety, depression, insomnia, panic attacks, serious episodes of self-harm, and suicidal ideation." (Ruling at 21.) But there appears to be no evidence in the record demonstrating these harms.

occurred between August 4, 2017, and August 18, 2017—during the original honor process and before litigation was contemplated. (Pl.'s Sanctions Opp'n at 5.) Likewise, Plaintiff challenges Wesleyan's contention that the mirror image was destroyed in late October or November because there is no evidence that Plaintiff or her counsel (former or current) ordered its destruction. (*Id.*) Additionally, Plaintiff argues that Wesleyan has failed to demonstrate that Plaintiff acted with the intent to deprive Wesleyan of the mirror image. (*Id.* at 7-8.) Nor has Wesleyan been prejudiced, according to Plaintiff, because "the BDO web history report captures the relevant web history for the time period at issue" and because Wesleyan claims it does not need this data to prove its case. (*Id.* at 13.)

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Federal Rule of Civil Procedure 37(e)(1) permits a court to sanction a party "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Whether and how to sanction parties for spoliation of evidence remains at the "broad discretion" of district courts. *See West*, 167 F.3d at 779; *Fujitsu Ltd. v. Fed. Exp. Corp*, 247 F.3d 423, 436 (2d Cir. 2001) ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge . . . .") (citations omitted).

To obtain sanctions based on the spoliation of evidence, the movant must show

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (internal quotation and citation omitted). Where the party who failed to preserve the electronically stored information ("ESI") "acted with the intent to deprive another party of the information's use in the litigation," the Court may "presume that the lost information was unfavorable to the party . . . instruct the jury that it may or must presume the information was unfavorable to the party" or "dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2). A party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence. *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 509-10 (S.D.N.Y. 2013) (awarding sanctions for the destruction of ESI in the form of an adverse inference jury instruction).

### 1. Duty to Preserve

"Identifying the boundaries of the duty to preserve involves two related inquiries: when does the duty to preserve attach, and what evidence must be preserved?" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). The

> obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.

*Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). "A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010).

Once the duty to preserve arises, it extends "to any documents or tangible things (as defined by Rule 34(a) [including email]) made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.'" *Zubulake*, 220 F.R.D. at 217-18. Rule 34(a) entitles parties to documents (including ESI) "which are in

the possession, custody or control of the party upon whom the request is served." Fed. R. Civ. P. 34(a). "[D]ocuments are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146-47 (S.D.N.Y. 1997).

The parties dispute whether Plaintiff was under an obligation to preserve her iPhone internet history data and the mirror image created by BDO when they were lost. Plaintiff argues that she had no obligation to preserve her web history in August of 2017 because her first Honor Board hearing did not take place until August 16, well before this litigation commenced. (Pl.'s Sanctions Mem. at 5.) Plaintiff also contends that Wesleyan cannot establish when (or if) the mirror image was destroyed, and therefore cannot claim that Plaintiff was under a duty to preserve it when it went missing. (*Id.* at 6.) Wesleyan argues that Plaintiff knew in August that her iPhone internet history was the sole focus of her hearings and thus was relevant to potential litigation. (Def.'s Sanctions Mem. at 13.) Defendant further argues that because "Plaintiff retained counsel, litigation counsel, and an expert before the first possible date that the Mirror image was destroyed" she was under a duty to preserve that evidence. (*Id.*) Wesleyan has demonstrated that Plaintiff had a duty to preserve the mirror image and failed to preserve that evidence.[8] Three considerations compel this conclusion.

---

[8] On the other hand, Wesleyan has not demonstrated that Plaintiff had a duty to preserve her iPhone internet history, which was destroyed sometime in August 2017. While Plaintiff's Honor Board process had started during that time, it is not clear from the evidence that she had contemplated litigation when she deleted her internet history. Wesleyan argues that she still had a duty to preserve the data and failed to do so even after her deletions in August, but Wesleyan has not demonstrated that the loss of that data materially weakens their defense given that the web report produced in discovery reflects similar data. Thus, even if there was a duty to preserve the data Plaintiff deleted from her iPhone, Wesleyan has not persuaded the Court that its absence has caused it prejudice. *See* Fed. R. Civ. P. 37(e) (authorizing

First, because Plaintiff's counsel (both former and current) and BDO were her agents, she was therefore responsible for their actions with respect to preservation of relevant data that could be evidence in a future litigation. *See Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 669 (S.D.N.Y. 2017) (finding that text messages on a third-party's phone were under plaintiff's control given close business relationship between the plaintiff and the third-party who had physical custody over the evidence). As their client, Plaintiff had the legal right and the practical ability to obtain and maintain the mirror image created by BDO. Thus, Plaintiff is responsible for the disappearance of the mirror image whether she ordered its destruction, her counsel did, or she failed to maintain a litigation hold in place sufficient to put BDO on notice to ensure it preserved the mirror image. *See In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 197 (S.D.N.Y. 2007).

Second, while there is no conclusive evidence that confirms whether the mirror image was destroyed or the exact date of that occurrence, no one disputes that it does not presently exist. Moreover, there is evidence that the mirror image likely disappeared sometime between October 28, 2017 and mid-November 2017, as Gary Pate's deposition testimony suggests. (*See* Pate Dep. at 42:5-17 (discussing BDO's practice of preserving data for a specified period of time, then giving a client the option of deleting data).) Plaintiff argues that Wesleyan cannot claim that Plaintiff's duty arose before the mirror image disappeared because this testimony is speculative. True, Mr. Pate's testimony conjecturing about the probable date the mirror image disappeared based on BDO's general business practice is not direct evidence of its destruction. Circumstantial evidence, however, may be accorded equal weight with direct evidence, *see Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184 (2d Cir. 1992); *see also United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989)

---

sanctions only for lost data that "cannot be restored or replaced through additional discovery").

("Circumstantial evidence, it should be noted, if relied upon by the jury, is of no lesser probative value than direct evidence."). As no direct or circumstantial evidence in the record contradicts the testimony of Mr. Pate, the Court will rely on his testimony that the mirror image likely disappeared between late October and mid-November of 2017.[9]

Third, Plaintiff's duty to preserve the mirror image arose before it vanished. Plaintiff retained counsel and an expert to conduct a forensic analysis of her iPhone in August 2017 when she had been formally charged with an honor code violation. Plaintiff signed an engagement letter with BDO on August 22, 2018, and BDO created the mirror image of Plaintiff's iPhone shortly thereafter. (*See* Pate Dep. at 43:8-45:18.) Then, during Plaintiff's second hearing on September 13, 2017, she indicated that she might file a lawsuit if she was unsatisfied with the outcome of the honor proceedings. (Second Hr'g Tr. at 50 (stating "if this was brought to a court of law, *which is what I will pursue if I'm not found innocent* -- you know, this is a big issue, because even the lawyers -- I mean, anyone who looks at this data would find me innocent") (emphasis added).) Afterwards, she retained second counsel (who remains her litigation counsel) on October 27, 2017. (*See* Lau Decl. ¶ 3.) Therefore, Plaintiff's duty to preserve arose at least after her second hearing or retaining counsel, before the mirror image went missing either in late October or mid-November.

The Court recognizes that this litigation did not commence until 2019 and any one of the factors discussed likely would not alone create a duty to preserve. For instance, Plaintiff's suggestion at her hearing that she might file a lawsuit does not indicate her actual intent at

---

[9] Plaintiff also argues that Plaintiff's former counsel, Mr. Wu, might have relevant testimony as to whether BDO actually informed Plaintiff or her representatives that the mirror image would be destroyed. She argues that the absence of his testimony leaves in doubt whether and when the mirror image was destroyed. (Pl.'s Sanctions Mem. at 6-7.) But the absence of testimony from a non-party who may have relevant knowledge neither confirms nor contradicts this evidence.

that time to enter litigation. But whether Plaintiff intended litigation when she hired either of her lawyers, retained BDO, or made those statements is not the relevant question. Rather, Plaintiff had a duty to preserve evidence relevant to her honor code charges the moment she *reasonably anticipated* litigation. *See Zubulake*, 220 F.R.D. at 218. Considering Plaintiff's actions and words as a whole, she reasonably anticipated litigation by September 13, 2017 when she verbally indicated that litigation might ensue (even if she did not intend to sue at that moment) or by October 27 when she retained a second attorney who now represents her in this litigation. *See, e.g.*, *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350, 354 (N.D. Ill. 2016) (concluding that the duty to preserve started when the plaintiff had made explicit references to legal action and retained the attorney who represented her in the current lawsuit); *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 377 (D. Conn. 2007) (duty to preserve evidence arose when defendants held a meeting to discuss the underlying incident because the meeting indicated that the university defendants were aware of the plaintiff's sexual misconduct allegations). Either way, Plaintiff's duty to preserve the mirror image arose before the period during which the mirror image likely was destroyed.

### 2. Culpable State of Mind

When a party has a "known duty to preserve," that party's "conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2)." *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018). Thus, whether the spoliator affirmatively destroys the data, or passively allows it to be lost, that party may be sanctioned for the spoliation of evidence. *See, e.g., Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 428-29 (W.D.N.Y. 2017) ("While knowing they had a duty to preserve the event recorder data, defendants allowed the original data on the event recorder to be overwritten . . . . On this record, the Court finds that defendants acted with the intent to deprive [plaintiff] of the use

of the event recorder data"); *Ottoson v. SMBC Leasing &Fin., Inc.*, 268 F. Supp. 3d 570, 582-83 (S.D.N.Y. 2017) (conscious failure "to take any reasonable steps to preserve" relevant communications can satisfy the intent required of Rule 37(e)(2)) (collecting cases).

The mirror image was created for only one purpose: to aid plaintiff in her defense in her case before the Honor Board. This is not data that is created or kept during the ordinary course of business or for personal use. Plaintiff knew that it was relevant to her case and because she was reasonably aware that litigation could ensue, then her failure to preserve it is sufficient to find that she acted with the intent to deprive within the meaning of the Federal Rules.

### 3. Prejudice

In the context of a motion for spoliation sanctions, "relevance" means that "the destroyed evidence would have been favorable to the movant." *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 643 F. Supp. 2d 482, 495 (S.D.N.Y. 2009); *Ungar*, 329 F.R.D. at 15 ("[W]here a party destroys the only evidence that might vindicate their opponent's claims and thereby assures victory for themselves, the deterrent purposes of the spoliation doctrine may well be served by an appropriate sanction, even without affirmative proof as to whether the evidence would have been advantageous to the movant."). "Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner." *Pension Comm.*, 685 F. Supp. 2d at 467. However, where prejudice cannot be inferred from the spoliator's state of mind, it may be proven circumstantially, in which case sanctions (other than those specifically enumerated in subdivision (e)(2)) may be awarded. *See* Fed. R. Civ. P. 37(e)(1); *Ungar*, 329 F.R.D. at 14.

The missing mirror image is relevant to Wesleyan's affirmative defense that that Plaintiff cheated on her exams, and it is prejudicial to Wesleyan, who was forced to litigate that claim without the aid of the mirror image. Plaintiff knew that the mirror image of her

iPhone was highly relevant to her Honor Board hearings because she commissioned its creation to support her defense. As discussed, the evidence establishes that Plaintiff failed to preserve the mirror image and it suggests that it could not have been deleted without her or her counsel's knowledge. Additionally, Wesleyan has established that, had the mirror image been recovered, it would either confirm or contradict the Moodle log evidence. In its absence, Plaintiff has raised doubts about the strength of the Moodle log evidence in her summary judgment arguments and would most likely raise those doubts before a jury in the event of a trial.

Plaintiff argues that Wesleyan's belief that it should prevail without this extra potentially corroborating evidence forecloses Defendant's arguments as to prejudice. This argument lacks merit. The sole dispute with respect to whether Plaintiff cheated hinges on the accuracy of the Moodle logs, which evidence Plaintiff's cheating. The deleted data would either corroborate or contradict the Moodle logs. And, although Defendant's affirmative defense did not prove necessary in the disposition of the merits, Wesleyan's prejudice also stems from the effort it undertook to litigate the spoliation issue, which would have been unnecessary had the mirror image been part of the record. Therefore, Defendant has demonstrated prejudice with respect its affirmative defense that Plaintiff violated the Student Honor Code and the expense of litigating its spoliation claim.

### 4.  Sanction

Wesleyan requests that the Court sanction Plaintiff by dismissing the case, adopt an adverse inference against Plaintiff on the merits of her claims, deny Plaintiff the privilege of anonymity, and/or award Wesleyan attorneys' fees and costs. (Def.'s Sanctions Mem. at 13.) Spoliation sanctions should be designed to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position [they] would have been in absent

the wrongful destruction of evidence by the opposing party." *West*, 167 F.3d at 779. Case-dispositive sanctions, however, "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Id.* For spoliators who have acted with the "intent to deprive" the other party of the deleted evidence, the Federal Rules provide the court with three specific sanctions: a court may (1) presume that the lost information was unfavorable to the party, (2) instruct the jury that it may or must presume the information was unfavorable to the party or (3) dismiss the action or enter a default judgment. Fed. R. Civ. P. 37(e)(2).

Respecting Wesleyan's request for dismissal and an adverse inference, Plaintiff's deleted evidence is not directly related to Plaintiff's breach of contract, negligent misrepresentation, and reckless and wanton conduct claims; even though it is relevant to Wesleyan's affirmative defense that she cheated.[10] Thus, irrespective of the prejudice to Wesleyan, it still has prevailed on the merits of those claims. As such, the Court will not sanction Plaintiff with dismissal or an adverse inference because neither sanction would appropriately restore Wesleyan to the position it would have held if the mirror image still existed.[11] *See West*, 167 F.3d at 779 (spoliation sanctions are intended to both "deter parties from engaging in spoliation" and to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party").

However, the Court grants reasonable attorneys' fees and costs to compensate for the resources Wesleyan has expended establishing and chronicling Plaintiff's destruction of

---

[10] Given that the Court has held that Wesleyan is entitled to summary judgment on Plaintiff's remaining claims, whether it should adopt an adverse inference against Plaintiff as to Wesleyan's affirmative defense is a moot issue.

[11] Similarly, the Court rejects Wesleyan's request to strip Plaintiff of her anonymity because the prejudice it has suffered is unrelated to Plaintiff's anonymity.

evidence and filing its motion for spoliation sanctions.[12] *See Experience Hendrix, LLC v. Pitsicalis*, No. 17 Civ. 1927 (PAE), 2018 WL 6191039, at *11-12 (S.D.N.Y. Nov. 28, 2018) (entitling movant to an award reflecting the reasonable attorneys' fees and costs incurred in connection with bringing and litigating a successful motion for spoliation sanctions); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-CV-1893-HRL, 2016 WL 5870218, at *7 (N.D. Cal. Oct. 7, 2016) (awarding plaintiffs attorneys' fees incurred in bringing sanctions motions).

## V.      Conclusion

For the forgoing reasons, Wesleyan's motions for summary judgment [Doc. # 235] and for sanctions [Doc. # 233] are GRANTED.

Should Wesleyan apply to the Court for reasonable attorneys' fees and costs associated with developing its motion for sanctions, it shall file its fully documented application by no later than Monday July 25, 2022. Any response by Plaintiff will be due by August 5, 2022.

IT IS SO ORDERED.



/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of July 2022

---

[12] This does not extend to fees and costs incurred in briefing Wesleyan's affirmative defense. While the availability of the mirror image may have strengthened Wesleyan's argument, Wesleyan still would have needed to argue that Plaintiff cheated as a part of its affirmative defense even with the mirror image as its aid.